# *EXHIBIT 1*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| UNITED WHOLESALE MORTGAGE, LLC, | |
| Plaintiff, | Case No. 2:24-cv-10216 |
| v. | Hon. Terrence G. Berg<br>Mag. David R. Grand |
| ATLANTIC TRUST MORTGAGE CORPORATION, | |
| Defendant. | |

**UNITED WHOLESALE MORTGAGE, LLC'S
[PROPOSED] MOTION FOR PROTECTIVE ORDER**

United Wholesale Mortgage, LLC ("UWM") moves under Federal Rule of Civil Procedure 26(c) for a protective order prohibiting the deposition of its Chief Executive Officer, Mathew Ishbia. Deposing Mr. Ishbia would impose an undue burden on him for testimony that has little to no relevance and is at best duplicative of the prior deposition of UMW's Chief Marketing Officer, Sarah DeCiantis, who testified as the UWM corporate representative in the substantially similar *UWM v. Kevron* case, and who is noticed to be deposed once again in this case. Moreover, the subjects of the deposition are either demonstrably outside of Mr. Ishbia's personal knowledge or, for those subjects on which he might have limited knowledge, the same information can be (or has been) obtained through less

1

burdensome means. The reasons supporting this motion are more fully set forth in the accompanying brief.

Under Local Rule 7.1, there have been repeated conferences between the parties' attorneys in which UWM's counsel explained the nature of the motion or request and its legal basis and requested but did not obtain concurrence in the relief sought.

WHEREFORE, UWM respectfully requests that the Court grant this motion an enter an order prohibiting the deposition of Mathew Ishbia.

Respectfully submitted,

By: */s/* _____

Roger P. Meyers (P73255)
William E. McDonald (P76709)
Moheeb H. Murray (P63893)
Mahde Y. Abdallah (P80121)
**BUSH SEYFERTH PLLC**
100 West Big Beaver Road, Suite 400
Troy, MI 48084
T/F: (248) 822-7800
meyers@bsplaw.com
mcdonald@bsplaw.com
murray@bsplaw.com
abdallah@bsplaw.com
*Attorneys for United Wholesale Mortgage, LLC*

Dated: _____.

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| UNITED WHOLESALE MORTGAGE, LLC, | |
| Plaintiff, | Case No. 2:24-cv-10216 |
| v. | Hon. Terrence G. Berg<br>Mag. David R. Grand |
| ATLANTIC TRUST MORTGAGE CORPORATION, | |
| Defendant. | |

**UNITED WHOLESALE MORTGAGE, LLC'S
<u>BRIEF IN SUPPORT OF ITS MOTION FOR PROTECTIVE ORDER</u>**

## STATEMENT OF ISSUE PRESENTED

1.      Should the Court enter a protective order precluding the deposition of UWM's CEO, Mathew Ishbia, because allowing his deposition would impose an undue burden on him and UWM in light of the relevance of the testimony to be obtained, and the means of obtaining the information sought through other less burdensome forms of discovery?

|  |  |
|---|---|
| UWM answers: | Yes. |
| Atlantic Trust answers: | No. |
| The Court should answer: | Yes. |

i

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

- *Serrano v. Cintas Corp.*, 699 F.3d 884 (6th Cir. 2012)

- *Fox v. Amazon.com, Inc.*, No. 3:16-CV-3013, 2017 WL 9476870 (M.D. Tenn. Sept. 21, 2017)

- *Overall v. Oakland Cnty.*, No. 20-12869, 2022 WL 351068, at *5 (E.D. Mich. Feb. 4, 2022)

**TABLE OF CONTENTS**

**PAGE(S)**

INTRODUCTION ........................................................................................2

BACKGROUND ........................................................................................2

    A.    Atlantic Trust breaches its agreement and UWM sues. ........................2

    B.    Atlantic Trust insists on deposing UWM's CEO. ...............................4

LEGAL STANDARD ................................................................................5

ARGUMENT .............................................................................................6

    I.    Deposing Mr. Ishbia will impose an undue burden on him and UWM. ...........................................................................................8

    II.    The topics Atlantic Trust intends to explore are irrelevant. ................10

    III.    The information to be sought from Mr. Ishbia can be—or already has been—obtained through less burdensome means. ...........14

    IV.    Mr. Ishbia has no personal knowledge of broker-specific issues that Atlantic Trust intends to question him about. .............................17

CONCLUSION .........................................................................................20

iii

# INDEX OF AUTHORITIES

**PAGE(S)**

**CASES**

*Banks v. Off. of Senate Sergeant-at-Arms*,

    222 F.R.D. 7 (D.D.C. 2004) ...............................................................................19

*Brian J. Lyngaas, D.D.S., P.L.L.C. v. Solstice Benefits, Inc.*,

    No. 22-10830, 2023 WL 6302998 (E.D. Mich. Sept. 27, 2023)................... 10, 16

*Ceiva Logic, Inc. v. Amazon.com, Inc.*,

    No. 2:19-CV-09129-AB-MAAX, 2021 WL 12349625 (C.D. Cal. Nov. 10, 2021)
    .............................................................................................................................10

*Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*,

    936 F.2d 889 (6th Cir. 1991) ....................................................................... 18, 20

*Fox v. Amazon.com, Inc.*,

    No. 3:16-CV-3013, 2017 WL 9476870 (M.D. Tenn. Sept. 21, 2017).................10

*Haydar v. Amazon Corp., LLC*,

    No. 19-2410, 2021 WL 4206279 (6th Cir. Sept. 16, 2021) ................................11

*Hemlock Semiconductor Corp. v. Kyocera Corp.*,

    No. 15-CV-11236, 2016 WL 1660862 (E.D. Mich. Apr. 27, 2016)....................11

*Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH*,

    867 F.3d 692 (6th Cir. 2017)..............................................................................13

*In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.*,

    205 F.R.D. 535 (S.D. Ind. 2002) .......................................................................20

*Katz v. Batavia Marine & Sporting Supplies, Inc.*,

    984 F.2d 422 (Fed. Cir. 1993) ..............................................................................5

# INDEX OF AUTHORITIES
## (continued)

**PAGE(S)**

*Loomis v. Unum Grp. Corp.*,

  338 F.R.D. 225 (E.D. Tenn. 2021) .........................................................................6

*McCracken v. Ford Motor Co.*,

  No. 07-CV-2018, 2009 WL 10700999 (E.D. Pa. Apr. 21, 2009) ........................14

*Mitchell v. Arnold*,

  No. 3:20-CV-00530-DJH, 2023 WL 7711478 (W.D. Ky. Nov. 15, 2023) .. 18, 20

*Mulvey v. Chrysler Corp.*,

  106 F.R.D. 364 (D.R.I. 1985)..............................................................................17

*Oppenheimer Fund, Inc. v. Sanders*,

  437 U.S. 340 (1978) ..............................................................................................5

*Overall v. Oakland Cnty.*,

  No. 20-12869, 2022 WL 351068 (E.D. Mich. Feb. 4, 2022).............. 9, 14, 16, 17

*Prosonic Corp. v. Stafford*,

  No. 2:07-CV-0803, 2008 WL 2323528 (S.D. Ohio June 2, 2008) ......................19

*Rory v. Continental Ins. Co.*,

  473 Mich. 457, 703 N.W.2d 23 (2005) ...............................................................13

*Serrano v. Cintas Corp.*,

  699 F.3d 884 (6th Cir. 2012)..............................................................................6, 11

*Sgaggio v. Diaz*,

  No. 22-CV-02043-PAB-MDB, 2023 WL 22188 (D. Colo. Jan. 3, 2023) .............9

# INDEX OF AUTHORITIES
## (continued)

**PAGE(S)**

*Tribula v. SPX Corp.*,

    No. 08-CV-13300-DT, 2009 WL 87269 (E.D. Mich. Jan. 12, 2009)..............6, 10

*UWM v. America's Moneyline, Inc., et al.*,

    Case No. 2:22-cv-10228 (E.D. Mich.) ..........................................................4, 18

*UWM v. Kevron*,

    Case No. 2:22-cv-10395 (E.D. Mich.) ........................................................ *passim*

*UWM v. Madison Atrina LLC d/b/a District Lending*,

    Case No. 2:24-cv-10216 (E.D. Mich.) .................................................... 4, 5, 17, 18

*Watson v. City of Cleveland*,

    202 F. App'x 844 (6th Cir. 2006)........................................................................17

*Zurich Ins. Co. v. CCR & Co.*,

    226 Mich. App. 599, 576 N.W.2d 392 (1997) ............................................. 12, 15

## OTHER AUTHORITIES

8A Charles Alan Wright & Arthur R. Miller,

    Federal Practice and Procedure § 2036 (3d ed. 2012) .......................................11

## RULES

Fed. R. Civ. P. 26 ........................................................................................... *passim*

**INTRODUCTION**

Atlantic Trust seeks to depose the CEO of the country's largest wholesale mortgage lender purportedly to get "answers" to irrelevant questions regarding a contract the CEO did not draft, did not negotiate, and never discussed with Atlantic Trust. The tack of deposing top-level executives like Mathew Ishbia is disfavored to begin with, but the undue burden it presents here places the deposition squarely at odds with Rule 26. Atlantic Trust either (1) already has the information it seeks, (2) will more easily obtain that information from other depositions to which UWM has already agreed or has already completed, or (3) cannot obtain the information from Mr. Ishbia due to his lack of personal knowledge. The heavy burden imposed far outweighs the slight or non-existent benefit to be gained by the intrusive deposition. The Court should enter a protective order preventing Mr. Ishbia's deposition.

**BACKGROUND**

**A.     Atlantic Trust breaches its agreement and UWM sues.**

UWM is a wholesale mortgage lender that works exclusively with independent mortgage brokers and non-delegated correspondent lenders ("Broker Partners") across the country to provide home mortgage products to borrowers. *See* ECF No. 13, PageID.80, ¶ 7. This distinguishes it from retail lenders, who deal directly with individual borrowers. *See id.*, PageID.80, ¶ 8.

Brokers who choose to work with UWM agree to the terms in a Wholesale Broker Agreement. *Id.*, PageID.81, ¶¶ 13–14; ECF Nos. 13-1, 13-2. Atlantic Trust

entered into such an agreement with UWM in January 2018. ECF No. 13, PageID.81, ¶ 13. That agreement could be amended in multiple ways, including by posting an amendment to UWM's website. *Id.*, PageID.95–96, ¶ 20; ECF No. 13-1, PageID.99, § 7.08.

On March 4, 2021, UWM publicly announced its "All-In Initiative," stating that it had decided to end its business relationships with Broker Partners who chose to continue originating loans with two retail lenders specified in the Agreement (the "Select Retail Lenders"). ECF No. 13, PageID.83, ¶ 22. To further implement the All-In Initiative, UWM amended its wholesale broker agreement to add an additional warranty and representation that a Broker Partner must make as to each submitted loan that it will not submit a mortgage loan or mortgage loan application to a Select Retail Lender (the "All-In Addendum"). *Id.*, PageID.81, 83–84, ¶¶ 14-15, 24-25. A breach of this provision entitles UWM to liquidated damages. *Id.*, PageID.84, ¶ 26.

After the announcement, Atlantic Trust ceased submitting loans to UWM for a time, but later resumed doing so, subject to the All-In Addendum. *See id.*, PageID.85–87, ¶¶ 29-45. Despite becoming subject to the All-In-Addendum, Atlantic Trust submitted mortgage loans to at least one of the Select Retail Lenders while still submitting mortgage loans to UWM. *Id.*, PageID.87–88, ¶¶ 46-50. The submissions of loans to Select Retail Lenders constituted breaches of the Wholesale Broker Agreement that are the subject of this case and others involving other

3

brokers. *See id.*; *UWM v. Kevron*, Case No. 2:22-cv-10395 (E.D. Mich.) ["*Kevron*"]; *UWM v. America's Moneyline, Inc., et al.*, Case No. 2:22-cv-10228 (E.D. Mich.) ["*America's Moneyline*"]; *UWM v. Madison Atrina LLC d/b/a District Lending*, Case No. 2:24-cv-10216 (E.D. Mich.) ["*District Lending*"]. Judgment has been entered in UWM's favor in *Kevron*; liability was found in UWM's favor in *America's Moneyline*; and *District Lending* remains pending before Judge Michelson.

### B.    Atlantic Trust insists on deposing UWM's CEO.

The defendant brokers in this case and in *District Lending* and *America's Moneyline* have the same counsel, who has made a concerted effort to force Mr. Ishbia's deposition. The issue of Mr. Ishbia's deposition was brought to the Court's attention in December. *See* Minute Entry of Dec. 11, 2025; Ex. A, Email of December 11, 2025. Atlantic Trust's counsel explained that the reason for seeking Mr. Ishbia's deposition has to do with the decision to implement the All-In Addendum:

> As to Mr. Ishbia, he was personally involved in determining the nature, amount and structure of the Liquidated Damages provision which is a central issue in this case and forms the basis of UWM's claim for damages. In the related *Kevron* matter, UWM's Chief Marketing Officer [Sarah DeCiantis] confirmed under oath that Mr. Ishbia himself (*not* through a proxy or less senior executive) was present and directly and personally involved in the implementation and contours of the liquidated damages provision. Details of the implementation and construction of the liquidated damages claim is relevant in this matter because Atlantic Trust is fully entitled to challenge the reasonableness

of the liquidated damages provision as well as its alleged nexus to actual injury suffered.

Ex. A. During the subsequent informal, off-the-record conference, the Court stated it would allow the deposition, conditioned on a very narrow scope and a four-hour limit. Atlantic Trust's counsel then tried to leverage this Court's decision in the *District Lending* case, seeking to add *hours more* to Mr. Ishbia's proposed deposition so he can be questioned about *other* issues. *District Lending*, Minute Entry of Dec. 15, 2025. Meanwhile, discovery conducted since the conference in this Court has reinforced the absence of any genuine basis for deposing Mr. Ishbia at all; yet Atlantic Trust has continued to press forward seeking to take the deposition.

## LEGAL STANDARD

Parties may seek discovery on "nonprivileged matter[s] that [are] relevant to any party's claim or defense."  Fed. R. Civ. P. 26(b)(1). But because the "potential for discovery abuse is ever-present," *Katz v. Batavia Marine & Sporting Supplies, Inc.* 984 F.2d 422, 424 (Fed. Cir. 1993), discovery "has ultimate and necessary boundaries." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).

Rule 26(c) empowers district courts to enforce those boundaries. The Rule allows a party to move for a protective order to prevent, limit, or regulate the timing of depositions "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Such a motion is properly granted upon good cause shown, meaning the movant has shown "a particular and specific

5

demonstration of fact of any enumerated harm." *Loomis v. Unum Grp. Corp.*, 338 F.R.D. 225, 229 (E.D. Tenn. 2021). "[S]howing that the proposed discovery is irrelevant can satisfy the 'good cause' requirement of Rule 26(c)." *Tribula v. SPX Corp.*, No. 08-CV-13300-DT, 2009 WL 87269, at *1 (E.D. Mich. Jan. 12, 2009).[1] Ultimately, a court must balance a party's "right to discovery with the need to prevent fishing expeditions." *Serrano v. Cintas Corp.*, 699 F.3d 884, 902 (6th Cir. 2012).[2]

## ARGUMENT

Rule 26(c) compels the prevention of UWM CEO Mathew Ishbia's deposition. Atlantic Trust's expressed reason for seeking this deposition is to press Mr. Ishbia on whether the All-In Addendum was meant to penalize brokers. But this is a straightforward breach-of-contract case where the contract language is clear and unambiguous. Indeed, the Court recently (after the December discovery conference) held in dismissing Atlantic Trust's counterclaims that, in the face of the fully integrated agreement, Atlantic Trust could not rely on alleged extrinsic terms or representations. *See* ECF No. 33, PageID.403–04.

As that ruling reinforces, the reasons for the contractual provisions are

---

[1] Unpublished cases are attached as Exhibit D.

[2] Throughout, unless otherwise noted, all emphases and alterations are added, and all internal quotation marks, citations, and footnotes are omitted.

6

irrelevant; the relevant factual issues go to what provisions Atlantic Trust agreed to and whether and to what extent it breached those provisions. These are matters Mr. Ishbia has demonstrably no personal knowledge about, so his deposition will not lead to the discovery of anything relevant. It would, however, unnecessarily burden and harass both him and UWM. A protective order preventing the deposition is warranted for that reason alone.

The burden is also entirely avoidable through numerous other means of discovery. Atlantic Trust hopes to probe into the discussion at a particular meeting. Ex. A. UWM has already agreed to produce for deposition another UWM executive: Chief Marketing Officer, Sarah DeCiantis. Ms. DeCiantis was a physically present participant at the meeting and was previously deposed on the same issues, *as corporate representative*, in the *Kevron* matter. Thus, Atlantic Trust will have access to two depositions of a senior C-suite executive (along with depositions of others) on this very topic. Atop that, UWM has even offered to produce for deposition its Chief Legal Officer, Adam Wolfe, who is the person most knowledgeable about the agreement at issue in this case, including the implementation of the All-In Addendum and associated liquidated damages provision.[3] Thus, to the extent

---

[3]   For avoidance of doubt, Mr. Wolfe would testify as to the *facts* associated with these provisions, not as to privileged communications or attorneys' mental processes. But Atlantic Trust could not properly seek to elicit such information from Mr. Ishbia, either, so it would lose no benefit to which it would otherwise be entitled

7

Atlantic Trust's desire is truly to explore these issues—despite their irrelevance—it has had ample opportunity. There is no need to subject UWM's CEO to questions Atlantic Trust either has asked or could have asked many others.

Moreover, Atlantic Trust's counsel has indicated that it intends to inquire about UWM's actions involving specific brokers and the All-In Addendum; but those are issues about which Mr. Ishbia, as CEO, would have **no** personal knowledge, as supported by both declaration and common sense. If the deposition is allowed to go forward, Mr. Ishbia will be subjected to an open-ended barrage of questioning that could serve no purpose other than to annoy and harass. Indeed, counsel's plan to delve into hours of questioning about other brokers demonstrates there can be no legitimate reason for insisting so adamantly on this deposition.

Discovery is broad, but it has limits. Where Atlantic Trust cannot show that some necessary, *relevant* information can *solely* be obtained through deposing Mr. Ishbia—after the many other forms of discovery have been exhausted—the burden imposed by his deposition cannot be justified. As such, a protective order preventing his deposition should be entered.

## I.    Deposing Mr. Ishbia will impose an undue burden on him and UWM.

Rule 26 takes account of the harm to would-be deponents in more than one way. Under subrule (b)(2)(C), "the court *must* limit" discovery when it is

---

in accepting this proposed compromise.

"unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." And under subrule (c)(1), a protective order is justified to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."

Under those standards, there is ample reason to preclude Mr. Ishbia's deposition. He would not have any personal knowledge of when Atlantic Trust entered into the Wholesale Broker Agreements. Ex. B, Decl. of Adam Wolfe. Nor would he have personal knowledge of the loans Atlantic Trust submitted. *Id.* His testimony about the All-In Addendum meeting would be duplicative of Ms. DeCiantis's past *and* already-scheduled forthcoming deposition testimony. Meanwhile, his duties as CEO are demanding. *Id.* Pulling him away from those duties to prepare and sit for a deposition would work not just a burden on him, but a burden and expense on UWM, too. *Id.*; *see also Overall v. Oakland Cnty.*, No. 20-12869, 2022 WL 351068, at *2 (E.D. Mich. Feb. 4, 2022) (recognizing the burden imposed on "high-ranking officials" by "the time that is required to prepare for depositions"); *Sgaggio v. Diaz*, No. 22-CV-02043-PAB-MDB, 2023 WL 22188, at *6 (D. Colo. Jan. 3, 2023) ("the preparation and the deposition itself can be time-consuming").

While UWM recognizes that this Court would limit the length of Mr. Ishbia's deposition to four hours, even a shortened deposition can constitute an undue burden.

9

*See Fox v. Amazon.com, Inc.*, No. 3:16-CV-3013, 2017 WL 9476870, at *2 (M.D. Tenn. Sept. 21, 2017) (ruling that "even with [a one-hour] time limitation on his testimony . . . the burden and inconvenience on Amazon and Mr. Bezos" did not justify the latter's deposition); *Ceiva Logic, Inc. v. Amazon.com, Inc.*, No. 2:19-CV-09129-AB-MAAX, 2021 WL 12349625, at *9 (C.D. Cal. Nov. 10, 2021) ("even assuming Mr. Bezos actually participated in the design and development of the Fire Tablet and Echo Show families of products, and even if his knowledge is unique, Plaintiff has not established that his knowledge on this topic would be relevant to any issue in this case").

Meanwhile, protective orders preventing the depositions of CEOs have been granted on much less of an evidentiary showing than what exists here. *See, e.g.*, *Brian J. Lyngaas, D.D.S., P.L.L.C. v. Solstice Benefits, Inc.*, Case No. 2:22-cv-10830-LVP-CI (E.D. Mich.) ECF Nos. 68, 51-3, PageID.1116. There is demonstrably no basis for believing Mr. Ishbia has knowledge on the subjects to be questioned about, and as will be explained *infra*, what limited knowledge he might possess is both irrelevant and duplicative of what other witnesses can testify to.

**II.     The topics Atlantic Trust intends to explore are irrelevant.**

The burden imposed by Mr. Ishbia's deposition is particularly pronounced given the irrelevance of the information that would be pursued in it. *See Tribula*, 2009 WL 87269, at *1 ("showing that the proposed discovery is irrelevant can satisfy

the 'good cause' requirement of Rule 26(c)"). "[D]iscovery has limits and these limits grow more formidable as the showing of need decreases. Thus, even very slight inconvenience may be unreasonable if there is no occasion for the inquiry and it cannot benefit the party making it." *Serrano*, 699 F.3d at 901 (quoting 8A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2036 (3d ed. 2012)); *see also Haydar v. Amazon Corp., LLC*, No. 19-2410, 2021 WL 4206279, at *7 (6th Cir. Sept. 16, 2021) (prohibiting deposition of CEO's administrative assistant was proper given its "the minimal probative value").

The given reason for deposing Mr. Ishbia is District Lending's belief that "[d]etails of the implementation and construction of the liquidated damages claim is [sic] relevant in this matter because Atlantic Trust is fully entitled to challenge the reasonableness of the liquidated damages provision as well as its alleged nexus to actual injury suffered." Ex. A. That is irrelevant territory for at least two reasons.

**There is no ambiguity to resolve.** This is a breach-of-contract case that involves a fully integrated agreement. *See* ECF Nos. 13, 13-2, PageID.118. Atlantic Trust has not made (nor could it make) any argument that the All-In Addendum is ambiguous. *See* ECF No. 13-2, PageID.111, 121–22, §§ 3.03(x), 7.30. So, testimony about its meaning would be irrelevant and plainly inadmissible. *See Hemlock Semiconductor Corp. v. Kyocera Corp.*, No. 15-CV-11236, 2016 WL 1660862, at *4 (E.D. Mich. Apr. 27, 2016) ("witness interpretations of unambiguous contractual

11

provisions are irrelevant"). Given that discovery is limited to matters "relevant to any party's claim or defense," Fed. R. Civ. P. 26(b)(1), such irrelevant testimony is not discoverable.

**UWM's reason for adopting the provision is irrelevant.** UWM's corporate representative was previously thoroughly questioned about the origins and basis of the All-In Addendum and liquidated damages provisions. *See Kevron*, ECF No. 41-8, PageID.1209–10, 1327–33. That testimony is the very basis for Atlantic Trust seeking Mr. Ishbia's testimony. *See* Ex. A. But far from showing the need to depose Mr. Ishbia, the testimony demonstrates the opposite. UWM's representative testified that: (1) legal counsel determined the liquidated damages amounts, (2) the decision to implement the All-In Addendum, including the damages amounts, was made at a single meeting which the corporate representative personally attended with several others, and (3) UWM's representative was "fully prepared" and had "full authority" to speak on behalf of UWM about the decision and "represent[ed] all of the information available to UWM." *Kevron*, ECF No. 41-8, PageID.1205–06, 1327, 1332, 12:21–13:23, 134:2-23, 139:9-11.

Again, this is a contract case. A party's reason for requesting particular contractual obligations is irrelevant to the issues in this case. *See Zurich Ins. Co. v. CCR & Co.*, 226 Mich. App. 599, 604, 576 N.W.2d 392, 395 (1997) ("It is beyond doubt that the actual mental processes of the contracting parties are wholly irrelevant

12

to the construction of contractual terms."); *Rory v. Continental Ins. Co.*, 473 Mich. 457, 469, 703 N.W.2d 23, 30 n.21 (2005) ("the intent of the contracting parties is best discerned by the language actually used in the contract"). UWM's reasons for amending the agreement are irrelevant.

The same conclusion applies to any further inquiry into how the liquidated damages amounts were determined. Under Michigan law, liquidated damages are measured by an objective standard of reasonableness. *Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH*, 867 F.3d 692, 706 (6th Cir. 2017). Judge Michelson's ruling in *Kevron* regarding the exact same contract language settled the question of enforceability of the liquidated-damages provision. *Kevron*, ECF No. 55, PageID.1691. This case should be no different, or at the very least, can be resolved with the same or similar evidence utilized in the *Kevron* case. *See generally id.* Mr. Ishbia's deposition was neither needed nor relevant in that case—nor is it here.

Meanwhile, if getting at the reasons for these provisions were the true reason for seeking Mr. Ishbia's deposition, then Atlantic Trust would surely get far more value from deposing UWM's Chief Legal Officer, Adam Wolfe, who is the person most knowledgeable about the agreement at issue in this case, including the implementation of the All-In Addendum and associated liquidated damages

13

provision. That Atlantic Trust rejected that option in favor of pressing for Mr. Ishbia's deposition calls deeply into question its assertions about relevance and need.

### III. The information to be sought from Mr. Ishbia can be—or already has been—obtained through less burdensome means.

Putting aside its irrelevance, the information sought from Mr. Ishbia can be (or already has been) more easily obtained through other means. That too weighs against compelling his deposition. *See* Fed. R. Civ. P. 26(b)(2)(c)(i) (discovery must be limited where it "can be obtained from some other source that is more convenient, less burdensome, or less expensive"); *Overall*, 2022 WL 351068, at *5 ("The Court may refuse to allow the deposition of the apex employee before the party makes [an] effort to depose lower-level employees who are more closely tied to the issues to be addressed."); *McCracken v. Ford Motor Co.*, No. 07-CV-2018, 2009 WL 10700999, at *1 (E.D. Pa. Apr. 21, 2009) (preventing deposition of Ford's CEO where there was "no indication that Mr. Mulally has any direct knowledge of the facts at issue in this action or that the information sought from Mr. Mullaly cannot be obtained more easily through other less obtrusive discovery").

As the Court observed, UWM (not Mr. Ishbia, personally) is the plaintiff and it is normal to expect the plaintiff to endure some burden when pursuing its case. But that is not a license to harass and oppress in the name of so-called discovery, and Rule 26(c) does not extend its protections only to defendants.

Meanwhile, UWM—through its corporate representative—was already deposed and thoroughly questioned on how the decision was reached to add the All-In Addendum. *See Kevron*, ECF No. 41-8, PageID.1209–10, 1327–33. The decision occurred in a single meeting, at which the representative was physically present and participated, and the details of the liquidated damages were defined by legal counsel.[4] *Id.* The same witness who served as UWM's corporate representative in *Kevron* is also being deposed in this case despite the near-certain duplication that will result. Moreover, Chief Legal Officer Adam Wolfe—whose deposition was also offered—has submitted a declaration confirming and describing the above facts. Ex. B.

Atop that, these facts are hardly surprising: a liquidated damages provision is a discrete legal mechanism within a legal instrument. It is the domain of lawyers, and Mr. Ishbia is not a lawyer. Like any company of its size, UWM utilizes legal staff to prepare and propose particular contracts and provisions. *Id.* A contracting party's intent is not relevant, *Zurich*, 576 N.W.2d at 395, but even if it was, Mr. Ishbia's personal testimony cannot be more probative of any relevant issue than the

---

[4] One of the avenues UWM used to announce the All-In Initiative was a Facebook Live event. *Kevron*, ECF No. 41-8, PageID.1232. Mr. Ishbia delivered that particular announcement as a spokesperson for UWM, but the decision for the Initiative was UWM's. *Id.* at 1210; Ex. B.

testimony of the actual contracting party, UWM, and of the chief architect of the agreement.

Moreover, numerous UWM witnesses, including high-level executives, have already been deposed. Justin Glass, for example, is UWM's Senior Vice President of National Accounts and was already deposed. So were Hassan Elherchi and Jessie Drury, two account executives who directly worked with Atlantic Trust. To the extent Atlantic Trust genuinely seeks testimony about UWM's interactions with Atlantic Trust, these depositions—not that of the CEO who would not interact at such a level—would be the ones with potentially relevant testimony.

If any doubt remains, however, it should fall to Atlantic Trust to make a genuine, non-speculative showing why Mr. Ishbia would actually be expected to have unique and relevant knowledge that cannot be obtained in a less burdensome fashion. That is precisely what was ordered in *Overall*:

> Thus, the Court will **GRANT** the protective order. In the event that Plaintiff takes the depositions of, or propound[s] other discovery to, those actually involved in the development and implementation of the relevant issues *and* Plaintiff makes a showing that she made reasonable efforts to obtain the needed evidence but cannot do so except via a deposition of [the contested deponent], the Court will consider lifting the protective order at that time.

2022 WL 351068, at *5 (emphasis original). *See also Brian J. Lyngaas, D.D.S., P.L.L.C. v. Solstice Benefits, Inc.*, No. 22-10830, 2023 WL 6302998, at *5 (E.D. Mich. Sept. 27, 2023) (granting protective order to prevent CEO's deposition "until

16

Plaintiff has reasonably and in good faith pursued discovery from other sources," and requiring "the exhausting [of] other sources of discovery").

Atlantic Trust should be required to first exhaust the various, significantly less burdensome avenues at its disposal, including the already-noticed deposition of a co-attendee of the All-In decision meeting and the proffered deposition of Adam Wolfe. If other sources can provide the purportedly necessary information, there is not even an arguable basis for seeking it from Mr. Ishbia. *See Watson v. City of Cleveland*, 202 F. App'x 844, 852 (6th Cir. 2006) (deposition of mayor was not permitted when information could be obtained from other members of the mayoral administration and through less burdensome forms of discovery); *Mulvey v. Chrysler Corp.*, 106 F.R.D. 364, 366 (D.R.I. 1985) (preventing deposition of Chrysler CEO and finding that "an orderly discovery process will be best served by resorting to interrogatories at this time, without prejudice to a subsequent oral deposition if the answers to the interrogatories so warrant"). Thereafter, if Atlantic Trust still contends Mr. Ishbia's deposition would provide—and is the only means of obtaining—truly relevant information, it can attempt to make a showing to justify that contention. *See Overall*, 2022 WL 351068, at *5.

## IV.   Mr. Ishbia has no personal knowledge of broker-specific issues that Atlantic Trust intends to question him about.

Originally, the given reason for deposing Mr. Ishbia was his involvement at the meeting. Ex. A. During a call with the Court in the *District Lending*, however,

Atlantic Trust's counsel expressed the intention to question Mr. Ishbia about a variety of other cases, involving other brokers. *District Lending*, Minute Entry of Dec. 15, 2025. This development provides new and independent reasons to prevent the deposition.

For context, Atlantic Trust is not the only broker to have breached the All-In Addendum. The broker in *Kevron*, for example, also did so. *See* Case No. 2:22-cv-10395, Order, ECF No. 55, PageID.1691. Similar cases are also pending. *See, e.g.*, *District Lending* and *America's Moneyline* (all three before Judge Michelson). These cases share the common nucleus of brokers breaching the All-In Addendum but are otherwise factually specific to the defendant brokers. Indeed, the motion practice in both *Kevron* and here have shown how the key legal issues turn on when and how the brokers agreed to the All-In Addendum and when they submitted loans to UWM and the Select Retail Lenders. *See generally* ECF No. 19; *Kevron*, ECF No. 55.

Multiple sworn statements confirm why Mr. Ishbia would lack personal knowledge about particular brokers and the loans they submitted. Ex. B; Ex. C, Elherchi Dep. 26:18-22. That should end the push for his deposition on those topics. *See Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991) (relying on affidavit stating deponent "had no knowledge" of the topics to be explored); *Mitchell v. Arnold*, No. 3:20-CV-00530-DJH, 2023 WL 7711478, at *4 (W.D. Ky. Nov. 15, 2023) (precluding deposition of former mayor based on "an

18

affidavit stating that he has no personal knowledge of the events" at issue). Atlantic Trust's plan to delve into these areas therefore does not justify the substantial undue burden of the deposition, much less *lengthening* that deposition *by hours*, as Atlantic Trust's counsel then turned around and sought to do via *District Lending*.

Lastly, in this area too, Atlantic Trust already had the opportunity to question a UWM witness with actual knowledge on this subject. UWM employee Heather Demy's role included gathering data on brokers and their loan closings—the very subject Atlantic Trust purportedly needs extra time to explore with Mr. Ishbia. Nothing in her testimony gave any basis to believe that Mr. Ishbia would have unique knowledge in that area. The same is true of the depositions of account executives Elherchi and Drury.

This new trajectory—in the face of other UWM employees' testimony— illustrates why the proposed deposition deserved heightened scrutiny to begin with: once the deposition commences, the door is open to an easy avenue for annoying or harassing a high-level executive. *Prosonic Corp. v. Stafford*, No. 2:07-CV-0803, 2008 WL 2323528, at *4 (S.D. Ohio June 2, 2008). ("As a general matter, of course, a witness at a deposition is required to answer even irrelevant questions"); *see also Banks v. Off. of Senate Sergeant-at-Arms*, 222 F.R.D. 7, 18 (D.D.C. 2004) (recognizing the same as a "burden" to "be endured" even though it may "waste[] everyone's time"). Although circuits vary in their approach to high-level

19

depositions, the overarching concern "is that high level executives are vulnerable to numerous, repetitive, harassing, and abusive depositions, and therefore need some measure of protection from the courts." *In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.*, 205 F.R.D. 535, 536 (S.D. Ind. 2002). Rule 26 does not countenance questioning Mr. Ishbia on these topics, nor any other not-yet-disclosed ones, where it is apparent at the outset that he has no personal knowledge to provide. *See Elvis Presley Enters., Inc.*, 936 F.2d at 894; *Mitchell*, 2023 WL 7711478, at *4.

## CONCLUSION

Deposing UWM's CEO, Mr. Ishbia, would be unduly burdensome and unjustified.   The Court therefore should enter a protective order precluding it entirely, or at minimum prohibiting it until and unless Atlantic Trust completes all other discovery and makes a detailed and non-speculative showing why Mr. Ishbia would be expected to have personal knowledge of matters that are both relevant and could not have been explored by any other discovery mechanism.

Respectfully submitted,

By: */s/*_____
Roger P. Meyers (P73255)
William E. McDonald (P76709)
Moheeb H. Murray (P63893)
Mahde Y. Abdallah (P80121)
**BUSH SEYFERTH PLLC**
100 West Big Beaver Road, Suite 400
Troy, MI 48084
T/F: (248) 822-7800
meyers@bsplaw.com

20

mcdonald@bsplaw.com
murray@bsplaw.com
abdallah@bsplaw.com
*Attorneys for United Wholesale Mortgage, LLC*


Dated: _____.

# *EXHIBIT A*

## Goldberg, Robyn

| | |
|---|---|
| **From:** | Abdallah, Mahde |
| **Sent:** | Thursday, December 11, 2025 11:43 AM |
| **To:** | Emily Vradenburg; Jason Hirsch |
| **Cc:** | Jeffrey B. Morganroth; McDonald III, William; Morrison, Lane; Murray, Moheeb; Goldberg, Robyn |
| **Subject:** | RE: [EXTERNAL] RE: United Wholesale Mortgage v Atlantic Trust, Case No. 2:24-cv-10216 |
| **Attachments:** | Ex. 1 - Atlantic Emails.pdf; Ex. 2-Defendant's Initial Disclosures.PDF |

Ms. Vradenburg,

The parties jointly submit the following statement of the discovery dispute for the Court's consideration:

Defendant Atlantic Trust seeks to depose six of United Wholesale Mortgage's ("UWM") employees, ranging from UWM's executive leadership to UWM's sales department. The requested deponents from UWM are:

- Chairman, President, and CEO Mathew Ishbia;
- Chief Marketing Officer Sarah DeCiantis;
- Chief Digital Officer Justin Glass;
- Assistant Vice President of Strategic Partnerships Heather Demy;
- Account Executive Hassan Elherchi; and
- Account Executive Jesse Drury.

UWM agreed to produce each witness for deposition except for Mr. Ishbia and Mr. Glass—the two deponents that are the subject of the instant discovery dispute.

### Defendant Atlantic Trust's Position:

Defendant's position is that it is entitled to select witnesses of its own choosing and is not limited solely to witnesses UWM determines are relevant. Defendant believes Mr. Glass and Mr. Ishbia have relevant personal knowledge of material issues in this case.

As to Mr. Glass, Defendant believes that he was personally involved in UWM's promise to provide a 60 day trial period which is directly at issue in this case through oral communications and direction to other UWM representatives. Mr. Glass was personally involved in communications wherein he sought to persuade Atlantic Trust to do business with UWM, while being fully aware that Atlantic Trust was conducting business with Rocket Mortgage. This information is directly relevant to Defendant's counterclaim which remains pending but, in any event, is relevant to Defendant's defenses because the determination of the terms of the 60 day trial period is directly relevant to any calculation of alleged damages as is the timing, nature and extent of UWM's knowledge that Atlantic Trust was conducting business with Rocket Mortgage.

As to Mr. Ishbia, he was personally involved in determining the nature, amount and structure of the Liquidated Damages provision which is a central issue in this case and forms the basis of UWM's claim for damages. In the related *Kevron* matter, UWM's Chief Marketing Officer confirmed under oath that Mr.

1

Ishbia himself (*not* through a proxy or less senior executive) was present and directly and personally involved in the implementation and contours of the liquidated damages provision. Details of the implementation and construction of the liquidated damages claim is relevant in this matter because Atlantic Trust is fully entitled to challenge the reasonableness of the liquidated damages provision as well as its alleged nexus to actual injury suffered.

**Plaintiff United Wholesale Mortgage's Positions:**

The depositions of UWM's Chairman, President, and CEO Mathew Ishbia and Chief Digital Officer Justin Glass should be forbidden under Fed. R. Civ. P. 26(c)(1) because the sought-after testimony is irrelevant under Fed. R. Evid. 401 and is sought to annoy and unduly burden the deponents. UWM's First Amended Complaint asserts only a breach-of-contract claim against Atlantic Trust for breach of the All-In Addendum to the parties' Wholesale Broker Agreement, which prohibited Atlantic Trust from sending loans to certain retail lenders while doing business with UWM. Issues relevant to the ultimate inquiry of the case are therefore simple and limited to whether Atlantic Trust agreed to the All-In Addendum, whether Atlantic Trust breached the Addendum by submitting loans to the lenders, and determining the number of times Atlantic Trust closed loans with those lenders to calculate liquidated damages. But Atlantic Trust seeks discovery that has no bearing on these issues.

Atlantic Trust claims that it seeks to depose Mr. Glass in relation to a 60-day trial period that Atlantic Trust entered with UWM. But it was a different deponent, Hassan Elherchi, that proposed the 60-day trial. *See* attached Ex. 1. Further, the relevance of the 60-day trial is subject to the Court denying UWM's pending Motion to Dismiss Atlantic Trust's Counterclaim. ECF No. 23.

Atlantic Trust also claims to want to depose Mr. Ishbia regarding the All-In Addendum's liquidated-damages provision. But Mr. Ishbia's testimony has no relevance to the liquidated-damages provision's validity. Liquidated damages provisions are sustained "if the amount is reasonable with relation to the possible injury suffered," "not unconscionable or excessive," and "unless 'it is obvious from the contract . . . that the principle of compensation has been disregarded.'" *UAW-GM Hum. Res. Ctr. v. KSL Recreation Corp.*, 579 N.W.2d 411, 421 (Mich. Ct. App. 1998); *Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH*, 867 F.3d 692, 706 (6th Cir. 2017). These are legal questions based on the Wholesale Broker Agreement that are not reserved for Mr. Ishbia. Further, the validity of the liquidated-damages provision has already been upheld in analogous cases before the Hon. Laurie J. Michelson, one of which involves the same counsel. *See United Wholesale Mortg., LLC v. Am.'s Moneyline*, Inc., No. 22-10228, 2025 WL 1819015 (E.D. Mich. July 1, 2025); *United Wholesale Mortg., LLC v. Kevron Invs., Inc.*, No. 22-10395, 2025 WL 968895 (E.D. Mich. Mar. 31, 2025). Additionally, questions regarding the liquidated-damages provision can be directed to UWM's corporate representative (Chief Marketing Officer Sarah DeCiantis), as was done in the *Kevron* matter, because the testimony would be duplicative among those present at the meeting wherein the All-In Addendum was discussed.

Finally, the true motive behind the depositions is to annoy and unduly burden Mr. Ishbia and Mr. Glass, as Atlantic Trust seeks to depose them on a host of irrelevant issues, including the purported "true goals behind the Ultimatum" or UWM's purported "decision to permit some independent mortgage brokers to continue to do business with both UWM and Rocket Pro." Ex. 2, Atlantic Trust's Initial Disclosures, at p. 4.

Thank you,

**Mahde Y. Abdallah** | Senior Associate | **Bush Seyferth PLLC** | Tel/Fax: (248) 822-7860 | Cell: (313) 727-9999 | abdallah@bsplaw.com

---

**From:** Emily Vradenburg <Emily_Vradenburg@mied.uscourts.gov>
**Sent:** Wednesday, December 10, 2025 3:44 PM
**To:** Jason Hirsch <JHirsch@morganrothlaw.com>
**Cc:** Jeffrey B. Morganroth <JMorganroth@morganrothlaw.com>; Abdallah, Mahde <abdallah@bsplaw.com>; McDonald III, William <McDonald@bsplaw.com>; Morrison, Lane <morrison@bsplaw.com>; Murray, Moheeb <murray@bsplaw.com>
**Subject:** [EXTERNAL] RE: United Wholesale Mortgage v Atlantic Trust, Case No. 2:24-cv-10216

> Some people who received this message don't often get email from emily_vradenburg@mied.uscourts.gov. Learn why this is important

Hello again,

In preparation of the status conference this coming Friday, could counsel please provide the court with a little more information on the discovery dispute by noon, tomorrow?

A joint response to this email would be sufficient.

Thank you.

*Emily Vradenburg*

Case Manager to the
Honorable Terrence G. Berg
U.S. District Court – Eastern District of Michigan
313-234-2644
Emily_vradenburg@mied.uscourts.gov

---

**From:** Emily Vradenburg
**Sent:** Wednesday, December 10, 2025 1:37 PM
**To:** 'Jason Hirsch' <JHirsch@morganrothlaw.com>
**Cc:** Jeffrey B. Morganroth <JMorganroth@morganrothlaw.com>; Abdallah, Mahde <abdallah@bsplaw.com>; McDonald III, William <mcdonald@bsplaw.com>; Morrison, Lane <morrison@bsplaw.com>; Murray, Moheeb <murray@bsplaw.com>
**Subject:** RE: United Wholesale Mortgage v Atlantic Trust, Case No. 2:24-cv-10216

Good afternoon,

2:00 p.m. on Friday, 12/12 works for the Court.
An NEF will be sent through CM/ECF with instructions on how to dial in.

Thank you!

*Emily Vradenburg*

Case Manager to the
Honorable Terrence G. Berg
U.S. District Court – Eastern District of Michigan
313-234-2644
Emily_vradenburg@mied.uscourts.gov

---

**From:** Jason Hirsch <JHirsch@morganrothlaw.com>
**Sent:** Wednesday, December 10, 2025 9:32 AM
**To:** Emily Vradenburg <Emily_Vradenburg@mied.uscourts.gov>
**Cc:** Jeffrey B. Morganroth <JMorganroth@morganrothlaw.com>; Abdallah, Mahde <abdallah@bsplaw.com>; McDonald III, William <mcdonald@bsplaw.com>; Morrison, Lane <morrison@bsplaw.com>; Murray, Moheeb <murray@bsplaw.com>
**Subject:** RE: United Wholesale Mortgage v Atlantic Trust, Case No. 2:24-cv-10216

<mark>CAUTION - EXTERNAL:</mark>

Ms. Vradenburg,

2pm will work for all counsel if that is still available. Thank you.

Sincerely,

Jason R. Hirsch
**Morganroth & Morganroth, PLLC**
344 North Old Woodward Avenue, Suite 200
Birmingham, Michigan 48009
(248) 864-4000 ext. 120
(248) 864-4001 (facsimile)
jhirsch@morganrothlaw.com
https://www.morganrothlaw.com/

  

This e-mail is subject to the attorney/client and attorney work product privileges.

---

**From:** Emily Vradenburg <Emily_Vradenburg@mied.uscourts.gov>
**Sent:** Tuesday, December 9, 2025 2:12 PM
**To:** Jason Hirsch <JHirsch@morganrothlaw.com>
**Cc:** Jeffrey B. Morganroth <JMorganroth@morganrothlaw.com>; Abdallah, Mahde <abdallah@bsplaw.com>; McDonald III, William <mcdonald@bsplaw.com>; Morrison, Lane <morrison@bsplaw.com>; Murray, Moheeb <murray@bsplaw.com>
**Subject:** RE: United Wholesale Mortgage v Atlantic Trust, Case No. 2:24-cv-10216

Good afternoon, Counsel,

We have an opening for a telephonic status conference this Friday, 12/12 anytime between 10:00 a.m. and 11:00 a.m. or between 2:00 p.m. and 3:00 p.m.

Please confer and advise which time works best for everyone.

Thank you,


*Emily Vradenburg*

Case Manager to the
Honorable Terrence G. Berg
U.S. District Court – Eastern District of Michigan
313-234-2644
Emily_vradenburg@mied.uscourts.gov

---

**From:** Jason Hirsch <JHirsch@morganrothlaw.com>
**Sent:** Monday, December 8, 2025 8:45 AM
**To:** Emily Vradenburg <Emily_Vradenburg@mied.uscourts.gov>
**Cc:** Jeffrey B. Morganroth <JMorganroth@morganrothlaw.com>; Abdallah, Mahde <abdallah@bsplaw.com>; McDonald III, William <mcdonald@bsplaw.com>; Morrison, Lane <morrison@bsplaw.com>; Murray, Moheeb <murray@bsplaw.com>
**Subject:** United Wholesale Mortgage v Atlantic Trust, Case No. 2:24-cv-10216

CAUTION - EXTERNAL:

Ms. Vradenburg:

I write in connection with the above-referenced case.

In accord with Judge Berg's Discovery Practice Guideline, Paragraph E, Defendant, Atlantic Trust, respectfully requests that a telephone conference with the Court to resolve a discovery dispute be scheduled on a mutually convenient date and time. The parties have met and conferred as required by Judge Berg's Discovery Dispute Practice Guidelines, but were unable to resolve the dispute.

The dispute revolves around Defendant's request to conduct depositions of certain representatives of UWM whom UWM has declined to produce for deposition.

All counsel have been cc'd on this email.

Sincerely,

Jason R. Hirsch

**Morganroth & Morganroth, PLLC**
344 North Old Woodward Avenue, Suite 200
Birmingham, Michigan 48009
(248) 864-4000 ext. 120
(248) 864-4001 (facsimile)
jhirsch@morganrothlaw.com
https://www.morganrothlaw.com/



This e-mail is subject to the attorney/client and attorney work product privileges.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

# *EXHIBIT B*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

UNITED WHOLESALE
MORTGAGE, LLC,

     Plaintiff/Counter-Defendant,

v.

ATLANTIC TRUST
MORTGAGE CORPORATION,

     Defendant/Counter-Plaintiff.

Case No. 2:24-cv-10216

Hon. Terrence G. Berg
Mag. David R. Grand

---

## DECLARATION OF ADAM WOLFE

Pursuant to 28 U.S.C. § 1746, I, Adam Wolfe, hereby declare and state as follows:

1. I am over the age of 18 and am a resident of the State of Michigan. I have personal knowledge of the facts in this affidavit and, if called as a witness, could testify competently to them.

2. I serve as Chief Legal and Administrative Officer of United Wholesale Mortgage, LLC ("UWM").

3. Through my role, I am familiar with the executive operations of UWM, including the schedule, duties, and obligations of UWM's Chief Executive Officer, Mathew Ishiba, in those operations.

4. UWM is the largest mortgage lender in the United States.

5. As CEO of UWM, Mr. Ishbia's work days are routinely packed with meetings, most of which he leads.

6. These meetings involve significant decision-making for UWM for which the coordination of multiple attendees' schedules is essential and at which Mr. Ishbia's attendance is indispensable.

7. Through my role and work with Mr. Ishbia, I am also familiar with how his role as co-owner of professional sports franchises (i.e., the NBA's Phoenix Suns and WBNA's Phoenix Mercury) taxes his schedule and availability beyond his responsibilities at UWM.

8. I am aware that in this lawsuit UWM has alleged breach of contract committed by Atlantic Trust Mortgage Corporation relating to provisions connected to the All-In Initiative.

9. I understand that counsel for Atlantic Trust seeks to depose Mr. Ishbia for multiple hours.

10. I further understand that Mr. Ishbia's deposition is likely to involve questioning about decision-making that would have occurred over five years ago, with a particular emphasis on the liquidated damages provisions in Wholesale Broker Agreements.

11. As Chief Legal and Administrative Officer, I was responsible for the changes to Wholesale Broker Agreements in 2021. This responsibility included the

2

determination of what legal mechanisms would be utilized within those agreements, including liquidated damages.

12. Determining the basis and amount of liquidated damages to propose for approval was a legal decision made by myself and those under my purview.

13. I was in attendance at the meeting at which the decision to implement changes to Wholesale Broker Agreements was made. That decision was guided by the recommendations prepared by myself and others on the legal team.

14. The numbers for the liquidated damages provision ultimately adopted were those prepared and proposed by the legal team, under my supervision, prior to the meeting.

15. From 2021 through the present, Mr. Ishbia has had no personal involvement in, and thus would be unlikely to have any personal knowledge about, Atlantic Trust's agreements with UWM or about its particular submissions of loans to UWM or other entities.

16. I am familiar with the process of preparing a witness for deposition, the demands of being deposed, and many of the costs and complications likely to be incurred by UWM due to the deposition of Mr. Ishbia.

17. Based on the foregoing, and in addition to the time significant time I would anticipate would be required to properly prepare Mr. Ishbia for deposition,

committing him to a deposition of any length in this case would significantly hamper UWM's ability to conduct its operations.

18.    Among other burdens, Mr. Ishbia's inability to attend to his obligations or to have his travel schedule disrupted due to a deposition would require significant staffing and other resources to be diverted at significant cost to UWM.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed on ____3/24/26_____, 2026.

_____
Adam Wolfe

4

# *EXHIBIT C*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED WHOLESALE MORTGAGE,

LLC,

  Plaintiff/Counter-Defendant,     Case No. 2:24-cv-10216

vs.                           Hon. Terrence G. Berg

ATLANTIC TRUST MORTGAGE,       Mag. David R. Grand

CORPORATION,

  Defendant/Counter-Plaintiff.


VIDEOTAPED DEPOSITION


DEPONENT:      HASSAN ELHERCHI

DATE:         Tuesday, March 10, 2026

TIME:         10:01 a.m.

LOCATION:     Bush Seyferth PLLC

              100 W. Big Beaver Road, Suite 400

              Troy, Michigan

REPORTER:     Elizabeth G. LaBarge, CSR-4467

VIDEOGRAPHER:  Bailey Wellman

JOB NO:       50812

## Nationwide Litigation Support Solutions

▶ Court Reporting    ✉ production@fortzlegal.com
▶ Process Service    📞 844.730.4066
▶ eDiscovery
▶ Document Solutions
▶ Trial Support



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED WHOLESALE MORTGAGE,

LLC,

  Plaintiff/Counter-Defendant,    Case No. 2:24-cv-10216

vs.    Hon. Terrence G. Berg

ATLANTIC TRUST MORTGAGE,    Mag. David R. Grand

CORPORATION,

  Defendant/Counter-Plaintiff.




VIDEOTAPED DEPOSITION


| | |
|---|---|
| DEPONENT: | HASSAN ELHERCHI |
| DATE: | Tuesday, March 10, 2026 |
| TIME: | 10:01 a.m. |
| LOCATION: | Bush Seyferth PLLC |
| | 100 W. Big Beaver Road, Suite 400 |
| | Troy, Michigan |
| REPORTER: | Elizabeth G. LaBarge, CSR-4467 |
| VIDEOGRAPHER: | Bailey Wellman |
| JOB NO: | 50812 |

UNITED WHOLESALE MORTGAGE v ATLANTIC TRUST MORTGAGE          Job 50812
ELHERCHI, HASSAN 03/10/2026                                           2

APPEARANCES:

     BUSH SEYFERTH PLLC

     By:  Mahde F. Abdallah, Esq.

     100 W. Big Beaver Road, Suite 400

     Troy, Michigan  48084

     (248) 822-7800

     abdallah@bsplaw.com

          Appearing on behalf of the Plaintiff.


     MORGANROTH & MORGANROTH, PLLC

     By:  Jason R. Hirsch, Esq.

     344 North Old Woodward Avenue, Suite 200

     Birmingham, Michigan  48009

     (248) 864-4000

     jhirsch@morganrothlaw.com

          Appearing on behalf of the Defendant.

I   N   D   E   X

W I T N E S S

    HASSAN ELHERCHI                                          PAGE

Examination by Mr. Hirsch                                      6

Examination by Abdallah                                       68

Re-Examination by Mr. Hirsch                                  71


                    E  X  H  I  B  I  T  S

NUMBER        DESCRIPTION                                   PAGE

Exhibit 1    First Amended Complaint . . . . . . . .         38

Exhibit 11   12/12/22 email chain

             (ATLANTIC 000001 - 000006) . . . . . . .        40

Exhibit 14   2/5/24 email

             (UWM_ATLANTIC000001 - 000003) . . . . . .       65

Exhibit 15   5/23/24 letter (UWM_ATLANTIC000159)  . .        60

Exhibit 16   Flowchart (UWM_ATLANTIC000160) . . . . .        54

Exhibit 19   Hassan Elherchi LinkedIn profile . . . .         8

                    *       *       *

Tuesday, March 10, 2026

Troy, Michigan

10:01 a.m.

\*     \*     \*

VIDEOGRAPHER:  Good morning.  We are now on the record at 10:01 a.m. on Tuesday, March 10th, 2026. This begins the videotaped deposition of Hassan Elherchi taken in the matter of United Wholesale Mortgage LLC verse Atlantic Trust Mortgage Corporation, Case Number 24-cv-10216.  We are taking this deposition at the offices of BSP Law in Troy, Michigan.  My name is Bailey Wellman, your legal videographer today, representing Fortz Legal Support.

Counsel, will you please state your name and whom you represent, after which our court reporter will swear in the witness.

MR. ABDALLAH:  Good morning.  Mahde Abdallah on behalf of the Plaintiff United Wholesale Mortgage.

MR. HIRSCH:  Jason Hirsch for Defendant Atlantic Trust.

COURT REPORTER:  And I will swear you in if you'll raise your right hand.

Do you solemnly swear or affirm the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

MR. ELHERCHI:  Yes.

MR. ABDALLAH:  Jason, before we start, I forgot to mention before we went on the record, Mr. Elherchi has a family -- a sensitive family situation, so there is a chance that he gets a phone call during the deposition, so we'd just ask that if he does get that call -- his phone is on him, if he does get that call, we're just going to ask that we break off -- he'll answer the pending question, but we break off the record so he can attend to that situation.

MR. HIRSCH:  Right, and I'll tell him in a second about breaks, but I appreciate that --

MR. ABDALLAH:  Sure.

MR. HIRSCH:  -- and I understand that, so you'll --

THE WITNESS:  Thank you.

MR. HIRSCH:  -- let me know if I don't hear it or --

THE WITNESS:  Oh, no, she's okay, yeah, hopefully.

MR. HIRSCH:  Okay.  Good morning, sir.  My name is Jason Hirsch, I'm one of the attorneys for Defendant in this matter.

Let the record show that this is the

deposition of Hassan Elherchi taken pursuant to notice under the Federal Rules of Civil Procedure.

H A S S A N   E L H E R C H I

having been first duly sworn, was examined and testified as follows:

E X A M I N A T I O N

BY MR. HIRSCH:

Q   Sir, you understand you were just sworn in.  I'll be asking you a series of questions and you understand that your answers are going to be given under oath, correct?

A   Yes.

Q   And please make sure you answer all my questions verbally so that they can be recorded by our court reporter, okay?

A   Yes.

Q   And please make sure to let me finish my entire question before you start your answer, both to make sure that you understand the question and because our court reporter can't record two of us talking over each other, okay?

A   Yes.

Q   And we just talked a little bit about breaks, but if you need a break at any time, sir, other than when a question is pending, please let me know and we'll

certainly take a break, okay?

A    Yes.

Q    And if you don't understand a question at any time, please let me know and I'll try to clarify the question, okay?

A    Yes.

Q    And if at any time I interrupt you or you haven't completed your answer, please let me know and I'll let you finish your answer for the record, okay?

A    Yes.

Q    Sir, could you state your full name for the record?

A    Yeah.  Hassan Elherchi.

Q    Sir, could you tell me about your education, beginning with undergraduate college forward?

A    Yes.  I started at Henry Ford Community College and then I moved on to get my Bachelor's at Wayne State University.

Q    And for what period of time were you at Henry Ford Community College?

A    It would have been right after high school, which would have been 2013.

Q    And for what period of time were you at Wayne State?

A    I'm not 100 percent of the exact year I started, but I want to say it was 2015, if I'm not mistaken.

                MR. HIRSCH:  Can you mark this as 19,

please.

(Exhibit 19 marked for identification.)

BY MR. HIRSCH:

Q    Sir, we just handed you what we've marked as Exhibit 19, and if you'd take a moment to take a look at it and tell me if you recognize that document?

A    Yes, I do.

Q    And what is it?

A    It looks like it's my LinkedIn profile.

Q    Okay.  And on your LinkedIn profile on the third page under education, it lists Wayne State, 2017 to 2019; do you see that, sir?

A    Yes.

Q    Are those dates correct?

A    Yes.

Q    Okay.  And this particular LinkedIn profile doesn't -- does not list Henry Ford, correct?

A    That is correct.

Q    Any reason for that?

A    No reason.

Q    And you got a Bachelor's degree in finance and financial management services; is that correct?

A    Yes.

Q    Would that be a B.S. or a B.A.?

A    B.A.

Q   And do you have any other formal education beyond the B.A. from Wayne State?

A   No.

Q   Do you hold any professional licenses?

A   No.

Q   I'd like to move now to your employment history.  Can you tell me about your employment history beginning with -- well, can you tell me about your employment history from high school forward?

A   Yes.  After high school, I worked at a hookah lounge in Dearborn.  From there I moved over to TCF Bank. After TCF Bank, I went to Chase Bank.  And then I joined UWM.

Q   And for what period of time did you work at the hookah lounge?

A   Roughly about a year and a half.

Q   Do you remember the dates?

A   Not the exact dates, but the years, it would have been 2013 to roughly mid 2014.

Q   And the next job you told me about was TCF Bank, correct?

A   Yes.

Q   And if you look on page -- starting at the bottom of page 2, but over to page 3 of Exhibit 19, you list TCF Bank there; do you see that?

A    Yes.

Q    Okay.  And you worked there from July 2015 to
July 2017; is that correct?

A    Yes.

Q    Okay.  And it says here you were branch manager; is
that correct?

A    Yes.

Q    Did you hold any other positions with TCF Bank?

A    I started as a teller.  Became a supervisor after
that.

Q    And then branch manager?

A    Then branch manager, yes.

Q    What were your duties as a teller at TCF Bank?

A    Basically, deposits, withdrawals, transfers, just
basic banking, so...

Q    What were your duties as a supervisor at TCF Bank?

A    To oversee tellers, you know, approve any limits that
are above a regular teller's limit.

Q    What were your duties as branch manager at TCF Bank?

A    Supervisor duties, but along with that, we would, you
know, help clients with opening safe deposit box,
credit cards, accounts, as well.

Q    Did you have any involvement with mortgages at
TCF Bank?

A    No.

Q    The next job listed on Exhibit 19 is JPMorgan Chase; is that correct?

A    Yes.

Q    And that's from July 2017 to April 2019; are those dates correct?

A    Yes.

Q    And according to Exhibit 19, the LinkedIn profile, it says private client manager; is that correct?

A    It should be private client banker.  Private client manager was the only toggle available.

Q    Private client banker.  Did you hold any other positions at Chase Bank?

A    I started as a personal banker and then I moved to a private client banker.

Q    What were your duties as a personal banker at JPMorgan Chase?

A    Opening up accounts, assisting the tellers if they needed help, welcoming people into the branch, helping them with the ATM inside the branch.

Q    And what were your duties as a private client banker at JPMorgan Chase?

A    Mainly, opening accounts for -- well, I would say a private client.  Private clients, excuse me.

Q    What does "private client" mean in that context?

A    Somebody who's a client of JPMorgan as well as Chase

Bank, so if they had assets with JPMorgan.

Q    And the next position listed here is with United Wholesale Mortgage, correct?

A    That is correct.

Q    And it says you held that position beginning in April 2018 to the present; is that correct?

A    No, there's a typo there, it's 2019 April.

Q    And you're still at UWM, correct?

A    Yes, correct.

Q    And did you hold any positions between July 2017 when you left TCF and April 2019 when you went over to UWM?

         MR. ABDALLAH:  Objection, form.

         THE WITNESS:  I'm sorry, could you repeat that question?  I'm not understanding what you're asking.

BY MR. HIRSCH:

Q    Well, let me ask a slightly different question.  I think we talked a moment ago about the time frame you had listed for TCF Bank on the LinkedIn profile and it says that that position ended in July 2017, correct?

A    Correct.

Q    Oh, I'm sorry, I was -- I apologize, I was looking at TCF.

A    Yep.

Q    Oh, I see, okay.  So it's April 2019 at UWM, and that

was the follow-on to JPMorgan, got it.  I got that right now, correct?

A   Yes.

Q   All right, thank you.

    UWM, the position listed is account executive; is that correct?

A   Yes.

Q   Did you hold any other positions with UWM?

A   Yes.

Q   What other positions did you hold with UWM?

A   Team lead and senior account executive.

Q   What period of time were you a team lead at UWM?

A   It was in 2023 -- or, I'm sorry, I apologize -- 2021 for three months.

Q   And what period of time were you a senior account executive at UWM?

A   I don't recall the exact time frame of when I became a senior, but it was roughly in the 2022 year.

Q   And is that your current position, senior account executive?

A   Yes.

Q   Okay.  And what period of time were you an account executive at UWM?

A   It would have been from 2019 until I became a senior, which would have been 2022.

Q   And you were a team lead in between for some time in 2021, correct?

A   Yes.

Q   What were your duties as a team lead at UWM?

A   Helping the account executives on my team, assisting them with their accounts, and training them.

Q   How many account executives were on your team?

A   Roughly about eight to ten, depending on the time frame.

Q   Can you tell me any of the ones you remember?

A   Any of the account executives that were on my team that I remember?

Q   Yes, any names you remember?

A   Yes.  Emily Wolford.  Mohamad Assaf.  Who else was on my team?  Colleen Smith.  Jasmine Taylor.  That's as much as I can remember.

Q   Okay.  What were your duties as an account executive at UWM?

A   Overseeing my accounts, assisting them with loan scenarios.  Importing loans into the system.

Q   What do you mean by assist with loan scenarios?

A   If they would reach out to me and ask me about a question, for example, on an FHA loan, am I able to have two FHA mortgages, what are the guidelines for that, I would then look up the guidelines and assist

them with the answers.

Q    And when you say -- I think you said importing loans was one of your duties to --

A    Yes, importing into our system, into our pipeline.

Q    Where would they be imported from?

A    Whatever LOS they're using, their loan origination system -- sorry -- that they're using, they would have to transfer it from that into the UWM portal.

Q    So some broker partner would be using a loan origination system, and if they needed assistance getting it over to UWM's system, you -- that would be one of your duties?

A    Yes.

Q    And then were there any differences in your duties when you became a senior account executive?

A    No, just the title change.

Q    Okay.  And if you look on the first page of Exhibit 19 under your name, you say top ten producer, do you see that?

A    Yes.

Q    What does that mean?

A    Top ten sales guy in the company based on production.

Q    And what does production mean, is that number of loans or --

A    Yes.

Q    -- volume --

A    Units.

Q    Units.

A    Um-hmm.

Q    And for what period of time?

A    For that year.

Q    Are you currently a top ten producer?

A    Yes.

Q    For what years have you been a top ten producer?

A    2021 was my first year, 2022, '23, '24, '25 and...

Q    We don't know about '26 yet?  Okay.

A    Hopefully.

        Oh, I do apologize, I'm sorry.  For 2023, I
was not.

Q    Okay.

A    Thank you.  Sorry.

Q    Also below your name on 19 it says Champions Club.

        What does that mean?

A    It's a similar metrics, where they, based on your
tenure, if you were top five in your tenure.  Based on
production in units, as well.

Q    So when you say based on your tenure, that means
for -- as compared to people that were there the same
length -- there at UWM the same length of time as you?

A    Yes.

Q    And for what years were you in the Champions Club?

A    2021, '22, '23, '24, and '25.

Q    Do you know why you're being deposed today?

A    Yes.

Q    And why is that?

A    There is a -- I believe there is a active lawsuit between UWM and Atlantic Trust.

Q    And are you aware that you are identified by UWM as a person who might have information about certain topics related to this case?

A    Yes.

Q    What do you know about this case?

          MR. ABDALLAH:  Objection to form.  You can answer.

A    Simply that UWM -- or I believe Atlantic Trust was using Rocket while still in an agreement with UWM.

BY MR. HIRSCH:

Q    When did you first learn about this case?

A    When it was presented to me by our attorneys, by my counsel.

Q    I don't want to know about any conversations you had with counsel, but can you give me a date or a date range?

A    I don't recall the exact date range.

Q    What knowledge do you have about -- well, strike that.

What was your role with respect to Atlantic Trust?

A    I was their account executive.

Q    For what period of time?

A    The end of 2022 to about April/May of 2023.

Q    Was there an account executive assigned to Atlantic Trust before you?

MR. ABDALLAH:  Objection, form.

A    Well, when they were with UWM previously, there was an account executive who was assigned to them, but after they came back to UWM, it was me first.

BY MR. HIRSCH:

Q    Do you know who it was when they -- when Atlantic Trust was previously with UWM?

A    No.

THE WITNESS:  Sorry.

MR. ABDALLAH:  That's okay.

BY MR. HIRSCH:

Q    And you said you were the account executive through April or May 2023, correct?

A    Yes.

Q    Was there any account executive assigned after that time?

A    Yes.

Q    Who was the account executive assigned after that

time?

A    Jessie Drury.

Q    Why was it that Mr. Drury became the account executive after around April or May 2023?

              MR. ABDALLAH:  Objection, foundation.

A    A broker requested it.

BY MR. HIRSCH:

Q    Meaning Atlantic Trust requested that?

A    Yes.

Q    Do you know why Atlantic Trust requested a different AE?

A    No.

Q    What knowledge do you have about Atlantic Trust's agreement to UWM's wholesale broker agreements?

A    Simply that they decided to be all in with UWM.

Q    Did they ever tell you they decided to be all in with UWM?

A    They signed the broker package.

Q    How do you know they signed the broker package?

A    In order to get signed back up with us, that's part of the process.

Q    You never saw any signed Wholesale Broker Agreement executed by a representative of Atlantic Trust, correct?

A    I was a part of the emails where the broker agreement

UNITED WHOLESALE MORTGAGE v ATLANTIC TRUST MORTGAGE
ELHERCHI, HASSAN 03/10/2026

Job 50812
20

was sent to them and then they sent it back signed, but I never physically opened it and saw it signed.

Q    What knowledge do you have about Atlantic Trust's submission of mortgage loans to Rocket Mortgage after March 4th, 2021?

A    I don't have any knowledge of that.

Q    Do you have any knowledge about Atlantic Trust's submissions of mortgage loans to Fairway since March 4th, 2021?

A    No.

Q    Do you know the significance of the date March 4th, 2021?

A    No.

Q    Do you know the date that UWM made the announcement of its all-in initiative?

A    No.

Q    Do you have any knowledge of Atlantic Trust's loans submitted to Rocket Mortgage prior to March 4th, 2021?

A    No, I do not.

Q    Do you know if UWM monitored mortgage loans or loan applications sent by its broker partners to Rocket Mortgage prior to March 4th, 2021?

        MR. ABDALLAH:  Objection, form and foundation.

A    I don't know.

BY MR. HIRSCH:

Q    Would your answer be the same as to monitoring loans broker partners made to Fairway?

A    Yeah, I also don't know.

Q    Do you know if UWM monitored loans broker partners sent to Rocket Mortgage after March 4th, 2021?

          MR. ABDALLAH:  I'm going to object to form and foundation.

          You can answer.

A    Yes.

BY MR. HIRSCH:

Q    Do you know why UWM monitored that?

A    No.

Q    Do you know what tools UWM used to monitor that?

A    No.

Q    Do you know who was responsible for monitoring that?

A    No.

Q    I take it you were not responsible for monitoring that?

A    No.

Q    And you were not responsible for monitoring that as to broker partners for whom you were the account executive?

A    No, I was not in charge of monitoring for my own brokers either.  I'm sorry I said -- just to clarify.

Q   I got it, thank you.  Do you know if UWM had any
    written policies about how it would monitor loans
    broker partners were sending to other lenders?

A   No.

Q   Have you ever prepared any list of loans Atlantic
    Trust sent to Rocket Mortgage?

A   No.

Q   Have you ever seen a list of loans that Atlantic Trust
    sent to Rocket Mortgage?

A   No.

Q   Have you ever prepared a list of loans that Atlantic
    Trust sent to UWM?

A   No.

Q   Have you ever seen such a list?

A   In my pipeline, but I never seen a list of loans that
    they sent to UWM other than loans that they imported
    to my pipeline.

Q   So when you say your pipeline, you would see
    individual loans as they'd come through; is that
    correct?

A   Yes.

Q   But you never saw it compiled in aggregate on a list
    for some time period?

A   No.

Q   Have you ever seen the First Amended Complaint filed

in this case?

A    No.

Q    Were you ever consulted about the allegations made by UWM in this case?

A    No.

Q    Have you ever seen the counterclaim filed by Atlantic Trust in this case?

A    No.

            THE WITNESS:  Am I okay to just reach for this?  I'm --

            MR. ABDALLAH:  Yeah.

            THE WITNESS:  -- getting one, I just want to make sure.

            MR. ABDALLAH:  Can we take a break?

            THE WITNESS:  No, no, we're okay, it's fine. Thank you.  Sorry.

            MR. HIRSCH:  Just let me know.

            THE WITNESS:  Yeah, thank you.

BY MR. ABDALLAH:

Q    You are familiar with UWM's all-in initiative, correct?

A    Yes.

Q    What is it?

A    The broker is either all in with UWM and 73 other lenders or Rocket and Fairway and 73 other lenders.

Q   You said brokers are either all in with UWM and 73
other lenders, did you say?

A   Yes.

Q   What do you mean, what are those 73 other lenders?

A   So you can either work with UWM and the 73 other
lenders that are available to them or Rocket and
Fairway and the 73 other lenders that are available to
them.  That number may have changed from when the
initiative came out, but basically, you can work with
UWM and other lenders or Rocket and Fairway and other
lenders.

Q   So when you say 73 lenders, you're just referring to
every other lender except Rocket Mortgage and Fairway;
is that correct?

A   Yes.

Q   When did you first become familiar with the all-in
initiative?

A   When Mat announced it.

Q   And when you say when Mat announced it, you're talking
about Mr. Ishbia's announcement on Facebook live; is
that right?

A   Yes.

Q   And did you see it live?

A   Yes.

Q   What was your reaction when you -- well, strike that.

Did you know that was going to be in the offing before Mr. Ishbia's announcement on Facebook live?

A   No.

Q   What was your reaction when Mr. Ishbia made the announcement of the all-in initiative?

A   Just a normal reaction.  Really, no reaction to it.

Q   Did you discuss it with any of your colleagues at or around the time Mr. Ishbia made the announcement?

A   Yes.

Q   What reaction did your colleagues have to the announcement?

MR. ABDALLAH:  Objection, foundation.

A   Similar to me, no reaction.

BY MR. HIRSCH:

Q   Did you have any involvement in drafting the language of the all-in provision that is in the Wholesale Broker Agreement?

A   No.

Q   Do you know who was involved in that?

A   No.

Q   Why was the all-in initiative implemented?

A   I don't know.

Q   Do you know who decided to implement the all-in initiative?

A    No.

Q    What is the purpose of the all-in initiative?

A    I don't know.

Q    You've mentioned Mr. Ishbia before, correct?  Who is
Mr. Ishbia?

A    Our CEO of UWM.

Q    And do you know Mr. Ishbia?

A    Yes.

Q    Do you know if he was the person who decided to
implement the all-in initiative?

A    I have no idea.

Q    Did you ever hear that he was the person who decided
to implement the all-in initiative?

A    No.

Q    Did you ever discuss the all-in initiative with
Mr. Ishbia?

A    No.

Q    Did you ever discuss Atlantic Trust with Mr. Ishbia?

A    No.

Q    Did you ever discuss any broker partner violating the
all-in initiative with Mr. Ishbia?

A    No.

Q    Did you have any involvement in the roll-out of the
all-in initiative?

A    No.

Q Do you know who was involved in the roll-out?

A No.

Q Now, sir, I'm going to represent to you that the all-in initiative was announced on March 4th, 2021 for the purposes of the next question, okay?

A Okay.

Q Do you recall if that was during the period of time you were a team lead?

A I was not, no.

Q So then that would have been the period of time when you were account -- an account executive; is that correct?

A Yes.

Q And as an account executive, did you convey any information about the all-in initiative to your broker partner accounts?

A Yes.

Q How did you convey that information?

A A phone call.

Q And what did you convey to each broker partner about the all-in initiative?

A That they would have to be all in with UWM or if they decided to go to Rocket, their account would be terminated.

Q Was there some UWM policy about what should be

conveyed to the broker partners or did you decide what to convey on your own to your broker partners?

A   We just basically took what the addendum said and relayed it to our brokers.

Q   What feedback did you get from your broker partners when you conveyed this information?

A   They didn't have any issues with it.

Q   Did any of your broker partner accounts indicate they would not agree to the all-in initiative?

A   No.

Q   Do you know if your particular broker partner accounts were doing business with Rocket at the time you conveyed to them that the all-in initiative was being implemented?

A   I don't recall.

Q   Did any of your broker partner accounts terminate their relationship with UWM after or around the time the all-in initiative was implemented?

A   No.

Q   We've talked a little bit about Atlantic Trust so far, correct?

A   Yes.

Q   And they were one of your broker partners for a period of time when you were account executive, correct?

A   Yes.

Q    And senior account executive, right?

A    Yes.

Q    Okay.  How did you first become familiar with Atlantic Trust?

A    Through LinkedIn.

Q    When you say through LinkedIn, did they reach out to you or did you reach out to them?

A    There was a post about Atlantic Trust Mortgage and I clicked on their page and found they were a broker and reached out to them through their website, I went onto their website, found the broker owner's information.

Q    When did you locate them on LinkedIn?

A    It would have been in the end of 2002 (sic), so either November or December of 2022.

Q    Were you aware at that time that Atlantic Trust had previously had a relationship with UWM?

A    Yes.

Q    How did you know they had previously had a relationship with UWM?

A    When I looked up their name in Salesforce, it showed that they were an active -- or they were an account in our system; therefore, they were active at one point.

Q    So you knew at some point prior they had had a different account executive because you knew it wasn't you, right?

A    Yes.

Q    Okay.  Did you have any obligation to talk to the
     prior account executive before reaching out to
     Atlantic Trust?

A    I don't have access to that, so I can only see that
     they were a previous account, I can't see who worked
     them before or any other information.

Q    And when you reached out to Atlantic Trust towards the
     end of 2022, how did you do that, what was the method
     of communication?

A    Email.

Q    Do you recall to whom you sent the email, do you know,
     was it a person?

A    Yes.  It was the broker owner, Scott, or I should say
     one of the broker owners, Scott.

Q    And so just to be clear, you had no involvement with
     Atlantic Trust when they had previously had a
     relationship with UWM, correct?

A    Yes.

Q    So you had nothing to do with any Wholesale Broker
     Agreement they had executed prior to the time you
     reached out to them at the end of 2022, correct?

A    Yes.

Q    Did you happen to pull up their prior Wholesale Broker
     Agreement?

A    No, I don't have access to that.

Q    Do you know when the relationship with UWM ended?

     Be --

          MR. ABDALLAH:  Objection, form.

          MR. HIRSCH:  Sorry.

BY MR. HIRSCH:

Q    Before you reached out to them at the end of 2022?

          MR. ABDALLAH:  Same objection.

A    No, I don't.

BY MR. HIRSCH:

Q    But you did not think it was an active relationship;
     is that right?

A    Correct.

Q    Did you look up whether you -- whether Atlantic Trust
     had submitted any loans to UWM recently?

A    No, I don't have access to that.

Q    Did you have access to when the last loan Atlantic
     Trust submitted to UWM had occurred?

A    No.

Q    So how was it you knew they weren't active with UWM?

A    They were assigned to house, they didn't have an AE
     assigned to their name.

Q    So when a broker partner is assigned to house, does
     that mean that at some point they had done business
     with UWM?

A    Yes.

Q    And do you know what the criteria is then for a broker
     to get assigned to house, is there some period of time
     they had to be dormant or not submitting loans?

A    No, it's just they're just not active at UWM.

Q    But you don't know how long the inactivity has to last
     to get assigned to house?

A    It's immediate.  So if you're no longer -- if you get
     terminated today, you'll be assigned to house in the
     same day.

Q    So you're saying that the relationship with UWM had
     been terminated, not just loans hadn't been submitted
     for a period of time; is that right?

              MR. ABDALLAH:  Objection, form, foundation,
     mischaracterizes the witness's testimony.

A    Yeah, I wouldn't know if it was terminated or they
     just haven't submitted loans to them, but they just
     weren't assigned to an AE, so therefore, they were not
     active.

BY MR. HIRSCH:

Q    Okay.  But you don't know how long, how much time
     would have to pass for someone not to submit a loan to
     UWM before they would get assigned to house; is that
     right?

A    Correct, I don't know.

Q    Okay.  And if UWM had alleged that Atlantic Trust
stopped submitting loans to UWM in February 2021, you
don't have anything to dispute that, correct?

A    I wouldn't know.

         THE WITNESS:  Excuse me for one second.

         We're okay, thank you.

BY MR. HIRSCH:

Q    Do you know if other broker partners stopped
submitting loans to UWM after the announcement of the
all-in initiative?

A    I don't know.

Q    Did any of your broker partner accounts stop doing
that?

A    No.

Q    Did UWM have any policy to try to get back brokers who
had stopped submitting loans after the announcement of
the all-in initiative?

A    I don't know.

Q    So you would agree with me that when you reached out
to Atlantic Trust towards the end of 2022, they were
certainly not bound to the all-in initiative at that
time, correct?

         MR. ABDALLAH:  Objection, foundation.

A    Yes.

BY MR. HIRSCH:

Q    And so to the extent Atlantic Trust was doing any business with Rocket, certainly prior to the end of 2022, they were not violating the all-in initiative, correct?

MR. ABDALLAH:  Objection, form, foundation, calls for a legal conclusion.

You can answer.

A    Yes.

BY MR. HIRSCH:

Q    Have you ever seen the Wholesale Broker Agreement, any version of it?

A    Yes, I've seen it.

Q    Have you seen a version of the Wholesale Broker Agreement that contains the all-in provision?

A    No.

Q    Have you ever seen the all-in provision itself?

A    No.

Q    So anything you would convey to a broker partner about the all-in provision would just be based on what you had been told, correct?

A    Yes.

Q    After you conveyed the information to your broker partners about the all-in initiative, did any of them ask you any questions about it?

A    Yes.

Q    What sort of questions did they ask you about it?

A    Just, you know, basically, who were the other
lender -- who were the lenders they couldn't use,
which were Rocket and Fairway, but that's about it.

Q    Are you familiar with the liquidated damages provision
in the Wholesale Broker Agreement?

A    No.

Q    Do you know what that is at all?

A    No.

Q    Do you know what penalty a broker partner faces if
they violate the all-in initiative?

     MR. ABDALLAH:  Objection, form, foundation,
calls for a legal conclusion.

A    No.

BY MR. HIRSCH:

Q    So I take it then that you don't know anything about
how any damages amount would be calculated under any
version of the Wholesale Broker Agreement; is that
correct?

A    That is correct.

Q    Other than Atlantic Trust, did any broker partner for
whom you were the account executive violate the all-in
initiative?

A    No.

     THE WITNESS:  Excuse me for one second.

Could I take this, please?

MR. ABDALLAH:  Yeah, we can go off --

MR. HIRSCH:  Yeah, let's take a break.

VIDEOGRAPHER:  Off the record at 10:49 a.m.

(Whereupon a break was taken.)

VIDEOGRAPHER:  Back on the record at 10:58 a.m.

BY MR. HIRSCH:

Q    Setting aside your own broker partners for whom you were the AE, did you hear about other broker partners who had violated the all-in initiative?

A    No.  The answer to that question is -- just to clarify, I found out at a later time that another broker was -- well, I guess the answer is still no. The answer is no.

Q    Okay.  Well, what were you going to say about another broker partner?

A    Another broker was being -- I reached out to another broker via email, he told me he was being sued by UWM, but I didn't know that he broke the all-in initiative, I had no idea what he was being sued for, so the answer to that is no.

Q    What broker partner was it that you had reached out to?

A    Madison Atrina.

Q   Do you know a broker partner or a former broker partner at UWM called Kevron?

A   No.

Q   Did you ever hear of a broker partner at UWM called Midland Funding?

A   No.

Q   Did you ever hear of a broker partner at UWM called America's Moneyline?

A   No.

Q   When you reached out to Madison Atrina, do you know who you spoke to?

A   The owner's name, but I don't remember his full name.

Q   Do you recall if the owner's name was Josh Rapaport?

A   Yes, I believe that was it.

Q   And what was the nature of your conversation with Mr. Rapaport?

A   Just an intro email asking if he'd like to become a partner with UWM and come back all in.

Q   Did you speak by phone or was this only by via email, the communication?

A   Email.

Q   And Mr. Rapaport wrote you back?

A   Yes.

Q   And do you recall what he told you?

A   I don't recall the exact wording for it, no.

Q    And there was no further follow-up after that exchange?

A    No.

        MR. HIRSCH:  Let's mark this as 1, actually.

        (Exhibit 1 marked for identification.)

BY MR. HIRSCH:

Q    Sir, our court reporter has just handed you what we've marked as Exhibit 1.  It's a document, the title on the first page is First Amended Complaint.

        Do you have that in front of you, sir?

A    Yes.

Q    And I think you told me before that you had not seen UWM's Complaint in this case.  Now that I've put it in front of you and certainly take an opportunity to look at it, that doesn't change your answer at all?

A    I believe my attorneys presented this to me.  Is this the deposition?

Q    Yeah, I don't want to know what you said to your --

A    Oh --

Q    -- attorneys --

A    -- my apologies.

Q    -- I just want to know if you recall seeing that, now that I've put it in front of you?

A    No.

Q     Okay.

A     I don't recall seeing it.

Q     Okay.  I'd like you to turn to page 8, paragraph 34.
And do you see where it says under paragraph 34, "In
2022, UWM began to contact broker partners who had
stopped submitting mortgage loans" -- I think maybe
that's supposed to be -- "to UWM after the all-in
initiative announcement to discuss those broker
partners submitting new mortgage loans to UWM," do you
see where it says that?

A     Yes.

Q     Okay.  Do you recall if there was any policy by UWM to
start contacting broker partners who had stopped
submitting loans to UWM after the all-in initiative
announcement?

A     I don't recall.

Q     So when you decided to contact Atlantic Trust at the
end of 2022, that was solely your decision?

A     Yes.

Q     I'd like you to look now to starting at the bottom of
page 8 and over to page 9, it's the paragraph labeled
36, and it says, "In or around December 2022, UWM
contacted Atlantic Trust and encouraged Atlantic Trust
to submit mortgage loans to UWM - and not the select
retail lenders - during a 60-day trial period, after

which, if Atlantic Trust was not satisfied with submitting mortgage loans to UWM and not the select retail lenders, it could terminate the agreement and again work with the select retail lenders," do you see that, sir?

A    Yes.

Q    And that would be you who contacted Atlantic Trust in December 2022?

A    Yes.

          MR. ABDALLAH:  Are you through with Exhibit 1?  For now?

          MR. HIRSCH:  I am probably through for now. Let's mark this as 11, please.

          (Exhibit 11 marked for identification.)

          THE WITNESS:  Thank you.

BY MR. HIRSCH:

Q    Sir, we've just handed you what we've marked as Deposition Exhibit 11 and certainly you can take a moment to look through that, and when you've done that, the question is do you recognize that document?

A    Yes, I do.

Q    What is that?

A    Emails between me and Scott Goldstein.

Q    And sort of starting -- I guess they go in reverse chronological order, so if we look at page 5, which is

sort of the oldest email in the chain, December 12, 2022, 8:13 a.m., that's your email to Mr. Goldstein; is that right?

A   Yes.

Q   Is that your first effort to reach out after you had seen them on LinkedIn?

A   Yes.

Q   Was there any sort of LinkedIn message prior to this or is this the first communication?

A   To my recollection, this is the first communication with them.

Q   And did you previously have any connection with Mr. Goldstein?

A   No.

Q   And in this email, sort of the second sentence, you say, "I wanted to reach out in hopes of bringing you guys back all in with UWM and I know that starts with a phone call so I can understand exactly what your concerns are," do you see that?

A   Yes.

Q   So at this point, you understood that Atlantic Trust had previously worked with UWM, right?

A   Yes.

Q   And you say in the next paragraph, I'm just going to read a section of it, you say, "I work very closely

with Mat Ishbia," do you see that?

A    Yes.

Q    And is that accurate?

A    Yes.

Q    But you did not work with Mr. Ishbia on implementing the all-in initiative, correct?

A    No.

Q    What to you --

          MR. ABDALLAH:  I'll -- I'll clarify.  I think he meant to answer a certain way, but just the way the double negative of the question --

          MR. HIRSCH:  Okay, maybe I'll try to ask him again then.

BY MR. HIRSCH:

Q    I didn't mean to ask a double negative, but your answer before was that you didn't -- did not work with Mr. Ishbia with respect to the all-in initiative, correct?

A    Correct, I did not work with him on that.

Q    So although you worked closely with him on other things, not that, right?

A    Correct.

Q    Okay.  So what were some of the things you worked closely with Mr. Ishbia on?

A    Just my existing broker accounts, their, you know,

production, and if they needed any help with anything or if I needed help with like training or how to handle a phone call, I would ask Mr. Ishbia.

Q   But you also never discussed the all-in initiative with Mr. Ishbia, correct?

A   No.

Q   So moving backwards sort of up this chain, there's an email from Mr. Goldstein to you on the same day, December 12th, at 10:02 a.m., do you see that, it sort of starts on the bottom of page 4?

A   Yes.

Q   And in that email, Mr. Goldstein says, "We receive emails from UWM all the time and are happy to come back but we will not sign the addendum that we won't work with Quicken," do you see that?

A   Yes.

Q   And you understood Quicken to mean Rocket Mortgage, correct?

A   Yes.

Q   And it was your understanding at that time, December 12th, 2022, that there was no way to work with UWM if you won't sign the addendum; is that right?

A   Yes.

Q   Okay.  Nevertheless, you email back Mr. Goldstein just

a few minutes later, same date at 10:18 a.m., and you say, "Give us a 60 day trial, we want to show you what we have to offer," do you see that first sentence?

A   Yes.

Q   "If after that you aren't happy you are more than welcome to go back to Rocket," do you see that?

A   Yes.

Q   Okay.  So even though Mr. Goldstein had said they won't sign the addendum, you persisted, right?

A   Yes.

Q   Now, when you mention a 60-day trial, what did you mean by that?

A   Come back all in with UWM.  If after 60 days you're no longer happy, let us know and you can go back to Rocket.

Q   Was a 60-day trial period something that was common at UWM?

A   Not to my knowledge, no.

Q   So that was something you came up with; is that right?

A   Yes.

Q   Is there some reason you picked 60 days as opposed to some other number?

A   No, just two months of them giving all they can to UWM, all in, and if they're not happy.

Q   Now, again, going backwards here, Mr. Goldstein

replies to you just a few minutes later, same day, 10:21 a.m., Mr. Goldstein writes, "There are no emotions involved, we just won't leave Rocket who has been a valuable asset to our company.  If you won't require us to sign the addendum we are happy to discuss further," do you see that?

A    Yes.

Q    Okay.  So what did you understand Mr. Goldstein to be telling you there?

A    That they don't want to lose Rocket.

Q    Right.  Well, wasn't he telling you that the only way he wants to discuss further is if there won't be a requirement to sign the all-in addendum?

        MR. ABDALLAH:  Objection, form and foundation.

A    Yes.

BY MR. HIRSCH:

Q    Okay.  By the way, had you offered a 60-day trial period to any other broker partners?

A    Yes.

Q    Who had you offered 60-day trials to, what other broker partners?

A    I don't recall their names.

Q    Do you recall if any of the other broker partners to whom you offered a 60-day trial took you up on that?

A    No.

Q    I'm sorry.  No, you don't recall, or no, none of them
     did?

A    No, I don't -- no, they did not take us up on that
     offer.

Q    Okay.  So when you were conveying this 60-day trial
     period, you understood that to be an offer to come
     back to UWM, but the broker partner still cannot do
     business with Rocket; is that correct?

A    Yes, come back all in with UWM.

Q    And does UWM have any policy that describes what a
     trial period would be?

A    No, not to my knowledge.

Q    Do you know if any other AEs used the phrase "trial
     period"?

A    No.

Q    I'm sorry.  No, you don't know, or no --

A    No, I don't know if they did.

Q    So I take it you don't know if any other AE ever
     offered a trial period to any other broker partner?

A    I don't know.

Q    Now, you then write back to Mr. Goldstein, again, same
     day, a few minutes later at 10:25, this is the email
     that starts at the bottom of page 2 and goes over, and
     you say, "Allow us to be an asset.  Whatever you are

getting there, I can make sure you get here and more.
If for one second you feel like what I am saying isn't
true, then you just continues" -- continue, I
guess -- "on with Rocket," do you see that?

A    Yes.

Q    So aren't you telling Mr. Goldstein there that they
can continue with Rocket?

MR. ABDALLAH:  Objection, form, foundation.

A    No.

BY MR. HIRSCH:

Q    Okay.  So what were you saying there?

A    U -- he would let me know what Rocket is giving him.
We would try to match whatever that is.  And if at
that point it didn't work out or he feels like what
I'm saying isn't true, then he doesn't have to come
back all in and he can continue with Rocket.

Q    But when you say he doesn't have to come back all in,
you mean he doesn't have to come back at all, right?

A    Correct.

Q    So then a few minutes later at 10:28 a.m.
Mr. Goldstein writes to you, "We are happy to work
with both but we will not leave Rocket who has stuck
by us when UWM gave us an ultimatum," do you see that?

A    Yes.

Q    Okay.  So you would agree with me that, again, it

sounds like Mr. Goldstein is telling you that they will only work with UWM if they can continue to work with both UWM and Rocket, correct?

A   Yes.

Q   Okay.  So what happened after this email chain?

A   He called me and we spoke briefly and then that's when they decided to sign up with UWM and come back all in with UWM.

Q   When did Mr. Goldstein call you?

A   Shortly after these emails, still in December of 2022.

Q   And he called you, you didn't call him; is that right?

A   Correct.

Q   Are those calls recorded?  If you know.

A   I'm -- well, it was done on my cell phone, so I don't think they're recorded.

Q   So that's your personal cell phone or is that a business cell phone?

A   Personal cell phone.

Q   Okay.  Do you know if your cell phone contains call log information going back that far?

A   No.  No, it doesn't.

Q   No, it doesn't, okay.  And do you recall if you actually talked to Mr. Goldstein when he called you or was there any voicemail message?

A   No, it was him.

Q   Okay.  What was the nature of the phone conversation you had with Mr. Goldstein?

A   I don't remember the full extent of the phone call, but the nature of the conversation was that they decided to come back all in with UWM.

Q   Did Mr. Goldstein again raise the point that he didn't want to be precluded from working with Rocket?

A   No.

Q   Do you recall what you said to persuade Atlantic Trust to come back and work with UWM and exclude Rocket?

A   I don't recall exactly the full conversation, but it was along the lines of giving us 60 days, giving UWM a shot, come back all in, and if they're not happy, he can go back, make sure and let us know, and he's free to go back.

Q   Do you recall if you offered Atlantic Trust any other sort of incentives to come back to UWM?

A   No.

Q   No, you didn't, or no, you don't recall?

A   No, I don't recall.

Q   So when you suggest a 60-day trial period, how is that any different than simply signing up with UWM?

A   It's not really any different.  You could sign up with UWM and leave after 60 days just as if you were to come here, do a 60-day with us, as well, too, it's

very similar.

Q    In fact, you can sign up with UWM and you can leave on
seven days' notice, right?

MR. ABDALLAH:  Objection, foundation.

A    I -- yeah, I don't see why you wouldn't be able to.

BY MR. HIRSCH:

Q    So the 60-day offer you were making was nothing, it
was no different than just signing up with UWM, right?

MR. ABDALLAH:  Objection, form.

A    It was a time frame of them to give us their undivided
attention and be all in with UWM for 60 days, and if
he's not happy, he can notify us and go back to
Rocket.

BY MR. HIRSCH:

Q    So what did Atlantic Trust get out of that deal?

A    To give UWM 60 days to try us out, our products, our
services, our speed.

Q    But they could do that at any time by simply signing
up with UWM, right?

A    That is correct.

Q    So even though Mr. Goldstein has previously expressly
stated that he would not agree to a provision that
said he couldn't do business with Rocket, you
understood after the phone call that he in fact was
agreeing to that; is that right?

A    Yes.

Q    And you think Mr. Goldstein understood that he was going to be agreeing to that?

A    I can't -- I guess I can't speak on what he believed afterwards.  It was stated in the phone call, though.

Q    He told you he agrees he won't do business with Rocket for 60 days?

A    I don't recall that.

Q    In fact, he didn't tell you that, right?

         MR. ABDALLAH:  Objection, asked and answered.

A    I don't recall whether he asked that.

BY MR. HIRSCH:

Q    Okay.  Did you ask him for his assurance that Atlantic Trust wouldn't do business with Rocket during the 60-day trial period?

A    I don't recall if I asked him.

Q    So UW -- strike that, I'm sorry.

         So Atlantic Trust did begin submitting loans to UWM again in December of 2022; is that right?

A    Yes.

Q    Okay.  And it's your understanding that Atlantic Trust only did that after they had signed a Wholesale Broker Agreement that contained the all-in initiative?

A    Yes, that's my understanding.

Q    And you never told Mr. Goldstein that he wouldn't have
     to follow the all-in initiative during the trial
     period?
               MR. ABDALLAH:  Objection, form.
A    No, I didn't -- I didn't tell him that he wouldn't
     have to follow it.
BY MR. HIRSCH:
Q    Do you recall when the first loan Atlantic Trust
     submitted to UWM, the date of the first loan Atlantic
     Trust submitted to UWM after you had re-signed them?
A    I don't know the exact date.
Q    Let's go back to Exhibit 1, page 10, paragraph 41.
A    Sorry, which paragraph was that?
Q    Paragraph 41 and it's on page 10.
A    Okay.
Q    And paragraph 41 says, "On December 22nd, 2022
     Atlantic Trust submitted its first mortgage loan to
     UWM since UWM had implemented the all-in initiative,"
     do you see that, sir?
A    Yes.
Q    Do you have any reason to disagree with that
     allegation?
A    No, other than I don't know the exact date, but the
     time frame sounds correct.
Q    Okay.  Now, do you know when it was that Atlantic

Trust's -- that -- well, strike that.

Let's look at, going backwards, paragraph 40, starting at the bottom of page 9.  This says, "On December 19th, 2022, Atlantic Trust reviewed UWM's yearly agreement renewal package, which included the all-in, and on January 19th, 2023, Atlantic Trust approved the renewal through UWM's online broker-facing portal," do you see that?

A    Yes.

Q    Okay.  First of all, are you as the account executive responsible for sending out the yearly renewal package?

A    No.

Q    Do you know who is responsible for doing that?

A    We have a renewals team.

Q    And Atlantic Trust would fall under the auspices of the renewal team even though they hadn't been with UWM for a period of time?

A    Yes.  Well, they would fall under two teams.  It would be the renewal team working with the sign-up team, as well.

Q    Okay.  So you would not have been notified or been in the loop when Atlantic Trust got their yearly renewal?

A    No.

Q    You would agree with me that if Atlantic Trust didn't

execute any yearly renewal until January 19th, 2023, any loan submitted before that time could not have been subject to the all-in provision, correct?

MR. ABDALLAH:  Objection, form, foundation, calls for a legal conclusion.

A    No, if they -- the answer is no.

BY MR. HIRSCH:

Q    So do you have any evidence confirming that Atlantic Trust agreed to the renewal in January of 2023?

A    No.

Q    Were you aware of any loans submitted by Atlantic Trust prior to January 19th, 2023 that didn't get processed?

A    Loans that were submitted to UWM that didn't get processed?

Q    Correct, sorry, to UWM.

A    Not that I recall.

MR. HIRSCH:  Could you mark this as 16, please.

(Exhibit 16 marked for identification.)

THE WITNESS:  Thank you.

BY MR. HIRSCH:

Q    Sir, I'm going to hand you what we've just marked as Deposition Exhibit 16, and I guess to broadly describe it, it looks like a flowchart, but after you've had a

chance to review it, my question is have you ever seen this flowchart before?

A    No.

Q    So do you know anything about the flow of how a broker partner would accept any terms of the Wholesale Broker Agreement?

A    No.

Q    Okay.  So given that your position was that after Atlantic Trust came back to work with UWM in around December of 2022, they were not permitted to also send loans to Rocket, did you do anything to monitor whether they were in fact complying with that?

A    No.

Q    Do you know if anybody at UWM did anything to check if Atlantic Trust was complying with that?

A    I don't know.

Q    Did you have any communications with Mr. Gold -- well, strike that.

         What was the next communication you had with Mr. Goldstein after Atlantic Trust had agreed to come back to work with UWM?

A    Just phone calls and emails about loans.

Q    What was the nature of the phone calls with Mr. Goldstein?

A    Loan scenarios, imported loans, underwriting

questions.

Q    What was the nature of the emails with Mr. Goldstein?

A    Same thing, loan scenarios, phone call -- emails, I'm sorry, about like underwriting issues or anything like that.

Q    Did you communicate with anyone else at Atlantic Trust?

A    Yes.  The -- the other loan officers and other broker owner, as well.

Q    Do you recall the names of those people?

A    Yes.  Just first names, though, I don't remember the last names, I don't recall the last names.  Wade. Kayla.  Eric.  Eric was Eric Hall.  And Amy, I don't remember Amy's last name.

Q    Just for clarity, would Wade Swindell be the person, does that ring --

A    I believe --

Q    -- a bell?

A    That sounds familiar, yes.

Q    And Kayla, do you know if it was Kayla Goldstein?

A    No.

Q    She may have had a maiden name at the time --

A    Yeah.

Q    -- or --

A    Sharp maybe?  I believe it was Kayla Sharp.  I'm not

100 percent sure about that last name, though.

Q    And were your communications with these folks, Wade,
Kayla, Eric, and Amy, the same type of communications
as you told me about with Mr. Goldstein?

A    Yes.

Q    Did Mr. Goldstein ever tell you that he was continuing
to do business with Rocket?

A    No.

Q    Did Mr. Goldstein ever talk to you about a product
that Rocket offered that UWM was not offering?

A    No.

Q    Did Mr. Goldstein ever tell you that he could get
better rates at Rocket?

A    No.

Q    Did Mr. Goldstein ever indicate any dissatisfaction
with UWM?

A    No.

Q    So the 60-day trial period would have run through
roughly February 22nd of 2023, correct?

A    Yes.

Q    Did you do any follow-up with Atlantic Trust after the
60-day trial period?

A    No.

Q    When did you first hear that Atlantic Trust had been
doing business with Rocket after they had come back to

UWM?

A    When I was notified by my attorneys.

Q    Do you remember a date, though?

A    No, I don't remember a date.

Q    Were you still working with Atlantic Trust at the time you were notified that they had been doing business with Rocket?

A    No.

Q    When did you cease doing business with Atlantic Trust?

A    It would be towards the end of April, beginning of May, roughly, I don't know the exact date.

Q    Of 2023?

A    Correct, 2023, my apologies.

Q    Why did that occur?

          MR. ABDALLAH:  Objection, asked and answered.

          THE WITNESS:  Why did what occur?

BY MR. HIRSCH:

Q    Well, why did you stop doing business with Atlantic Trust?

A    Broker requested a AE change.

Q    Do you know if Atlantic Trust continued to do business with UWM after the AE change?

A    I don't know.  I could no longer see their pipeline, so...

Q    I'm sorry, sir, did you tell me, did you know who the
new AE was who was assigned?

A    Yes.  It was Jessie Drury.

Q    Oh, right, Mr. Drury, right, thank you.

A    Yep.

Q    Did you ever discuss Atlantic Trust with Mr. Drury?

A    No.

Q    Would UWM continue to accept loans from a broker
partner if it knew the broker partner was doing
business with Rocket?

            MR. ABDALLAH:  Objection, foundation.

A    No.

BY MR. HIRSCH:

Q    No, it would not?

A    No, it would not.

Q    Did you ever face that scenario as an account
executive?

A    No.

Q    Was there any policy about what an account executive
was supposed to do if they learned that one of their
broker partners was doing business with Rocket?

A    There's no, like, policy, you would just speak with
your leader.

Q    And who was your leader in December 2022?

A    Danny Marogy.

Q    And is he still your team leader or did that change?

A    He is my AVP now, assistant vice president.

Q    And who was the team leader that succeeded Mr. Marogy?

A    Now or at that time?

Q    Well, the next one after Mr. Marogy.

A    No, I still report directly to him.

Q    Oh.  So you now report directly to him as an SVP?

A    He's an AVP, sorry, assistant vice president.

             MR. HIRSCH:  Okay.  Let's mark this as 15,
     please.

             (Exhibit 15 marked for identification.)

             THE WITNESS:  Thank you.

BY MR. HIRSCH:

Q    Sir, I've just handed you what we've marked as
     Exhibit 15 and take a moment to look at that.  When
     you've done that, the question is have you ever seen
     this document before?

A    No, I have not.

Q    So you had no involvement in sending a termination
     letter to Atlantic Trust; is that right?

A    That is correct, I had no involvement.

Q    And this is dated May 23rd, 2024, so that was when you
     were no longer the AE for Atlantic Trust; is that
     right?

A    Yes.

Q    Did anyone inform you that Atlantic Trust had -- that
UWM had terminated its relationship with Atlantic
Trust?

A    No.

Q    Do you know the reason Atlan -- do you know the reason
UWM terminated its relationship with Atlantic Trust?

A    No.

Q    Who is Justin Glass?

A    He is a -- I don't remember the exact -- SVP or VP of
sales.

Q    Were you ever aware that Mr. Glass was negotiating
with Atlantic Trust to become a correspondent lender
with UWM?

A    I was not aware.

Q    Do you know Heather Demy?

A    Yes.

Q    Who is she?

A    I don't know her exact title, but she works at UWM.

Q    Do you know what she does?

A    Not really, no.

Q    Do you have any interactions with Ms. Demy?

A    No.

Q    Who is Sarah DeCiantis?

A    Chief marketing officer.

Q    Do you have any interactions with Ms. DeCiantis?

A    No.

Q    Professionally, I'm --

A    Yes, I don't.

Q    Who is Allen Beydoun?

A    Chief client officer.

Q    Do you have any professional interactions with Mr. Beydoun?

A    No.

Q    Who is Desmond Smith?

A    Chief growth officer.

Q    Do you have any interactions with Mr. Smith?

A    No.

Q    Who is Anthony Frederick?

A    Senior vice president of sales, SVP.

Q    Do you have any interactions with Mr. Frederick?

A    No.

Q    Are you familiar with a company called E Mortgage Capital?

A    Yes.  There's two of them.  The one located in Michigan or in California?

Q    I don't know.  Which one are you familiar with?

A    Michigan.

Q    So focusing on the one you're familiar with in Michigan, do they use UWM?

A    Yes.

Q    Are you the account executive for E Mortgage Capital
     in Michigan?

A    No.

Q    Do you know who is?

A    No, I don't know who the account executive is.

Q    Do you know whether E Mortgage Capital also sends
     loans to Rocket?

A    No, I have no idea.

Q    Are you familiar with a company called UMortgage?

A    No.  Oh, I'm sorry, yes, I am.  I apologize.
              "U" as in just the letter U, correct?

Q    The letter U.

A    Yes, I am.

Q    Is UMortgage a broker partner with UWM?

A    Yes.

Q    Are you the account executive for UMortgage?

A    No.

Q    Do you know who is?

A    They have multiple account executives, but I
     don't -- one of them that I do know is Robert Shkreli.

Q    Are you familiar with a company called Loan United
     Wholesale?

A    No.

Q    What did you do to prepare for your deposition today?

              MR. ABDALLAH:  Objection.  You can answer

the question, just do not reveal the contents of any communications you had with counsel.

A     I just met with my counsel.

BY MR. HIRSCH:

Q     Who did you meet with?

A     Mahde Abdallah.

Q     When did you meet with Mr. Abdallah?

A     Last week Friday.

Q     For how long did you meet?

A     Three hours.

Q     Did you review any documents to prepare for the deposition?

A     Yes.

Q     What documents did you review?

A     The emails that were provided and the LinkedIn profile.

Q     Did you review any emails beyond what I showed you today?

A     No.

          MR. HIRSCH:  If we could take a short break, I'm going to go through my list.

          VIDEOGRAPHER:  Off the record at 11:45 a.m.

          (Whereupon a break was taken.)

          VIDEOGRAPHER:  Back on the record at 11:53 a.m.

MR. HIRSCH: Can we mark this as 14,
please.

(Exhibit 14 marked for identification.)

THE WITNESS: Thank you.

BY MR. HIRSCH:

Q    Sir, I'm going to hand you what we've marked as
Exhibit 14 and, as always, take a moment to look at
that, and then my question is whether you've ever seen
this before?

A    I've never seen this before.

Q    Do you know who William McDonald is?

A    No.

Q    Okay.  I think we've established you know who Scott
Goldstein is, right?

A    Yes.

Q    And regardless of who this is sent to, it's coming
from Mr. Goldstein, do you see that?

A    Yes.

Q    On February 5th, 2024, do you see that?

A    Yes.

Q    Looking at the second sentence of the sort of text of
the message or the email, Mr. Goldstein says, "As I
explained, we never agreed to or signed the 'all in
addendum.'  We told UWM we would work with them again
but at no point would we ever sign the addendum," do

you see those two sentences?

A   Yes, I see them.

Q   Okay.  Did Mr. Goldstein ever tell you those things?

A   No.

Q   Well, he did tell you in the email before your phone call, right?

A   Correct, in the email he said he wouldn't sign it.

Q   Okay.  But you think he changed his position in the phone call, correct?

A   Yes.

Q   Next sentence, Mr. Goldstein writes, "They knew the entire time we were still working with Rocket, therefore if we were in breach of contract, at that point they should have come to us and let us know," do you see that sentence?

A   Yes.

Q   Did you know that the entire time they were working with Rocket, Atlantic Trust was working with Rocket?

A   No.

Q   And so you did not know at any time that Atlantic Trust was in breach of contract?

A   No, I did not.

Q   If you look at the last -- well, the last sort of full paragraph of this email, it says, "When UWM initiated the all in addendum, we canceled our partnership with

UWM and went with Rocket, it was UWM that came back to us to work with them again and we made in" -- maybe it's supposed to be "it" -- "abundantly clear we would never sign that addendum.  They still allowed us to work with them," do you see that sentence?

A    Yes.

Q    You do agree with the part that it was UWM that came back to Atlantic Trust, right?

A    Yes.

Q    And it was you who reached out to Atlantic Trust, correct?

A    Correct.

Q    And you do agree that Mr. Goldstein in the initial email said that Atlantic Trust would not agree to the addendum, right?

A    Yes.

Q    But you disagree with the last part, that UWM still allowed Atlantic Trust to work with UWM, correct?

A    That is correct, yes.

Q    Because UWM would not do that; is that right?

A    We would not do that.

Q    Okay.  And that's not what a trial period means according to you, right?

A    Correct.

          MR. ABDALLAH:  Objection, form.  You can

answer.

A    Yeah, that's not what a trial period means.

BY MR. HIRSCH:

Q    Okay.  But a trial period, according to you, is no different than just signing up with UWM, right?

MR. ABDALLAH:  Objection, form, mischaracterizes the witness's testimony.

You can answer.

A    Yes, there is no difference there.

MR. HIRSCH:  Okay.  I have nothing further. Thank you.

MR. ABDALLAH:  Just a few questions from me.

E X A M I N A T I O N

BY MR. ABDALLAH:

Q    Mr. Elherchi, there was some previous testimony about UWM monitoring loans with Rocket after the all-in addendum was announced; do you recall that testimony?

A    Yes.

Q    To your knowledge, was UWM monitoring the loans to Rocket specifically or as to all lenders?

A    All lenders.

Q    And in terms of loans being sent to other lenders, is it your understanding that UWM was monitoring loan submissions to other lenders or the loan closings?

A    We can't see submissions, we can only see loans

closed.

Q    Okay.  So when U -- to your knowledge, would the monitoring of loans that UWM does, that's limited to loan closings?

A    Yes, correct.

Q    There was also some prior testimony about Atlantic Trust signing a broker agreement and sending it back; do you recall that testimony?

A    Yes.

Q    To your knowledge, are they like sent a copy for them to like download or print and sign and send it back or what is the process of them signing or agreeing to the broker agreement?

        MR. HIRSCH:  Objection as to form.

A    They go into a -- they go -- they get a link to a portal where they can go into the portal and that document is presented to them and then they sign it.

BY MR. ABDALLAH:

Q    Okay.  So by "that document is presented to them," what document are you referring to?

A    The broker agreement.

Q    And when you say they sign it, are they electronically signing it online?

A    Yes.

Q    Okay.  And then do you know if they get a copy of the

broker agreement after?

A    I'm unsure if they get a copy.

Q    Okay.  And just to clarify, you have never discussed the all-in addendum with Mat Ishbia, correct?

A    No.

Q    No as in I'm correct or --

A    Oh, yeah, sorry, correct.

Q    All right, so let me just -- for the record, you've never discussed all in with Mat Ishbia; is that correct?

A    That is correct.

Q    Okay.  And then there was some prior testimony in the discussion today about the 60-day trial, right?

A    Yes.

Q    And I believe you testified that if Atlantic was not happy, then they can go back to Rocket, right?

A    Yes.

Q    What do you mean by they can go back to Rocket?

A    If after 60 days they're not satisfied with what we provided them, they could notify us and we would end the relationship and they could go back to Rocket.

Q    Okay.  So when you were saying that, it wasn't your understanding or you weren't conveying that they could after 60 days continue to do business with UWM and Rocket, right?

A    Right.

Q    It was more they would end the relationship with UWM and go back to working with Rocket --

A    Correct.

Q    -- fair?

          Can a broker submit loans to UWM if they're not signed up with UWM?

A    No.

Q    Okay.  So in or around December of 2022 when Atlantic started doing business with UWM again, were they able to submit their first loan before taking any action to become an active account or sign the broker agreement again?

A    No, they were not able to.

Q    Okay.  So they had to sign the broker agreement again to submit a loan to UWM; is that fair?

A    That is correct.

          MR. ABDALLAH:  I have no further questions.

          MR. HIRSCH:  I have a couple follow-ups.

               R E - E X A M I N A T I O N

BY MR. HIRSCH:

Q    Sir, Mr. Abdallah asked you a couple of questions about the online portal that a broker partner goes into?

A    Yeah.

Q    Are you personally familiar with what that online
portal looks like?

A    No.

Q    And you don't know what steps a broker partner would
have to take in the online portal to approve any
agreement with UWM; is that right?

A    I know the broker agreement is in there and I know
that there's a compensation agreement in there.  Other
than that, I'm not familiar with the other steps.

Q    But you don't know the mechanics of what the broker
partner has to do; is that right?

A    Correct.

Q    And you don't know what steps a broker
partner -- well, strike that.

         You don't know what prompts a broker partner
would see if they seek to submit a loan to UWM; is
that right?

A    I can see those prompts.  If they decide to submit a
loan into my pipeline?

Q    Okay.  So would a broker partner see a prompt if they
had not signed a current agreement with UWM?

A    They wouldn't even have log-ins.  They wouldn't be
able to log into the system.

Q    And how would a broker partner get a log-in?

A    By completing the broker package in the portal, the

broker portal.

Q    What if a broker partner had an old log-in?

A    It's deactivated.  When they're --

Q    Do you know whether Atlantic Trust's log-in had been deactivated, the prior log-in, before they rejoined in December of 2022?

A    I don't know if it was and they just weren't active, they weren't in my name.

Q    But you don't know if the log-in itself was active, correct?

A    Correct, I don't know if it was active.

MR. HIRSCH:  Okay.  I have nothing further. Thank you.

MR. ABDALLAH:  No further questions.

VIDEOGRAPHER:  Okay.  This concludes today's deposition.  The time is 12:02 p.m., we are off the record.

(Deposition concluded at 12:02 p.m.)

*     *     *

State of Michigan          )

County of Wayne            )


  Certificate of Notary Public - Court Reporter


  I certify that this transcript is a complete,  true,
and correct record of the testimony of the witness held in
this case.


  I also certify that prior to taking this deposition,
the witness was duly sworn or affirmed to tell the truth.


  I further certify that I am not a relative or an
employee of or an attorney for a party; and that I am not
financially interested, directly or indirectly, in the
matter.


  I hereby set my hand this 18th day of March 2026.


*Elizabeth G. LaBarge*

    Elizabeth G. LaBarge, CSR-4467

    Certified Shorthand Reporter

    Notary Public, Wayne County, Michigan

    My Commission Expires November 27, 2029

# *EXHIBIT D*

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.540 Filed 03/26/26 Page 120 of 194

Brian J. Lyngaas, D.D.S., P.L.L.C. v. Solstice Benefits, Inc., Not Reported in Fed. Supp....

**2023 WL 6302998**
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

BRIAN J. LYNGAAS, D.D.S., P.L.L.C., Plaintiff,
v.
SOLSTICE BENEFITS, INC., Defendant.

Case No. 22-10830
|
Signed September 27, 2023

**Attorneys and Law Firms**

David M. Oppenheim, Jeffrey A. Berman, Bock, Hatch, Lewis, & Oppenheim, LLC, Chicago, IL, Richard Shenkan, Shenkan Injury Lawyers, LLC, West Bloomfield, MI, Phillip A. Bock, Bock Law Firm, LLC dba Bock Hatch & Oppenheim, LLC, Miami Beach, FL, for Plaintiff.

Jeffrey A. Backman, Roy Taub, Greenspoon Marder Law, Fort Lauderdale, FL, Kristen E. Guinn, Smith Haughey Rice & Roegge, Grand Rapids, MI, for Defendant.

**ORDER VACATING ORDER TO SHOW CAUSE; GRANTING PLAINTIFF'S MOTION TO SEAL; DENYING PLAINTIFF'S MOTION FOR PROTECTIVE ORDER; GRANTING DEFENDANT'S FOR PROTECTIVE ORDER. (ECF Nos. 37; 51; 63; 66).**

Curtis Ivy, Jr., United States Magistrate Judge

 **\*1**  Plaintiff filed this proposed class action lawsuit on April 18, 2022. (ECF No. 1). This matter was referred to the undersigned for all pretrial matters. (ECF No. 46). This matter is presently before the Court on the Court's Order to Show Cause, Plaintiff's motion to seal, Plaintiff's motion for protective order, Defendant's motion for protective order, and the parties' joint motion to strike the current case management order and reset deadlines. (ECF Nos. 37; 51; 63; 66).

### I. Motion to Seal

Eastern District of Michigan Local Rule 5.3 provides procedures for filing civil material under seal. Rule 5.3(b) governs here because no rule or statute is cited as authorizing sealing the documents. Plaintiff indicates the motion to seal is filed regarding documents designated "Confidential" pursuant to the parties stipulated protective order. (ECF No. 66, PageID. 1387). Rule 5.3(b) requires, among other things, that an unredacted version of the subject documents be filed under seal for evaluation by the Court. Plaintiff filed an unredacted version of the brief and documents in accordance with Local Rule 5.3 only after the Court issued an Order to Show Cause for failure to do so. (ECF Nos. 63; 67). As Plaintiff has timely responded to the Court's Order, the Court's Order to Show Cause is **VACATED**. (ECF No. 63).

In this Circuit, Courts are not permitted to take motions to seal lightly. The Sixth Circuit has long recognized a "strong presumption in favor of openness" in court records. *Rudd Equip. Co., Inc. v. John Deere Constr. & Forestry Co.*, 834 F.3d 589, 593 (6th Cir. 2016) (citing *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1179 (6th Cir. 1983)). The "heavy" burden of overcoming that presumption rests with the party seeking to seal the records. *Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 305 (6th Cir. 2016). The moving party must show that it will suffer a "clearly defined and serious injury" if the judicial records are not sealed. *Id.* at 307. This burden must be met **even if no party objects to the seal**, and it requires a "document-by-document, line-by-line" demonstration that the information in the document meets the "demanding" requirements for the seal. *Id.* at 308. In delineating the injury to be prevented, "specificity is essential." *Id.* Typically, "only trade secrets, information covered by a recognized privilege (such as attorney-client privilege), and information required by statute to be maintained in confidence (such as the name of a minor victim of a sexual assault)" are enough to overcome the presumption of access. *Id.* Should the Court order a document to be sealed, the Court must articulate why the interests supporting nondisclosure are compelling, why the interests supporting public access are not as compelling, and why the scope of the seal is no broader than necessary. *Id.* at 306.

Plaintiff argues the Court should order the documents be sealed because they are designed as "Confidential" pursuant to the stipulated protective order entered by the parties. (ECF No. 66, PageID. 1387). Plaintiff suggests that the information "is confidential information that is not publicly available (such as research and development, commercial, or other sensitive information)[.]" (*Id.* at PageID.1388).

 **\*2**  Even where the parties have entered a stipulated protective order, they must still satisfy the detailed

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.541 Filed 03/26/26 Page 121 of 194

Brian J. Lyngaas, D.D.S., P.L.L.C. v. Solstice Benefits, Inc., Not Reported in Fed. Supp....

analysis and specific findings and conclusions to justify the nondisclosure to the public. *Best Value Auto Parts Distributors, Inc. v. Quality Collision Parts, Inc.*, No. 19-12291, 2020 WL 6887362, at *2 (E.D. Mich. Nov. 24, 2020) (denying a motion for protective order where "[a]side from explaining that the materials are subject to the parties' stipulated protective order, however, the defendant did not 'analyze in detail, document by document, the propriety of secrecy' with supporting argument and legal citations.") (quoting *Shane Group*, 825 F.3d at 305); *Babcock & Wilcox Co. v. Cormetech, Inc.*, No. 5:14CV514, 2017 WL 4286776, at *1 (N.D. Ohio Sept. 27, 2017) ("In 2016, more than two years after this case was filed, the Sixth Circuit made clear that sealing orders are rarely to be entered and that agreements by parties as to what may be designated as confidential for purposes of discovery, i.e., stipulated protective orders, have little, if any, bearing on the filing of documents under seal with the Court.").

Despite Plaintiff's thin arguments and failure to perform a detailed analysis, the Court shall **GRANT** the motion to file under seal. (ECF No. 66). The interests supporting nondisclosure here are compelling as the information redacted and filed under seal is not of consequence to the Court's conclusions about the motion for protective order of Defendant's Chief Executive Officer ("CEO"). (ECF No. 67). As the information under seal has little, if any, bearing on the Court's conclusions, there is little harm to the public in granting the motion. The Court will not overlook a failure to articulate good cause for a seal in future filings. Parties should explain why the interests supporting nondisclosure are compelling, why the interests supporting public access are not as compelling, and why the scope of the seal is no broader than necessary.

## II. Motions for Protective Order

### a. Standard Governing Motions for Protective Order

Rule 26(c) allows the Court to issue protective orders for good cause shown to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including that the disclosure or discovery not be had, or that the disclosure or discovery be limited to certain matters. Fed. R. Civ. P. 26(c). The party seeking a protective order has the burden of showing that good cause exists for the order. *Nix v. Sword*, 11 F. App'x 498, 500 (6th Cir. 2001). To show good cause, the movant must articulate specific facts

showing "clearly defined and serious injury resulting from the discovery sought and cannot rely on conclusory statements." *Id.* (citations and internal quotation marks omitted).

### b. Analysis of Defendant's Motion for Protective Order

On July 11, 2023, Defendant moved for a protective order protecting Defendant's Chief Executive Officer ("CEO"), Dr. Weiss, from deposition. (ECF No. 51). Defendant argues that Dr. Weiss has no unique personal knowledge of the material facts of this lawsuit that Plaintiff cannot obtain from deposing other Solstice employees. (*Id.* at PageID.1097). Defendant states that Plaintiff has not deposed the Solstice employees who were personally involved in the preparation or transmission of the subject fax and deposing the CEO of Solstice without first having deposed the individuals with more knowledge would be unduly burdensome. (*Id.* at PageID.1098-99). Defendant also notes that Plaintiff has not sought a Rule 30(b)(6) deposition of a corporate representative yet. (*Id.* at PageID.1097).

Defendant argues that deposing a party's senior executive under the current circumstances is inappropriate. (*Id.* at PageID.1098). Defendant asserts that Dr. Weiss has no unique, personal knowledge of the facts here and, for many topics, has no knowledge. (*Id.*). Defendant indicates it would incur significant expense to prepare Dr. Weiss for a disposition where he does not have personal knowledge and "sent only a single, one-word e-mail message regarding the Fax Message." (*Id.*) (citing "Weiss Decl. at ¶ 6"). [1] Defendant explains that preparing Dr. Weiss for the deposition would also divert time and resources from his duties as an executive at Solstice. (*Id.*).

**\*3** Defendant argues that, given Dr. Weiss's lack of knowledge of this matter, that Plaintiff's attempts to depose Dr. Weiss are motived by harassing and annoying Solstice and its CEO. (*Id.* at PageID.1099). Defendant indicates Plaintiff has more convenient and less burdensome avenues of discovery available and Plaintiff has not undertaken any of those options prior to seeking to depose Dr. Weiss. (*Id.*). Defendant asserts that other Solstice employees are better situated to provide the requested discovery. (*Id.* at PageID.1101). Defendant argues that allowing Plaintiff to depose Dr. Weiss before pursuing other less burdensome, more convenient, and less expensive routes would be unduly burdensome to Solstice. Defendant asserts Plaintiff should first depose Solstice employees with direct involvement in the

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.542 Filed 03/26/26 Page 122 of 194

Brian J. Lyngaas, D.D.S., P.L.L.C. v. Solstice Benefits, Inc., Not Reported in Fed. Supp....

relevant facts or serve a Rule 30(b)(6) deposition notice. (*Id.* at PageID.1102).

In response, Plaintiff argues that Weiss was "directly involved" in forming the customer relationship highlighted in the fax at issue, that Weiss had first-hand knowledge about the customer service issues that prompted the fax, approved payment for the fax, and verified the interrogatory responses. (ECF No. 55, PageID.1221-22). Plaintiff argues that Sixth Circuit precedent has rejected the 'apex doctrine' which is a doctrine that "bars the deposition of high-level executives absent a showing of their 'unique personal knowledge' of relevant facts." *Serrano v. Cintas Corp.*, 699 F.3d 884, 900 (6th Cir. 2012). Plaintiff notes that *Serrano* held that a protective order cannot be justified based on a "bald assertion" that deposing a corporate officer would be unduly burdensome simply because that officer is at the apex of corporate leadership. (ECF No. 55) (citing *Serrano*, 699 F.3d at 901).

*Serrano*'s holding is that a corporate officer may not avoid deposition simply by nature of their position, that an apex officer is still subject to requirements of Rule 26(c)(1) in determine whether a deposition is unduly burdensome. *Serrano*, 699 F.3d at 901 (citing *Conti v. Am. Axle & Mfg., Inc.*, 326 F. App'x 900, 907 (6th Cir. 2009)). Even so, *Serrano* did not hold that a corporate officer may be deposed at any time no matter if the information may be obtained through other sources or is unduly burdensome. *Davis v. SIG Sauer, Inc.*, No. 322CV00010GFVTEBA, 2023 WL 3292869, at *2 (E.D. Ky. May 5, 2023) ("However, [the *Serrano* holding] doesn't mean all high-level executives must sit for discovery depositions at the whim of counsel.").

The court in *Serrano* noted that an apex official may not avoid deposition on "the *assumption* that the deposition would be unduly burdensome." *Serrano*, 699 F.3d at 902 (emphasis added). In assessing whether deposing an apex official is appropriate Courts should balance "the burdens on the deponent with the need for access to information relevant to the case, thus ensuring compliance with Rule 26(c)(1)." *Id.* A deposition of an apex official can be unduly burdensome where the discovery sought "is available through another more convenient and less expensive source[.]" *Davis*, No. 322CV00010GFVTEBA, 2023 WL 3292869, at *3. In sum, the Court need not be blind to reality that depositing an organization's CEO may be burdensome for a party.

Plaintiff argues that Weiss was involved with sending the fax at issue and Weiss was aware of the customer service issues that caused the fax. (ECF No. 55, PageID.1227-28). In support of this, Plaintiff references emails sent that support that Weiss knew of the customer service issues and approved the fax. (*Id.*). In reply Defendant clarifies that it does not argue that Weiss knows nothing of relevance to the lawsuit, but that Plaintiff has other less burdensome, less expensive, and more convenient ways to access the information. (ECF No. 57, PageID. 1244). Indeed, Defendant asserts that Plaintiff noticed Dr. Weiss's deposition "[b]efore taking a single deposition in this case[.]" (ECF No. 57, PageID. 1242).

**\*4** One of the bases relied upon by Plaintiff is that Weiss verified Defendant's interrogatories and Plaintiff appears to be asserting this is a reason to depose Dr. Weiss. (ECF No. 55, PageID. 1230). Defendant argues this is not material to whether Plaintiff should be able to depose Weiss. (ECF No. 51, PageID.1103-4). Defendant states that Dr. Weiss verified the answers "based on a review of records and other information from Solstice personnel and counsel" rather than because of his personal knowledge. (*Id.*).

The cases relied upon by Plaintiff do not support that verification of interrogatories is an independent and adequate basis to depose the chief officer of an organization, or that the verification of interrogatories is at all relevant to whether a deposition should be allowed. (ECF No. 55, PageID. 1230) (citing *Cf. Shepherd v. American Broad. Cos., Inc.*, 62 F.3d 1469, 1482 (D.C. Cir. 1995) ("the representative must have a basis for signing the responses and for thereby stating on behalf of the corporation that the responses are accurate"); *Balsley v. L.F.P., Inc.*, Case No. 08 CV 491, 2009 WL 10688224, *1 (N.D. Ohio March 10, 2009) ("Flynt maintains 'he played no role' in the decision to publish Plaintiffs' photographs, and that decision was handled by my employees without any input from me."); *Gazvoda v. Department of Homeland Sec.*, Case No. 15-cv-14099, 2018 WL 1281756, *4 (E.D. Mich. Mar. 13, 2018) ("two individuals verified that the interrogatory answers were accurate")).

These cases do not support Plaintiff's argument. Federal Rule of Civil Procedure 33 does not restrict answers by a representative of a corporate party to those with personal knowledge. The interrogatories may be answered by an officer or agent who must "furnish the information available *to the party.*" Fed. R. Civ. P. 33(b)(1)(B) (emphasis added); *accord. Shepherd v. Am. Broad. Cos., Inc.*, 62 F.3d 1469, 1481 (D.C. Cir. 1995); *In re Davol, Inc./C.R. Bard, Inc.*,

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.543 Filed 03/26/26 Page 123 of 194

Brian J. Lyngaas, D.D.S., P.L.L.C. v. Solstice Benefits, Inc., Not Reported in Fed. Supp....

*Polypropylene Hernia Mesh Prod. Liab. Litig.*, No. 2:18-CV-01022, 2023 WL 3902735, at \*5 (S.D. Ohio June 8, 2023) (collecting cases) ("Rule 33 of the Federal Rules of Civil Procedure provides that interrogatories directed to a corporation must be answered by 'any officer or agent,' and does not restrict that to those with personal knowledge.").

Indeed, each of the cases Plaintiff relies on is readily distinguishable or even holds the opposite of what Plaintiff asks the Court to do here today. *Shepherd*, 62 F.3d at 1482; *Balsley*, Case No. 08 CV 491, 2009 WL 10688224 at \*1; *Gazvoda*, Case No. 15-cv-14099, 2018 WL 1281756 at \*4. *Shepherd* deals with assertions that interrogatory verification was improper where, three years after verifying the responses, a corporate representative did not recall the process she used to ascertain the truthfulness of the corporations' responses. *Shepherd*, 62 F.3d at 1482. *Balsely* pre-dated the Sixth Circuit's holding in *Serrano* and the *Balsely* Court *applied the apex doctrine* requiring unique or specialized knowledge to bar the deposition of the owner of a magazine — the exact opposite of what Plaintiff asks the Court to do today. *Balsley*, No. 1:08 CV 491, 2009 WL 10688224 at \*2 ("Accordingly, the mere fact that Flynt complied with Rule 33 does not then mean that Flynt should be deposed in the absence of a demonstration by Plaintiffs that Flynt has unique or specialized knowledge of Plaintiffs' claims."). The *Balsley* court also rejected the argument that verification of discovery responses supported that deposition was appropriate and noted "Plaintiffs' argument that Flynt's verification of the interrogatory responses somehow suggest that Flynt can be deposed *is not well-taken*." *Id.* (emphasis added). The court in *Gazvoda* addressed whether someone who verified discovery responses could be deposed based on his personal knowledge of the responses, but that individual was in-house counsel for the agency he verified responses on behalf of. *Gazvoda*, No. 15-CV-14099, 2018 WL 1281756, at \*6. Therefore, the *Gazvoda* court applied the test for when discovery from an opposing counsel is appropriate, which is irrelevant to the issue currently before this Court. These cases do not support Plaintiff's arguments.

**\*5** In any event, the undersigned is not persuaded the case law supports that Dr. Weiss's verification of the discovery responses has any bearing on whether his deposition is appropriate now.

Rule 26(c) allows the Court to issue protective orders for good cause shown to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense,

including that the disclosure or discovery not be had, or that the disclosure or discovery be limited to certain matters. Fed. R. Civ. P. 26(c). The party seeking a protective order has the burden of showing that good cause exists for the order. *Nix v. Sword*, 11 F. App'x 498, 500 (6th Cir. 2001).

The Court concludes there is good cause for a protective order preventing the deposition of Dr. Weiss at this early phase of the litigation. It appears Plaintiff has not attempted to gather information from other sources who may be more familiar with the relevant conduct before jumping to the apex of Defendant's organization. Defendant argues that Plaintiff's attempts to depose Dr. Weiss are motived by harassing and annoying Solstice and its CEO. (ECF No. 51, PageID. 1092; PagID. 1099). The undersigned is inclined to agree. There appear to be better situated, knowledgeable individuals who were more closely involved with the sending of the fax who would be more convenient and less expensive to depose than Defendant's CEO. Because there are other sources of discovery that Plaintiff has not pursued to obtain this information, compelling Dr. Weiss to sit for the deposition would be unduly burdensome at this time. Defendant's motion for protective order is **GRANTED** until Plaintiff has reasonably and in good faith pursued discovery from other sources. (ECF No. 51). The undersigned cautions Plaintiff that efforts to depose Dr. Weiss again without first exhausting other sources of discovery could subject Plaintiff to sanctions. The Court does not look favorably upon efforts to harass and annoy.

### c. Analysis of Plaintiff's Motion for Protective Order

On May 24, 2023, Plaintiff filed a motion for a protective order regarding Defendant's communications with absent class members. (ECF No. 37). Plaintiff's position is that there is no need to communicate with absent class members before the Court determines the class certification. (*Id.* at PageID.445). Plaintiff argues that the absent class members are unlikely to know anything about this case and are unlikely to remember receiving Solstice's fax in April 2018. (*Id.*). Plaintiff's motion asks that the Court order the parties to "to produce immediately any written correspondence sent to absent class members about this case, and requiring parties to coordinate before contacting absent class members about the litigation so that all counsel may be present for in-person discussions." (*Id.* at PageID.453). Plaintiff indicates these measures are necessary to protect against potential abuse and coercion. (*Id.*).

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.544 Filed 03/26/26 Page 124 of 194

Brian J. Lyngaas, D.D.S., P.L.L.C. v. Solstice Benefits, Inc., Not Reported in Fed. Supp....

Plaintiff suggests that the Court should limit Defendant's ability to contact putative class members until the Court is "convinced the contacts would seek relevant, discoverable information." (*Id.* at PageID.447). Yet Plaintiff presents little evidence that the communication by Defendant does not seek relevant discoverable information, or that the communication otherwise presents concerns of coercion and abuse. Plaintiff notes the Eleventh Circuit has found that a unilateral communications scheme is " 'rife with potential for coercion,' particularly where 'the class and the class opponent are involved in an ongoing business relationship.' " (*Id.* at PageID.449) (quoting *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1202 (11th Cir. 1985)). That said, Plaintiff does not indicate whether the potential class members currently engage in an ongoing business relationship with the class opponent. The undersigned does note that Defendant appears to be attempting to argue that it has an existing provider relationship with the potential class members and Plaintiff when the fax was sent in 2018. Even so, Plaintiff's motion lacks any allegation of the existence of or factual details supporting that there is an ongoing business relationship between Defendant and potential class members. (ECF No. 37, PageID.444). In future filings, counsel is encouraged to focus on stating the factual support for their arguments and the logical bridge between the legal analysis and the factual issues presented in the motion.

**\*6** And *Kleiner* is poorly matched to the facts here. *Kleiner* involved an intentional scheme by the defendant to reach class members and entice them to withdraw from the class before those members received the court-approved notice advising them of their rights. The issue presently before the Court is whether Defendant may contact putative class members before class certification.

In response, Defendant states that it has informed Plaintiff's counsel that communication would "disclose the existence of the lawsuit, that it is a proposed class action, that we represent the Defendant, the identity of the Plaintiff and his counsel, the parties' positions, and that the putative class member has the right to decline to speak with us as well as the right to have their own legal representation during the communications." (ECF No. 44, PageID.691). Plaintiff's reply brief contains no additional factual allegations in support of the motion or relevant legal analysis which would aid in the question before the court. (ECF No. 47).

An order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 (1981). "The moving party must demonstrate that the actual or anticipated communications are or will be abusive in that [they] threaten[ ] the proper functioning of the litigation." *Tolmasoff v. Gen. Motors, LLC*, No. 16-11747, 2016 WL 3548219, at \*11 (E.D. Mich. June 30, 2016) (internal quotation marks omitted, further citation omitted) (alterations original). Abusive communications that courts have found sufficient to warrant a protective order include those which: coerce prospective class members into excluding themselves from the litigation; contain false, misleading, or confusing statements; or undermine cooperation with or confidence in class counsel. *Young v. Chieftain Coating, LLC*, No. 20-CV-10520-DT, 2022 WL 3020134, at \*2 (E.D. Mich. July 29, 2022) (citing and *Cox Nuclear Med. v. Gold Cup Coffee Servs., Inc.*, 214 F.R.D. 696, 697-98 (S.D. Ala. Mar. 7, 2003)).

"Generally, courts should refrain from interfering 'with any party's ability to communicate freely with putative class members unless there is a specific reason to believe that such interference is necessary.' " *Perkins v. Benore Logistics Sys., Inc.*, No. 16-13717, 2017 WL 445603, at \*2 (E.D. Mich. Feb. 2, 2017) (quoting *Austen v. Catterton Partners*, 831 F. Supp. 2d 559, 567 (D. Conn. Apr. 6, 2011)). "Intervention is warranted ... where such communications are found to be misleading or coercive, as such communication poses 'a serious threat to the fairness of the litigation process, the adequacy of representation and the administration of justice.' " *Id.* (quoting *Brown v. Mustang Sally's Spirits & Grill, Inc.*, No. 12-CV-529S, 2012 WL 4764585, at \*3 (W.D.N.Y. Oct. 5, 2012)).

The record before the Court does not support that Defendant has engaged in any communications that would warrant the Court's interference, much less that Defense counsel has engaged in the type of "subterfuge and subversion" that constitutes "an intolerable affront to the authority of the district court to police class member contacts." *Kleiner*, 751 F.2d at 1203. Simply put, Plaintiff advances no clear record of specific findings that would warrant a need for limitation of communication. Thus, Plaintiff's motion is **DENIED**. (ECF No. 37).

**\*7** **IT IS SO ORDERED.**

The parties here may object to and seek review of this Order, but are required to file any objections within 14 days of service as provided for in Federal Rule of Civil Procedure 72(a) and Local Rule 72.1(d). A party may not assign as error any defect in this Order to which timely objection was not made. Fed. R. Civ. P. 72(a). Any objections are required to specify the part of the Order to which the party objects and state the basis of the objection. When an objection is filed to a magistrate judge's ruling on a non-dispositive motion, the ruling remains in effect unless it is stayed by the magistrate judge or a district judge. E.D. Mich. Local Rule 72.2.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 6302998

---

**Footnotes**

1        The undersigned presumes these citations are referring to attachment three, which lacks an exhibit designation. In future filings, counsel should designate each attachment as an exhibit and cite the exhibits by either number or letter for the sake of clarity rather than using confusing and ambiguous shorthand such as "Weiss Decl. at ¶ 6."

---

**End of Document**                                  © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 12349625
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

CEIVA LOGIC, INC., Plaintiff,
v.
AMAZON.COM, INC., Defendant.

Case No. 2:19-CV-09129-AB-MAAx
|
Signed October 26, 2021
|
Filed November 10, 2021
|
Hearing: November 5, 2021 at 1:30 p.m.

**Attorneys and Law Firms**

Gary Alan Hecker, Nicole Kamish, Samuel W. Dunwoody IV, Pro Hac Vice, Munck Wilson Mandala LLP, Los Angeles, CA, Jordan C. Strauss, Pro Hac Vice, Michael C. Wilson, Pro Hac Vice, Muck Wilson Mandala LLP, Dallas, TX, for Plaintiff.

J. David Hadden, Saina S. Shamilov, Donna Tang Long, Johnson Kuriakose Kuncheria, Ravi R. Ranganath, Fenwick and West LLP, Mountain View, CA, Christine Jimin Ko, Christopher Shawn Lavin, Fenwick and West LLP, San Francisco, CA, Jeffrey A. Ware, Fenwick and West LLP, Seattle, WA, Melissa Leigh Lawton, Fenwick and West LLP, Santa Monica, CA, Olivia L. Wheeling, Pro Hac Vice, Fenwick and West LLP, New York, NY, for Defendant.

**REDACTED ORDER GRANTING DEFENDANT AMAZON.COM, INC.'S MOTION FOR PROTECTIVE ORDER PREVENTING DEPOSITION OF JEFFREY BEZOS (ECF NO. 152)**

MARIA A. AUDERO, UNITED STATES MAGISTRATE JUDGE

## I. INTRODUCTION

**\*1** Before the Court is Defendant's Motion for Protective Order Preventing Deposition of Jeffrey Bezos ("Motion"). (Mot., ECF No. 152.) The Motion was filed jointly by Defendant Amazon.com, Inc. ("Defendant") and Plaintiff Ceiva Logic, Inc. ("Plaintiff"), in the form of a Joint Stipulation as required by Central District of California Local

Civil Rule ("Local Rule") 37-2 ("Joint Stipulation"). (Jt. Stip., ECF No. 152-1.) Through the Motion and its supporting Joint Stipulation, Defendant seeks a protective order preventing the deposition of its Executive Chair and former Chief Executive Officer, Jeffrey Bezos. (*See generally* Motion; Jt. Stip.)

In support of its Motion, Defendant filed the Declaration of Saina S. Shamilov ("Shamilov Declaration") (Shamilov Decl., ECF No. 152-3), and its accompanying Exhibits A through AA[1] (Def.'s Ex. A (ECF No. 152-4); Ex. B (ECF No. 152-5); Ex. C (ECF No. 152-6) ; Ex. D (ECF No. 152-7) ; Ex. E (ECF No. 152-8) ; Ex. F (ECF No. 152-9); Ex. G (ECF No. 152-10); Ex. H (ECF No. 152-11) ; Ex. I (ECF No. 152-12); Ex. J (ECF No. 155-13); Ex. K (ECF No. 152-14); Ex. L (ECF No. 152-15); Ex. M (ECF No. 152-16); Ex. N (ECF No. 152-17); Ex. O (ECF No. 152-18); Ex. P (ECF No. 152-19); Ex. Q (ECF No. 152-20); Ex. R (ECF No. 152-21); Ex. S (ECF No. 152-22); Ex. T (ECF No. 152-23); Ex. U (ECF No. 152-24); Ex. V (ECF No. 152-25); Ex. W (ECF No. 152-26); Ex. X (ECF No. 152-27); Ex. Y (ECF No. 155-13); Ex. Z (ECF No. 155-15); Ex. AA (ECF No. 152-30)).

Plaintiff opposes the Motion. (Jt. Stip. 12–14, 38–61.)[2] In support of its opposition, Plaintiff filed the Declaration of Jordan C. Strauss ("Strauss Declaration") (Strauss Decl., ECF No. 152-31), and its accompanying Exhibits 1 through 31 (Pl.'s Ex. 1 (ECF No. 155-2);; Ex. 2 (ECF No. 152-33); Ex. 3 (ECF No. 152-34); Ex. 4 (ECF No. 152-35); Ex. 5 (ECF No. 152-36); Ex. 6 (ECF No. 152-37); Ex. 7 (ECF No. 152-38); Ex. 8 (ECF No. 152-39); Ex. 9 (ECF No. 155-3); Ex. 10 (ECF No. 155-4); Ex. 11 (ECF No. 155-5); Ex. 12 (ECF No. 155-6); Ex. 13 (ECF No. 155-7); Ex. 14 (ECF No. 155-8); Ex. 15 (ECF No. 155-9); Ex. 16 (ECF No. 152-47); Ex. 17 (ECF No. 155-48); Ex. 18 (ECF No. 152-49); Ex. 19 (ECF No. 155-10); Ex. 20 (ECF No. 152-51); Ex. 21 (ECF No. 152-52); Ex. 22 (ECF No. 155-11); Ex. 23 (ECF No. 155-12); Ex. 24 (ECF No. 152-55); Ex. 25 (ECF No. 152-56); Ex. 26 (ECF No. 152.57); Ex. 27 (ECF No. 152-58); Ex. 28 (ECF No. 152-59); Ex. 29 (ECF No. 152-60); Ex. 30 (ECF No. 152-61); Ex. 31 (ECF No. 152-62). In addition, Plaintiff filed the Declaration of Professor Stephen A. Edwards ("Edwards Declaration") (Edwards Decl., ECF No. 152-2), and its accompanying Exhibits 1 through 3 (Edwards Ex. 1 (*id.* at 8–36); Ex. 2 (*id.* at 37–70); Ex. 3 (*id.* at 71–91)).

**\*2** Having read and considered the papers submitted by the parties, the Court finds the Motion suitable for disposition without a hearing. See Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15. Accordingly, the hearing set for November 5, 2021 is hereby

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.547 Filed 03/26/26 Page 127 of 194

Ceiva Logic, Inc. v. Amazon.com, Inc., Not Reported in Fed. Supp. (2021)

**VACATED** and taken off calendar. For the reasons set forth below, Plaintiff's Motion is **GRANTED**.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background[3]

This patent infringement action, which proceeds on the basis of Plaintiff's First Amended Complaint ("FAC"), involves digital picture frame technology. (FAC, ECF No. 31, at ¶¶ 8, 19.) Plaintiff is the owner of U.S. Patent Nos. 6,442,573 (" '573 Patent"), 9,203,930 (" '930 Patent"), and 9,654,562 (" '562 Patent") (collectively, "Asserted Patents"). (*Id.* at ¶¶ 10, 28; *see also id.* at Exs. 1, 2, 3.) Plaintiff contends that Defendant infringes on the Asserted Patents through three accused product families—the Kindle e-Reader, the Echo Show, and the Fire Tablet families. (*Id.* at ¶¶ 95–116.)

### 1. The Creation of the Ceiva Frame

Plaintiff alleges that, although digital picture frames existed as of 1999, the technology required formatting of digital photos and proprietary equipment. (FAC ¶ 18.) Convinced that there was a better way to share and view digital photos, Ceiva's founders set out to invent a digital picture frame that overcame the challenges of the then-existing digital picture frame technology. (*Id.* at ¶ 19.) Thus was born the "Ceiva Display." (*Id.*) Generally, the Ceiva Display is "a self-configuring digital picture frame that automatically obtain[s] digital images from display on the frame from a repository that [can] be accessed via a communications network." (*Id.* at ¶ 20.) Specifically, the Asserted Patents disclose a digital picture frame that does not require user input to download new content or to update its software. (*Id.* at ¶¶ 56–59.) The claims in the Asserted Patents describe the technologies that enable the digital picture frame "to automatically access[ ] a remote data repository without any further user input." (*Id.* at ¶ 56.) In addition, the patent specifications describe the technological improvements that "enable the claimed digital picture frame to automatically issue a request to the remote server system, and thereby receive images and software updates without any user input." (*Id.*) At the time, the technologies claimed in the Asserted Patents were "unconventional." (*Id.* at ¶¶ 61–70.) The unique features of the Ceiva Display are described in its packaging: "(1) 'No computer needed to receive photos'; (2) 'Automatically receives and displays a digital photo slide show – up to twenty new photos a day'; (3) 'Simple to set up and use'; and (4)

'Perfect for parents and grandparents.' " (*Id.* at ¶ 75.) Plaintiff released its commercial embodiment of the Asserted Patents —the Ceiva Frame—in December 1999. (*Id.* at ¶ 73.)

On December 10, 1999, Plaintiff filed its first United States patent application to protect the inventions implemented in the Ceiva Display, Serial No. 09/458,849 (" '849 Application"). (FAC ¶ 22.) Four United states patents covering the inventions disclosed in the '849 Application have issued to date, three of which are the Asserted Patents. (*Id.* at ¶ 23.) The '573 Patent issued on August 27, 2002, the '930 Patent issued on December 1, 2015, and the '562 Patent issued on May 16, 2017. (*Id.* at ¶¶ 24, 26, 27.)

### 2. The Amazon-Ceiva Resale Agreement and Defendant's Promotion of the Ceiva Frame

**\*3** While the '849 Application was pending, and before any patents issued, the parties developed a relationship related to the Ceiva Frame. In March 2000, the parties entered into an agreement whereby Defendant would have the exclusive sales rights over the Ceiva Frame, which it would sell through its Amazon.com website ("Resale Agreement"). (Pl.'s Ex. 1.) The Resale Agreement required Defendant to, among other things, "support the launch of the Ceiva [Frame] on its web site with marketing to its customer base," including, among other things, sending "e-mail messages to targeted Amazon.com customers." (*Id.* at 2.)

On March 27, 2000, in "its first-ever national print advertisement," Defendant issued a press release about the Ceiva Frame. (*See* FAC ¶ 81.) It was entitled "Amazon.com Named Exclusive Retailer for New Internet-Enabled Picture Frame Ceiva, Making Amazon.com the Best Place to Find and Discover the Hottest Electronics." (Pl.'s Ex. 5 at 2.) The press release touted the Ceiva Frame as "the first-ever Internet-connected digital picture frame, which enables people to receive photos to a picture frame directly over a phone line." (*Id.*) It characterized the Ceiva Frame's functions as "anything but traditional." (*Id.*) It explained that, "[o]nce activated, it automatically calls the Ceiva service every night and downloads new images sent by friends and family," and displays "up to 10 new photos every morning." (*Id.*) It quoted Defendant's general manager as saying: " 'As the exclusive retailer of Ceiva, we give our customers just what they are looking for — access to the latest and greatest products first.' " (*Id.*)

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.548 Filed 03/26/26 Page 128 of 194

Ceiva Logic, Inc. v. Amazon.com, Inc., Not Reported in Fed. Supp. (2021)

On March 30, 2000, Defendant placed an advertisement in the *Wall Street Journal* in which it pictured the Ceiva Frame, publicizing it as "[t]he world's first internet-connected picture frame meets Uncle Frank's toupé" and highlighting that the reader could "[r]eceive photos of family and friends over the internet without computer. Available at Amazon.com. To learn more visit www.amazon.com/ceiva." (Pl.'s Ex. 6.)

On April 4, 2000, Sara Morris, the then-employee of Defendant who oversaw the relationship between Defendant and Plaintiff, sent an email to Plaintiff's representatives regarding an email that Mr. Bezos was to send to Defendant's customers ("Morris Email"). (Def.'s Ex. R.) The Morris Email attached a draft of what Ms. Morris referred to as "the Jeff email"—an email that would be sent from Mr. Bezos to Defendant's first one hundred thousand customers, offering them a special deal—"we'll give you $25 off"—on the Ceiva Frame ("Jeff Email"). (Def.'s Ex. Q.) The subject line of the Jeff Email was: "A special offer for long-time Amazonians." (*Id.* at 2.) The Jeff Email described the Ceiva Frame as "a pretty remarkable device" and noted that Defendant was "the only retailer—online or off—who carries it." (*Id.*) Distinguishing it from a "wooden picture frame," the Jeff Email explained that the Ceiva Frame "lets you download digital photos and display them in full color." (*Id.*) The Jeff Email noted the simplicity of the Ceiva Frame: "Just store your images in your account ... encourage your friends and family to do the same ... plug your Ceiva frame into the phone line and it'll fill with smiles and snapshots of your favorite people" with "[n]o Internet connection or computer needed." (*Id.*) The Jeff Email was signed: "Sincerely, Jeff Bezos, Founder and CEO, Amazon.com." (*Id.*) In the Morris Email, Ms. Morris explained that the Jeff Email she was forwarding was a draft that would be personalized by Mr. Bezos that day, that his edits might be "substantial," that his "his edits are final," and that there would be no "opportunity to make changes" thereafter. (Def.'s Ex. R at 2.)

**\*4** In or around April 2000, Mr. Bezos took part in an interview conducted and broadcast by the Cable News Network ("CNN"). (Def.'s Ex. T; *see also* ECF No. 156.) The interview focused on the profitability of Defendant's family of businesses. (Def.'s Ex. T.) Mr. Bezos explained to the CNN interviewer that Defendant was driving toward profitability in each of its businesses; that some of the businesses—such as the United States books business—already were profitable, while other businesses, which were at different stages of their life cycles—such as books, music, and video as a group—were not; that Defendant's goal was to make that group

profitable by the end of 2000; and that, in the meantime, Defendant was continuing to invest in its new business units, such as electronics, toys, and tools. (*See id.*) At this point, Mr. Bezos light-heartedly said: "By the way, I would like to encourage all of your viewers to buy the Ceiva picture frame ... that will help us with profitability." (*Id.*) To which the CNN host responded in laughter: "All right ... we've all decided to go out and buy some ... so that Jeff doesn't go bankrupt." (*Id.*)

On April 19, 2001, Dean Schiller, Plaintiff's founder and inventor of the Asserted Patents, sent an email to Mr. Bezos referencing a meeting between the two at a TED conference [4] ("Schiller Email"). (Jt. Stip. 26 n.14; Def.'s Ex. S.) In the Schiller Email, Mr. Schiller recounted their conversation at TED; offered to send Mr. Bezos a current version of the Ceiva Frame; acknowledged Mr. Bezos's support and enthusiasm; noted that Amazon.com had been a "very good distribution point for [Ceiva]"; acknowledged Mr. Bezos's "offer to send [an] email," which Ceiva was "unable to make happen for whatever reason;" stated that he would love to have Mr. Bezos send such an email if Mr. Bezos was "still interested"; and noted that Mr. Bezos's "own experience is an honest and compelling story that reveals the wonderful side of" the Ceiva Frame. (Def.'s Ex. S.)

### 3. The Alleged Infringement Notice to Defendant

Plaintiff marked the Ceiva Frame with its '573 Patent number. (FAC ¶ 89.) Defendant began offering Plaintiff's smart displays marked with the '573 Patent number for sale on its Amazon.com website at least as early as February 10, 2003. (*Id.* at ¶ 93.) In addition, but without Plaintiff's authorization, Defendant makes and sells Amazon-branded products—the Echo Show family of products, the Fire Tablet family of products, and the Kindle E-Book family of products—covered by at least one claim of the Asserted Patents. (*Id.* at ¶¶ 95–116.) Also without Plaintiff's authorization, Defendant offers for sale and sells third-party products covered by the '562 and the '930 Patents. (*Id.* at ¶¶ 98, 107.)

In November 2018, Plaintiff sent a letter to Defendant giving notice of Defendant's infringement of the '562 Patent and demanding that Defendant stop its infringement ("Notice Letter"). (FAC ¶ 89.) Despite having received and acknowledged the Notice Letter, Defendant has continued its infringement activities. (*Id.* at ¶¶ 91–92.)

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.549 Filed 03/26/26 Page 129 of 194

Ceiva Logic, Inc. v. Amazon.com, Inc., Not Reported in Fed. Supp. (2021)

This lawsuit followed.

**B. Procedural Background**

1. The Lawsuit

On October 23, 2019, Plaintiff filed its lawsuit against Defendant. (Compl., ECF No. 1.) The operative FAC, filed on February 13, 2020, asserts claims of direct infringement of the Asserted Patents. (*See* FAC.) Relevant here, Defendant asserts defenses, among others, that the Asserted Patents are invalid because they are obvious in light of prior art under 35 U.S.C. § 103 (Jt. Stip. 27), and that the Asserted Patents are not patent-eligible under 35 U.S.C. § 101 (*id.* at 30).

2. The Discovery Dispute

**\*5** Plaintiff currently seeks to depose Mr. Bezos on two general topics: (1) his role in the relationship between Defendant and Plaintiff, and his personal endorsement or promotion of the Ceiva Frame, and (2) his involvement in the design and development of the accused products. (Def.'s Ex. F at 8–10.) Plaintiff served Defendant with a notice of deposition of Mr. Bezos pursuant to Federal of Civil Procedure ("Rule") 30(b)(3). In addition, Plaintiff served Defendant with a Rule 30(b)(6) notice of deposition covering the following topics, among others:

Topic 18: The involvement of Jeff Bezos in the design and development of each accused product (*see, e.g.*, document no. AMZ-CEIVA00000754).

Topic 114: Amazon's business relationship with Ceiva as a seller of Ceiva's digital picture frame.

Topic 115: Amazon's business relationship with Ceiva as the exclusive retailer of Ceiva's digital picture frame.

Topic 116: Amazon's advertising, marketing and promotion of the Ceiva digital picture frame.

Topic 117: Ownership and/or use of Ceiva's digital picture frames by amazon's founders, board members, employees or agents.

Topic 118: Any technical and/or physical evaluating, testing, analysis, or reverse engineering of the [sic] Ceiva's digital picture frame by Amazon.

Topic 119: Communications between Amazon and Ceiva, including in connection with Amazon's business relationship with Ceiva as the exclusive retailer of the [sic] Ceiva's digital picture frame.

Topic 120: Communications between any employees of Ceiva and employees of Amazon in connection with their business relationship, including as the exclusive retailer of the [sic] Ceiva's digital picture frame.

Topic 121: Use by Amazon's founders, board members, or employees of the Ceiva subscription service.

Topic 122: Jeff Bezos' involvement in the business relationship between Ceiva and Amazon, including in connection with Amazon being the exclusive retailer of the Ceiva digital picture frame.

(Jt. Stip. 16–17.) All Topics, except Topics 18 and 118, relate to Plaintiff's first area of inquiry: Mr. Bezos's role in the relationship between Defendant and Plaintiff and his personal endorsement or promotion of the Ceiva Frame. Topics 18 and 118 relate to Plaintiff's second area of inquiry: Mr. Bezos's involvement in the design and development of the accused products and the alleged reverse engineering of the Ceiva Frame by Defendant.

Before issuing these deposition notices, Plaintiff sought to obtain the information encompassed by Topics 18 and 114 through 122 through other discovery means. (Jt. Stip. 49.) Specifically, Plaintiff served requests for admissions asking Defendant to admit that Mr. Bezos: (1) owned at least one Ceiva Frame, and (2) marketed, promoted, boasted, or referred to the Ceiva Frame as "revolutionary," all of which Defendant denied. (*Id.* (citing Pl.'s Ex. 28 at 3–4).) In addition, Plaintiff served an interrogatory asking Defendant to "[i]dentify any pre-suit communication(s) made by or on behalf of Amazon concerning Ceiva or its digital picture frame products," in response to which Defendant identified the pre-suit infringement notice letters, which did not involve Mr. Bezos. (*Id.* (citing Pl.'s Ex. 29 at 4).)

Because Defendant objected to the deposition of Mr. Bezos, Plaintiff requested the Court's intervention through its informal discovery dispute resolution process, seeking an order compelling Mr. Bezos's deposition. The Court held an informal discovery conference on June 4, 2021 ("June 4 IDC"). (June 4, 2021 IDC Order, ECF No. 123.) At the June 4 IDC, Plaintiff did not dispute that Mr. Bezos is "a high-ranking official" of Defendant, despite the fact that he

would be stepping down on July 5, 2021from his then-CEO position to one of Executive Chair. (June 4, 2021 IDC Tr., ECF No. 132, at 5–6.) Defendant objected to the deposition on the basis of the apex doctrine, arguing that (1) Plaintiff had not established that Mr. Bezos had unique knowledge about the deposition topics because it had not taken a single deposition before seeking that of Mr. Bezos, (2) Defendant had designated witnesses on the topics at issue and that those depositions had not yet been taken place, (3) Defendant had not exhausted other less-intrusive means of obtaining this information, including through third-party discovery, and (4) the discovery sought was not relevant. (*Id.* at 12–15.) Upon conferring with the parties, the Court noted that it was not convinced that Plaintiff had exhausted all other less-intrusive discovery methods before seeking to depose Mr. Bezos. (*Id.* at 15.) The Court suggested that, instead, Plaintiff first take the Rule 30(b)(6) depositions and depositions of other percipient witnesses and thereafter return to the Court with evidence that the depositions did not yield the information Plaintiff needs and that it believes can only be obtained from Mr. Bezos. (*Id.* at 16–17, 27.) The Court noted that it was not foreclosing the possibility of compelling Mr. Bezos to give a deposition, but that it wanted the parties to "do this in a way that makes sense and that respects the apex doctrine for somebody who ... Plaintiffs admit is very high-ranking." (*Id.* at 30.)

**\*6** Having deposed four corporate designees regarding the topics at issue, Plaintiff again requested the Court's intervention through its informal discovery dispute resolution process, seeking an order compelling Mr. Bezos's deposition. The Court held a further informal discovery conference on September 20, 2021 ("September 20 IDC"). (Sept. 20, 2021 IDC Order, ECF No. 144.) At the September 20 IDC, Plaintiff argued that the four corporate designees did not provide answers to the questions posed and, at times, provided testimony on the basis of speculation. (Sept. 20, 2021 Tr., ECF No. 145, at 5–10.) Defendant again objected to the deposition on the basis of the apex doctrine, arguing that (1) twelve depositions had been taken and that those deponents addressed the topics on which Plaintiff seeks to depose Mr. Bezos, and (2) in any event, Mr. Bezos's personal knowledge on those topics is not relevant to the case. (*Id.* at 12–19, 29–38.) The parties were unable to reach a resolution during the September 20 IDC, and this Motion followed.

Defendant seeks a protective order preventing Mr. Bezos's deposition on three grounds. *First*, it argues that Mr. Bezos has no unique, first-hand relevant knowledge regarding the relationship between Defendant and Plaintiff. (*Id.* at 18–33.)

*Second*, it argues that Mr. Bezos has no unique, first-hand relevant knowledge regarding the development of the accused products. (*Id.* at 33–35.) *Third*, it argues that, as a high-level executive who lacks unique, first-hand relevant knowledge about the case, Mr. Bezos is protected from deposition under the apex doctrine. (*Id.* at 35–36.)

## III. ANALYSIS

### A. Legal Standard

Rule 26(b)(1) governs the scope of discovery in federal cases and provides that parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. Fed. R. Civ. P. 26(b)(1). Rule 401 of the Federal Rules of Evidence provides that evidence is relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. But relevance alone does not justify discovery. As a general matter, Rule 26(b) is to be "liberally interpreted to permit wide-ranging discovery of information," even if that information is not ultimately admitted at trial. *Comcast of L.A., Inc. v. Top End Int'l, Inc.*, No. CV 03-2213-JFW(RCx), 2003 WL 22251149, at *2, 2003 U.S. Dist. LEXIS 18640, at *6 (C.D. Cal. July 2, 2003).

In addition to relevance, Rule 26(b)(1) requires that the discovery be proportional to the needs of the case. Fed. R. Civ. 26(b)(1). Proportionality is determined by a consideration of the following factors: "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* "Information within this scope of discovery need not be admissible in evidence to be discoverable." *Id.*

Further, the court "must limit the frequency or extent of discovery" pursuant to Rule 26(b)(2) if:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.551 Filed 03/26/26 Page 131 of 194

Ceiva Logic, Inc. v. Amazon.com, Inc., Not Reported in Fed. Supp. (2021)

opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1).

Fed. R. Civ. P. 26(b)(2)(C).

Upon a motion by a party, and for good cause shown, a court "may issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including ... forbidding the disclosure or discovery." Fed. R. Civ. P. 26(c)(A). To obtain such a protective order, "the party resisting discovery or seeking limitations thereon must show 'good cause' for its issuance. *Id.* "[A] strong showing is required before a party will be denied entirely the right to take a deposition." *Blankenship v. Hearst Corp.,* 519 F.2d 418, 429 (9th Cir. 1975) (citing 4 J. Moore, *Federal Practice* ¶ 26.69 (2d ed. 1974)). Such is a "heavy burden." *Id.*

**\*7** Courts recognize that depositions of high-level executives "create[ ] a tremendous potential for abuse or harassment." *Celebrity, Inc. v. Ultra Clean Holding, Inc.,* No. C 05-4374 MMC (JL), 2007 WL 205067, at \*3, 2007 U.S. Dist. LEXIS 8295, at \*8 (N.D. Cal. Jan. 25, 2007). Thus, protective orders under Rule 26(c) have been used to protect an entity when it faces, such as Defendant faces here, the deposition of an executive officer, also known as an apex deposition. *See, e.g.,* *Doble v. Mega Life & Health Ins. Co.,* No. C 09-1611 CRB, 2010 WL 3702441, at \*1–2, 2010 U.S. Dist. LEXIS 56190, at \*3–4 (N.D. Cal. May 18, 2010) (collecting cases where courts have prohibited the deposition of high-ranking corporate executives). In exercising discretion under Rules 26(b)(1) and (b)(2) to determine whether to prohibit an apex deposition, courts consider "(1) whether or not the high-level deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the case and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods, such as interrogatories and depositions of lower level employees." *WebSideStory, Inc. v. NetRatings, Inc.,* No. 06-cv-408 WQH(AJB), 2007 WL 1120567, at \*2, 2007 U.S. Dist. LEXIS 20481, at \*7 (S.D. Cal. Mar. 22, 2007).

As an initial matter, the party seeking the apex deposition must show that the executive has "direct personal factual information pertaining to material issues in an action[.]" *Littlefield v. Nutribullet,* No. CV 16-6894 MWF (SSx), 2017 WL 10438897, at \*6, 2017 U.S. Dist. LEXIS 229420, at

\*17 (C.D. Cal. Nov. 7, 2017) (quoting *Church of Scientology of Boston v. I.R.S.,* 138 F.R.D. 9, 12 (D. Mass. 1990)); *see also* *Hunt v. Cont'l Cas. Co.,* No. 13-cv-05966-HSG, 2015 WL 1518067, at \*2, 2015 U.S. Dist. LEXIS 44304, at \*6–7 (N.D. Cal. Apr. 3, 2015) (finding that plaintiff "proffered a substantial basis for concluding that [deponent] may have unique first-hand knowledge regarding the facts at issue in this case" because plaintiff's "gender and age discrimination claims include direct allegations regarding actions taken by and statements made by [deponent]" based on plaintiff's "direct interactions with [deponent]").

Even where an apex deponent has such direct personal knowledge, good cause has been found to prohibit an apex deposition where the "high-level corporate executive lack[ed] unique or superior knowledge of the facts in dispute." *WebSideStory, Inc.,* 2007 WL 1120567, at \*2, 2007 U.S. Dist. LEXIS 20481, at \*7. (citations omitted). Good cause also has been found where "the information sought in the deposition can be obtained through less intrusive discovery methods (such as interrogatories) or from depositions of lower-level employees with more direct knowledge of the facts at issue." *Affinity Labs of Tex. v. Apple, Inc.,* No. C 09-4436 CW (JL), 2011 WL 1753982, at \*15, 2011 U.S. Dist. LEXIS 53649, at \* 42 (N.D. Cal. May 9, 2011) (quoting *Baine v. Gen. Motors Corp.,* 141 F.R.D. 332, 334 (M.D. Ala. 1991)).

On the other hand, even a high-ranking executive is subject to deposition where it is found that he or she "has personal knowledge of facts relevant to the lawsuit[.]" *Id.* (citations omitted). Generally, a claimed lack of knowledge on behalf of the deponent does not alone provide sufficient ground for a protective order. *Id.* (citations omitted). Nor is "the fact that the apex witness has a busy schedule" sufficient to foreclose otherwise proper discovery. *Id.* (citation omitted).

**B. A Protective Order Preventing the Deposition of Mr. Bezos Regarding Topic 18 [5] is Warranted.**

Defendant contends that, because its Rule 30(b)(6) designees regarding Plaintiff's Topic 18—Matt Wong, Senior Manager of the Fire Tablet family of products, and Kevin Burkhart, Director of Marketing for the Echo Show family of products —have fully answered Plaintiff's questions on this topic, any knowledge or information Mr. Bezos may have is not "unique" as required for an apex deposition (Jt. Stip. 33– 35.) Plaintiff, on the other hand, disputes that Messrs. Wong and Burkhart fully answered its questions on this topic, and contends instead that, given Mr. Bezos's involvement in the

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.552 Filed 03/26/26 Page 132 of 194

Ceiva Logic, Inc. v. Amazon.com, Inc., Not Reported in Fed. Supp. (2021)

subject matter of this topic, any knowledge and information he may have is "unique" and justifies an apex deposition. (*Id.* at 49–55.)

**\*8** Defendant notes that Mr. Wong testified that, pursuant to his experience, "we have never had a review with [Mr. Bezos] regarding Fire Tablets," including product development milestones, and that the appearance of Mr. Bezos's name on certain product management documents does not necessarily mean that he specifically reviewed or approved them. (Def's Ex. Z at 199:1–200:13.) In addition, Defendant notes that Mr. Burkhart testified that Mr. Bezos was not involved in the drafting of technical documents, including concept review or go-to-market documents, but instead he provided only high-level guidance on the overall physical design of Echo Show devices, including the industrial design and form factor. (Def.'s Ex. Y at 138:22–139:14, 142:3–18.)

Plaintiff takes issue with the sufficiency of the testimony of Messrs. Wong and Burkhart. (Jt. Stip. 49–55.) With respect to Mr. Wong's testimony regarding the design and development of the Fire Tablet family of products, Plaintiffs notes that, as a threshold matter, Mr. Wong did not discuss with Mr. Bezos "his input or approval in the development of any version of the Fire Tablet product" (Pl.'s Ex. 22 at 199:5–12); that his only conversation with Mr. Bezos, which occurred in Spring 2020, was "on a confidential project" that was "not related Fire Tablets in any way," that also was not related to the Kindle or Echo Show families of products, and was instead "related to COVID-19" (*id.* at 202:9–15; 207:12–24; 210:19–24); and that he did not "try to search or locate any documents ... indicating Mr. Bezos's involvement in the design or development of any Fire Tablet product" (*id.* at 212:2–5, 221:2–7).

In addition, Plaintiff notes Mr. Wong's further testimony as follows: that he could not recall seeing or reviewing "any communications indicating Mr. Bezos's involvement in the development of approval of a Fire Tablet product" (*id.* at 199:13–17, 201:14–21, 203:23–204:1, 204:16–20, 218:24–219:3, 220:19–25); that he could not confirm whether a 2010 Business Requirement Document ("BRD") for [redacted] ; that he did not know whether the reference in the BRD for two other Fire Tablets to [redacted] ; that he could not confirm whether Mr. Bezos was personally involved in approving two other Fire Tablets, [redacted] ; that he "would be speculating" as to Mr. Bezos's involvement (*id.* at 218:20–23, 219:4–11); that he did not know the earliest date that Mr. Bezos became involved in providing input into the development or launch

of the Fire Tablet family of products (*id.* at 200:20–23); that he did not know "which products Mr. Bezos view[ed] as the biggest competitive threats to the Fire Tablet family of products" (*id.* at 205:16–20); that he did not recall or know how many of Defendant's products Mr. Bezos has "ever been personally involved with at the development stage" (*id.* at 207:6–10). In addition, Plaintiff notes that Mr. Wong limited his testimony to the period June 2019 to the present and 2015 to 2017 for only certain Fire Tablets (*id.* at 20:23–21:6, 21:25–22:6, 199:2–4, 200:5–19, 201:8–13, 211:14–212:1, 215:7–12, 215:20–216:11); and that he conceded that his testimony for any other time frame would be based on "[s]peculation based on [his] work on Fire Tablets since 2019" (*id.* at 219:16–19, 220:2–7).

With respect to Mr. Burkhart's testimony regarding the design and development of the Echo Show family of products, Plaintiff notes that, like Mr. Wong, Mr. Burkhart did not "try to locate any documents regarding Mr. Bezos's level of involvement in the design or development of the Echo Show products" (Pl.'s Ex. 23 at 144:21–24), and that, while Mr. Burkhart recalled having some discussions with Mr. Bezos, he could not recall how many, when, or the specific details of the discussions, including details regarding the industrial design or Mr. Bezos's feedback about the product (*id.* at 137:4–138:16, 139:7–11, 139:19–24, 140:10–13).

**\*9** In addition, Plaintiff notes Mr. Burkhart's further testimony as follows: that he could not confirm whether the Echo Show Gen 1 BRD stating "it reflects the direction received from Jeff" incorporated input from Jeff Bezos (*id.* at 136:19–137:2); that he "never asked Mr. Bezos whether or not he did edit or draft" the document (*id.* at 142:3–8, 142:20–23); that he did not know "the earliest date Mr. Bezos became involved in the development for the Echo Show products" (*id.* at 141:8–11); that he did not know the competitors that Mr. Bezos viewed as "the biggest threats" at the time of the concept review of an Echo Show product (*id.* at 143:15–19); that he did not know whether "Mr. Bezos' [sic] level of involvement in the Echo Show product family differed from his involvement in the development of any other [of Defendant's] products" (*id.* at 143:21–144:2); that he did not know whether there was a "particular Echo [S]how product version that Mr. Bezos was more heavily involved in with respect to the development or approval compared to the other Echo Show products" (*id.* at 144:4–8); that he did not know how many Echo Show product meetings Mr. Bezos attended (*id.* at 142:24–143:2); that he did not know if "Mr. Bezos' [sic] vision for the Echo Show product family evolved or changed

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.553 Filed 03/26/26 Page 133 of 194

Ceiva Logic, Inc. v. Amazon.com, Inc., Not Reported in Fed. Supp. (2021)

over the course of time" (*id.* at 141:12–16); that he did not know what other products Mr. Bezos was considering launching at the time of the concept review of an Echo Show product (*id.* at 141:18–22); and that he did not know what top five features and risk factors Mr. Bezos recommended for the Echo Show family of products (*id.* at 143:3–13).

Based upon this testimony, the Court concludes that Defendant failed to produce Rule 30(b)(6) witnesses who could answer Plaintiff's questions about Mr. Bezos's involvement in the design and development of the Fire Tablet and Echo Show families of products. Indeed, neither witness was able to testify to any details of Mr. Bezos's involvement. Nor were they able to testify with certainty that Mr. Bezos was *not* involved in the design and development of such products. Mr. Burkhardt testified that Mr. Bezos's involvement with the Echo Show family of products was limited to high-level input on the overall physical design of the products and he would not have drafted or reviewed technical documents, while Mr. Wong testified that he was not aware of Mr. Bezos having any involvement in the design or development of the Fire Tablet family of products. Mr. Wong also acknowledged that documents for certain products named Jeff as an approver or made references to his review, although Mr. Wong added that this did not necessarily mean that Mr. Bezos personally reviewed or approved the design of the products at issue. Overall, however, this testimony is not sufficient to establish that Mr. Bezos actually has *any* first-hand knowledge on this issue, let alone *unique* first-hand knowledge, as required for an apex deposition. *See, e.g.*, *Nucap. Indus. Inc. v. Robert Bosch LLC*, No. 15 CV 2207, 2017 WL 6059770, at \*3–4, 2017 U.S. Dist. LEXIS 201458, at \*8–11 (N.D. Ill. Dec. 7, 2017) (holding that the appearance of an executive's name on certain emails and business documents was insufficient to establish that executive's involvement in the events at issue, so as to justify taking his deposition).

Moreover, even assuming Mr. Bezos actually participated in the design and development of the Fire Tablet and Echo Show families of products, and even if his knowledge is unique, Plaintiff has not established that his knowledge on this topic would be relevant to any issue in this case. Rather than explain the relevancy of Mr. Bezos's involvement in the design and development of the accused products to the claims and defenses here, Plaintiff simply notes that "the jury should hear from Mr. Bezos himself regarding the role he went onto [sic] play in developing the accused products, after initially lauding the Ceiva Frame in 2000." (*Id.* at 60–61.) This is not enough. As Defendant argues, "[w]hether

Mr. Bezos was involved in any design and development of the accused products is irrelevant. What is relevant is the actual design, development, and functionality of the accused products." (*Id.* at 34.) The Court agrees with Defendant. The infringement inquiry requires comparing the claims of the asserted patents to the accused products. *See Kahn v. Gen. Motors Corp.*, 135 F.3d 1472, 1477 (Fed. Cir. 1998) ("Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device."). Defendant notes that it designated several witnesses as corporate representatives to testify about that technical aspects of the accused products—Mr. Bekele (regarding the Echo Show, Show Mode and Fire Tablet technical topics), Mr. Pradhan (regarding Alexa technical topics), Mr. Fresko (regarding the Fire Tablet technical topics), Mr. Nilakantan (regarding the Kindle technical topics), and Mr. Schulze (regarding the software update technical topics). (*Id.* at 33–34 n.19.) Noting that Plaintiff has identified no deficiency with this testimony or otherwise pointed to technical information it has not been able to obtain, Defendant questions the need for Mr. Bezos to answer technical questions. (*Id.* at 34.) Moreover, Plaintiff has offered no authority for its argument that the composition of the design and development team, and specifically the role each member played, in any way informs the ultimate infringement analysis. (*See generally* Jt. Stip.)

**\*10** Plaintiff's reliance on a Northern District of California case permitting the deposition of a Samsung executive who "oversaw the development of features that [the plaintiff] contend[ed] infringe[d] its utility patents" is misplaced. (Jt. Stip. 61 (citing *Apple Inc. v. Samsung Elecs. Co.*, 282 F.R.D. 259, 267–68 (N.D. Cal. 2012).) There, the plaintiff pointed to evidence showing comments and questions by the executive that specifically related to the allegedly infringing features of the accused products. *See Apple Inc.*, 282 F.R.D. at 267–68. Here, there is no similar evidence. At most, the name "Jeff" or "Jeff B." appears on some BRDs, but there is no evidence that these references are to Mr. Bezos. Moreover, Plaintiff has not established that Mr. Bezos "oversaw" the development of any features, let alone the specific features that allegedly infringe the Asserted Patents.

On this basis, the Court concludes that a protective order preventing Mr. Bezos's deposition regarding Topic 18 is warranted.

**C. A Protective Order Preventing Mr. Bezos's Deposition Regarding Topics 114, 115, 119, 120, and 122 Is Warranted.**

Defendant contends that, because its Rule 30(b)(6) designees regarding Plaintiff's Topics 114, 115, 119, 120, and 122— Scott Hayden, Vice President of IP and Associate General Counsel, on Topics 114 and 115, and Sara Morris, a former junior-level marketing manager, originally on Topics 116 through 122, and later added for Topics 114 and 115— have fully answered Plaintiff's questions on these topics, any knowledge or information Mr. Bezos may have is not "unique" as required for an apex deposition (Jt. Stip. 18–26.) Plaintiff, on the other hand, disputes that Mr. Hayden and Ms. Morris fully answered its questions on these topics, and contends instead that, given Mr. Bezos's involvement in the subject matter of the topics, any knowledge and information he may have is "unique" and justifies an apex deposition. (*Id.* at 39–49.)

Defendant first notes that Mr. Hayden testified that, despite Defendant's search for individuals with information about its relationship with Plaintiff, it was unable to find any current employees with such information. (Def.'s Ex. I at 43:2–44:6, 47:4–15.) Because of this, Defendant designated Ms. Morris —a former employee with such knowledge—on these topics. (Jt. Stip. 18 n.7.)

Defendant details Ms. Morris's testimony as follows: that the relationship between Defendant and Plaintiff began in early 2000 when Plaintiff approached Defendant (Def.'s Ex. K at 71:9–21, 197:7–14); that the relationship was "one tool in a large toolkit of activities that [Defendant was] undertaking to build a new product category" of consumer electronics (*id.* at 43:10–44:5); that Defendant wanted to be an exclusive retailer of the Ceiva Frame as part of Defendant's strategy to "drive traffic into the [consumer electronics] store" through "a number of different partnerships with different merchants or vendors who had new, somewhat gadgety products that would be enticing to customers" (*id.* at 73:24–74:8, 75:8–13); that an exclusive retailer arrangement "is a standard tactic in retailing and merchandising to give both parties a unique window of opportunity to achieve their objectives" (*id.* at 92:7–14); that Defendant believed the Ceiva Frame would "draw attention and drive traffic" to Defendant's website because "it was a new product that showed digital photographs in a rotating fashion, and that was somewhat new at the time" (*id.* at 75:24– 76:6); that Defendant's emails to Plaintiff used terms such as "gateway page" and "camera and digital imaging category pages" to describe the placement of Plaintiff's product on Defendant's website (*id.* at 177:24–178:19); that Defendant worked with "many different vendors and merchants" and engaged in "many different activities ... to build awareness

of this new [consumer electronics] product category" which Defendant was working to build "as quickly as possible ... to achieve lots of goals very quickly," including through "relationships with Sony and Canon and Hewlett-Packard" and their "Canon digital cameras," "Sony music products," and "DVD players." (*id.* at 44:6–11, 45:19–25, 87:24–88:5, 88:19–89:5, 89:21–90:6); and that Defendant engaged in other exclusive deals with partners over the years, including "an exclusive deal with Segway" (*id.* at 77:24–78:2, 198:2– 11).

**\*11** With respect to Mr. Bezos's involvement in Defendant's relationship with Plaintiff, Ms. Morris testified that he "played no role in that relationship" and that as the main person overseeing the relationship, she was "unaware of any personal involvement on behalf of Jeff Bezos" in that relationship" or "with the parties' 2000 Resale Agreement" and that the "likelihood that [Mr. Bezos] would be reviewing individual reseller agreements is very, very low." (*Id.* at 84:6– 14, 96:20–21, 97:4–5.)

Plaintiff takes issue with the sufficiency of Defendant's Rule 30(b)(6) witnesses regarding Defendant's business relationship with Plaintiff, the Resale Agreement, communications regarding the same, and Mr. Bezos's involvement therewith. *First*, Plaintiff notes that the testimony of Mr. Hayden makes clear that Defendant found no one with relevant information regarding the relationship between Defendant and Plaintiff. (Jt. Stip. 40–42.) When asked, Mr. Hayden admitted that Defendant's investigation yielded "no one that had any relevant information related to" the relationship between Defendant and Plaintiff or the exclusive seller transaction. (Pl.'s Ex. 19 at 52:10–15; *see also id.* at 47:4–7, 47:9.) Mr. Hayden also testified that he did not know whether Mr. Bezos had participated in any meetings with representatives of Plaintiff (*id.* at 51:19–52:6), and did not ask Mr. Bezos about any such meetings (*id.* at 44:11–14); that he knew no details regarding any meeting between Mr. Bezos and Mr. Schiller (*id.* at 112:24–114:2); that the only document Defendant was able to locate about the relationship was the Resale Agreement (*id.* at 44:5–6, 47:4–15, 52:19– 23, 55:17–18); that he could not confirm (1) the participants involved in putting the Resale Agreement in place, (2) why Defendant wanted to be the exclusive reseller of the Ceiva Frame, or (3) why Defendant did not want other retailers selling the Ceiva Frame (*id.* 57:17–59:1).

*Second*, Plaintiff contends that, like Mr. Hayden, Ms. Morris also was unable to answer Plaintiff's questions on these topics.

(Jt. Stip. 42–49.) Plaintiff notes that, as a threshold matter, like Mr. Hayden, Ms. Morris did not speak with Mr. Bezos and found no documents responsive to these topics. (*See Id.* at 42.) Indeed, Ms. Morris testified that she did not report to or work with Mr. Bezos (Pl.'s Ex. 21 at 83:17–20); that she worked as a "junior level marketing manager" at Amazon from 1999 to 2002 with at least four reports between her and Mr. Bezos (*id.* at 37:3–16, 45:14–15, 65:15–16, 84:2–5); that she only personally interacted with Mr. Bezos on two occasions, neither of which had any significance to the designated topics" (*id.* at 112:21–113:24); that neither she nor anyone acting for her communicated with Mr. Bezos in preparation for her testimony (*id.* 188:14–17); that she did not search for or locate any documents from her time at Defendant's employ regarding the deposition topics for which she was designated (*id.* at 17:18–23, 18:3–5, 18:12–18); and that she was "reaching really far back" in her memory given the amount of time that had passed since her employment with Defendant and the events at issue (*id.* at 80:4–10).

Moreover, Plaintiff notes that Ms. Morris testified that she had not seen the Resale Agreement prior to her preparation for her deposition (*id.* at 26:11–20); that other than noting that Carl Gish had signed the Resale Agreement, she did not know (1) who at Defendant was involved in the decision to enter into the relationship with Plaintiff (*id.* at 76:7–11:1, 77:7–8); (2) what Defendant's top five objectives were in entering the Resale Agreement (*id.* at 93:18–22); (3) whether Mr. Bezos reviewed the Resale Agreement (*id.* at 82:7–14, 87:4–10) or who wrote it" (*id.* at 81:25–82:3); that she could not "speak to the specifics of the business dealings" between Defendant and Plaintiff (*id.* at 44:12–19, 45:10–18); that she "could not speak from direct knowledge" regarding Defendant's interest in Plaintiff because she was not involved in those conversations (*id.* at 71:22–72:16); that she was unable to identify "any other products for which [Defendant] entered into an exclusive reseller arrangement in the consumer electronics category in 2000" (*id.* at 80:4–10, 92:15–23); and that she could not identify any other products Defendant may have pursued in 2000 (*id.* at 90:10–14).

**\*12** Based upon this testimony, the Court concludes that Defendant failed to produce a Rule 30(b)(6) witness who could answer Plaintiff's questions about Defendant's relationship with Plaintiff and the Resale Agreement. *First*, Mr. Hayden simply had no information on these topics. *Second*, although Ms. Morris was able to provide some generalities regarding the relationship between Defendant and Plaintiff, she was unable to answer the more pointed questions

about the relationship and the Resale Agreement at all or without resorting to speculation. Finally, Defendant concedes that Ms. Morris could not answer questions regarding who made the decision to enter into the Resale Agreement and who prepared it. (Jt. Stip. 25 (citing Def.'s Ex. K at 76:7–77:8, 81:25–82:3).)

Nevertheless, while these deponents may not have been able to answer all of Plaintiff's questions, Plaintiff has failed to establish that Mr. Bezos possesses any knowledge about these topics, let alone the "first-hand knowledge" required for an apex deposition. The only evidence before the Court is that there existed a business relationship between Defendant and Plaintiff, as evidenced by the Resale Agreement. (*See* Pl.'s Ex. 1.) But that alone is not sufficient to compel an apex deposition of Mr. Bezos. Instead, to avoid the protective order requested here, Plaintiff must establish that Mr. Bezos actually has first-hand knowledge about that relationship and the Resale Agreement (Topics 114, 115, 119, and 120), and that he actually was involved in that business relationship and in negotiating the Resale Agreement (Topic 122). This, Plaintiff has not done. To the contrary, the testimony of Defendant's Rule 30(b)(6) deponent is that Mr. Bezos was not involved in either the business relationship between Defendant and Plaintiff or the Resale Agreement. In addition, with respect to an alleged meeting between Mr. Bezos and Mr. Schiller, while there is evidence of an email from Mr. Schiller to Mr. Bezos regarding a purported meeting at a TED conference, there is no evidence before the Court that the meeting actually took place or that Mr. Bezos actually received the email or responded to it. Moreover, that Mr. Hayden and Ms. Morris did not speak with Mr. Bezos in preparation for the deposition does not necessarily mean, or otherwise reasonably imply, that Mr. Bezos has any knowledge of these topics. Without evidence of Mr. Bezos's actual first-hand knowledge about these topics, Plaintiff fails to meet its burden to justify an apex deposition.

On this basis, the Court concludes that a protective order preventing Mr. Bezos's deposition regarding Topics 114, 115, 119, 120, and 122 is warranted.

### D. A Protective Order Preventing the Deposition of Mr. Bezos Regarding Topic 116 Is Warranted.

Defendant contends that because its Rule 30(b)(6) designee regarding Topic 116—Ms. Morris—sufficiently answered Plaintiff's questions on this topic, any knowledge or information Mr. Bezos may have is not "unique" as required for an apex deposition. Although Topic 116 broadly seeks

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.556 Filed 03/26/26 Page 136 of 194

Ceiva Logic, Inc. v. Amazon.com, Inc., Not Reported in Fed. Supp. (2021)

information regarding Defendant's advertising, marketing, and promotion of the Ceiva Frame, relevant here are Plaintiff's specific inquiries about (1) Defendant's marketing campaign for the Ceiva Frame, including the *Wall Street Journal* advertisement and Defendant's March 2000 press release, (2) the Jeff Email, and (3) the CNN endorsement. (Jt. Stip. 43–48.) The Court addresses each sub-topic in turn.

### 1. Defendant's Marketing Campaign of the Ceiva Frame

Defendant details Ms. Morris's testimony regarding its marketing campaign for the Ceiva Frame as follows: that the "joint marketing campaign" between Defendant and Plaintiff was to promote the Ceiva Frame through Amazon.com, which followed the "co-op marketing" format Defendant used with a lot of vendors and merchants (Def.'s Ex. K at 99:15–100:12); that Defendant featured the Ceiva Frame in direct mail and print advertisements, including in the *Wall Street Journal* and a Sunday circular, as well as on its website and inserts included in its packaging (*id.* at 100:13–22, 101:15–23); that Defendant sent targeted promotional emails to its customers and also promoted the Ceiva Frame along with other consumer electronics products on a "media tour" undertaken by its Chris Payne, Defendant's General Manager of Consumer Electronics (*id.* at 53:6–9, 55:2–12, 95:11–96:3); that Plaintiff provided one million dollars for the joint marketing campaign (*id.* at 100:18–101:9); that Defendant issued a press release that, as part of its push to launch the new category of consumer electronics, announced its sale of the Ceiva Frame (*id.* at 114:1–115:5, 120:24–121:6); and that calling the Ceiva Frame "revolutionary" in the March 2000 press release was part of Defendant's marketing and publicity strategy and was done to "gain[ ] attention in a crowded marketplace and [to] find[ ] creative ways to call attention to what [Defendant] [was] doing" and to "generate attention and enthusiasm" for its new consumer electronics store (*id.* at 124:16–23, 173:12–19).

**\*13** Plaintiff takes issue with the sufficiency of Ms. Morris's testimony regarding Defendant's marketing campaign for the Ceiva Frame. It notes that Ms. Morris testified as follows: that she had no direct knowledge of whether Mr. Bezos was personally involved in approving the Wall Street Journal advertisement for the Ceiva Frame (Pl.'s Ex. 21 at 143:8–18, 144:15–22, 144:23–145:2, 145:8–14); that she did not know who drafted, edited, or approved the March 2000 press release for the Ceiva Frame (*id.* at 106:5–15, 107:2–7; 107:13–108:2, 108:25–109:7, 117:9–20, 117:21–118:8);

that she could not recall whether Defendant issued any other similar press releases during the 2000 timeframe" (*id.* at 115:24–116:9, 121:8–11); and that she recalled that Mr. Bezos "may have encouraged people to buy" the Ceiva Frame (*id.* at 128:18–24). Plaintiff also notes that, in its responses to Plaintiff's interrogatories, Defendant denied that Mr. Bezos marketed, promoted, boasted, or referred to the Ceiva Frame as "revolutionary." (Jt. Stip. 49.)

Plaintiff's concerns regarding Ms. Morris's testimony and Defendant's answer to its interrogatory are without merit. As a threshold matter, the subject matter of Topic 116, as written, does not contemplate answers regarding the nature and extent of Mr. Bezos's involvement in the marketing campaign. Unlike Topic 122, which expressly seeks a designee regarding Mr. Bezos's involvement, the language of Topic 116 reasonably could be interpreted to seek information about the marketing campaign, but not necessarily about Mr. Bezos's involvement. Still, even if Topic 116 were interpreted as broadly seeking information regarding Mr. Bezos's involvement in the marketing campaign, Plaintiff fails to establish the factual underpinnings of Mr. Bezos's first-hand knowledge on this topic—that he, in fact, was involved in the marketing campaign of the Ceiva Frame in the first instance, or that it was he who wrote the March 2000 press release that called the Ceiva Frame "revolutionary." Although Plaintiff must meet this burden before being allowed to take an apex deposition on this topic, it has offered no evidence of such involvement.

On this basis, the Court concludes that a protective order preventing Mr. Bezos's deposition regarding Topic 116 as it relates to Defendant's marketing campaign of the Ceiva Frame is warranted.

### 2. The Jeff Email

Defendant details Ms. Morris's testimony regarding the Jeff Email as follows: she agreed that the Resale Agreement required Defendant to "send e-mail messages to targeted Amazon.com customers" to promote the Ceiva Frame and she believed that Defendant did so (Def.'s Ex. K at 95:17–96:3); she confirmed that on April 4, 2000, she sent to Plaintiff's representatives the draft Jeff Email, which was intended to be sent to the first one hundred thousand Amazon customers, calling the Ceiva Frame "a pretty remarkable device," explaining that Defendant would be the "only retailer —online or off—who carries it," and offering $25.00 off

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.557 Filed 03/26/26 Page 137 of 194

Ceiva Logic, Inc. v. Amazon.com, Inc., Not Reported in Fed. Supp. (2021)

its purchase price (*id.* at 150:20–151:11; *see also* Def.'s Ex. Q)); that the draft Jeff Email was not drafted by Mr. Bezos but rather was drafted by the marketing team "in his voice" and that "Jeff [was] personalizing it [that day]" (*id.* at 151:20–152:7); that sending marketing emails to customers as if they were personalized messages from Mr. Bezos was a "fairly standard tool" that was employed "with some regularity" (*id.* at 158:17–25, 159:21–25); that the Jeff Email referred to the Ceiva Frame as "remarkable" because Mr. Bezos was "an enthusiast" and the email was "intended to carry his tone and his voice," because the Ceiva Frame was "a new kind of product," "it was a digital frame as opposed to a static wooden frame," and it could rotate ten photos, and because such language was intended to "generate attention and enthusiasm" for the Ceiva Frame and Defendant's new consumer electronics store (*id.* at 162:4–19, 173:12–19, 201:7–19); and that the Jeff Email targeted Defendant's first one hundred thousand customers because they were "a customer segment that" Defendant's employees " talked about fairly frequently," they were "early adopters" and "understood the internet a lot earlier than a lot of other people" and therefore "they might be naturally inclined to enjoy other products that were on the leading edge" (*id.* at 162:20–163:7).

**\*14** Plaintiff takes issue with the sufficiency of Ms. Morris's testimony regarding the Jeff Email. Plaintiff notes that Ms. Morris testified as follows: that despite having authored the April 4, 2000 email to Plaintiff's representatives, which she "did not remember [ ] at all," she could not confirm whether or why Mr. Bezos personalized the email, even though her own email stated that Mr. Bezos would be revising the email (Pl.'s Ex. 21 at 150:2–5, 150:20–24, 151:7–152:17, 155:18–156:19, 160:16–18); that she could only assume that the Jeff Email refers to the Ceiva Frame as " 'remarkable" "because it was new and it was a digital frame as opposed to a static wooden frame" (*id.* at 161:25–162:6, 162:14–19); that although Ms. Morris characterized such personal emails from Mr. Bezos as a marketing tool Defendant used "with some regularity," she could not recall any other specific product endorsed by Mr. Bezos through a personal email (*id.* at 158:13–25, 159:21–25); and that it would not be common for Mr. Bezos to be involved in marketing the product, and that if, in fact, he did so, it would be "an unusual event" (*id.* at 156:20–24, 159:1–6, 200:3–9).

Based upon this testimony, the Court concludes that Defendant failed to produce a Rule 30(b)(6) witness who could answer Plaintiff's specific questions about the Jeff Email with any degree of certainty, and instead produced a witness who inserted generalities about Defendant's practices into the discussion. Indeed, Ms. Morris was unable to provide answers to the most basic—let alone direct—questions about the Jeff Email and its meaning. Moreover, Ms. Morris's testimony brings into question the meaning of her own words in the April 4, 2020 email she sent to Plaintiff's representatives and who exactly wrote and "personalized" the Jeff Email, if at all. Specifically, although Ms. Morris wrote that Mr. Bezos would be "personalizing [the Jeff Email]" on that day, she testified that this actually meant that "[Mr. Bezos's] team was crafting a message in his voice that would go out under his name." (Pl.'s Ex. 21 at 151:20–152:17.)

Nevertheless, while Ms. Morris may not have been able to answer all of Plaintiff's questions about the Jeff Email, Plaintiff has failed to meet its burden of showing that Mr. Bezos has the "first-hand knowledge" about this topic required for an apex deposition. The only evidence before the Court is that someone prepared a draft email promoting the Ceiva Frame which, subject to personalization by Mr. Bezos, would be sent to the first one hundred thousand of Defendant's customers with a discount offer, and that this email was forwarded by Ms. Morris to Plaintiff, noting that Mr. Bezos's edits would be final. But that alone is not enough. Instead, to avoid the protective order requested here, Plaintiff must establish the factual underpinnings of Mr. Bezos's first-hand knowledge on this topic—that he, in fact, was aware of the Jeff Email, or wrote, personalized, or sent it. This, Plaintiff has not done. Moreover, the evidence is to the contrary. Indeed, Ms. Morris testified that Defendant's marketing team wrote the email and that sending out emails as if written by Mr. Bezos was a standard marketing tool. Moreover, Plaintiff's own document—the Schiller Email—implies that the Jeff Email was not sent (at least as of the alleged meeting at the TED conference), bringing further into question whether Mr. Bezos ever was involved with the Jeff Email.

On this basis, the Court concludes that a protective order preventing Mr. Bezos's deposition regarding Topic 116 as it relates to the Jeff Email is warranted.

### 3. The CNN Endorsement

As a threshold matter, the Court must conclude, for obvious reasons, that Mr. Bezos has first-hand knowledge regarding the CNN endorsement. Unlike the other topics discussed above, the CNN endorsement inherently bears indicia of first-hand knowledge. Indeed, the inquiry on this topic regards

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.558 Filed 03/26/26 Page 138 of 194

Ceiva Logic, Inc. v. Amazon.com, Inc., Not Reported in Fed. Supp. (2021)

words that Mr. Bezos personally spoke during a CNN interview that was broadcast to the public in April 2000. (*See* Jt. Stip. 24; Def.'s Ex. T.) Moreover, Defendant does not dispute that Mr. Bezos made the statement. (*See generally* Jt. Stip.)

 **\*15** Having found that Mr. Bezos has the requisite first-hand knowledge on this topic, the Court turns to the inquiry of whether such knowledge is unique to him. Defendant details Ms. Morris's testimony regarding Mr. Bezos's CNN endorsement of the Ceiva Frame as follows: that Mr. Bezos "encouraged [Defendant's] customers to considering purchasing" the Ceiva Frame, among other consumer electronics products including the Segway, (Def.'s Ex. K at 129:14–130:3, 130:15–23); that Mr. Bezos likely called the Ceiva Frame "really great" in the April 2000 CNN interview because he typically received "talking points" from his "media PR team," and that she "would think that he was handed talking points that morning and told what he needed to get into the media spot, and that was the talking point of the day" (*id.* at 135:16–25); that "typically when a CEO does a media appearance like that, he or she is prepped by his or her media team to convey a certain set of – of talking points" (*id.* at 137:12–15); and that the interview had been focused "around profitability" and Mr. Bezos likely "knew that the needed to get in one other talking point" (*id.* at 136:8–22).

Plaintiff again takes issue with the sufficiency of Ms. Morris's testimony regarding the CNN endorsement. Plaintiff notes that Ms. Morris testified as follows: that her testimony as to why Mr. Bezos "encourage[d] all of [CNN's] viewers to buy the Ceiva [F]rame" was based on only her general knowledge of how executives prepared for media interviews using talking points prepared by their media teams (Pl.'s Ex. 21 at 133:25–134:9, 136:12–22); that she had not seen the CNN segment until preparing for her deposition (*id.* at 138:13–17); that she admitted to "speculating" regarding Mr. Bezos's decision to encourage customers to buy the Ceiva Frame or to describe the Ceiva Frame as "really great" because she does "not live in his head" and didn't know what he was thinking (*id.* at 136:1–17, 137:4–11, 137:24–138:6, 138:18–23, 182:9–23); that she did not know whether Mr. Bezos or others conducted research in order to reach the opinion "that the frame was pretty remarkable" (*id.* at 183:12–15, 183:17); that she did not know "what Mr. Bezos may or may not have thought about how other image display devices compare[d] to the Ceiva [F]rame" (*id.* at 183:18–24); that she did not know what "Mr. Bezos believe[d] was unique

about the Ceiva [F]rame" (*id.* at 182:14–17); that she did not know what "features of the Ceiva [F]rame [Mr.] Bezos may have viewed as novel" (*id.* at 183:25–184:3, 184:5); that she could not identify any "products ... [Defendant] perceived as a competitor of the Ceiva [F]rame in 2000" (*id.* at 80:1–3); that she did not know what consumer electronic products Mr. Bezos was personally involved with or personally endorsed in 2000 (*id.* at 91:17–21, 130:4–12); that "[a]s a viewer, [she] would think that he was handed his talking points" (*id.* at 135:16–25); and that "typically" CEOs are given talking points in preparation for media appearances (*id.* at 137:12–15).

Based on this testimony, the Court concludes Defendant failed to produce a Rule 30(b)(6) witness who could answer Plaintiff's specific questions about Mr. Bezos's CNN endorsement other than what is known publicly and/or could be gleaned by watching the interview video, and that any insights offered by Defendant's witness about Mr. Bezos's statement during the CNN interview were speculative. Indeed, the testimony reveals that Ms. Morris testified solely from her limited personal knowledge about this topic. Moreover, Defendant concedes that Ms. Morris could not answer questions about Mr. Bezos's state of mind and personal beliefs, and specifically about his thoughts and decision-making process regarding the endorsement during the television interview, whether he actually believed the Ceiva Frame was "remarkable," what he believed was "unique" about it, and his thoughts regarding the comparison between the Ceiva Frame and other image display devices. (Jt. Stip 17 (citing Def.'s Ex. K at 136:8–14, 182:9–11, 182:14–16, 183:18–24).) On this basis, the Court concludes that Mr. Bezos's first-hand knowledge regarding the CNN endorsement is unique.

 **\*16** But the inquiry does not end there. A protective order preventing Mr. Bezos's deposition regarding the CNN endorsement may be warranted if his knowledge of the topic, despite being first-hand and unique, is not relevant to the claims or defenses of the case. Plaintiff argues that Mr. Bezos's knowledge regarding the CNN endorsement is relevant to (1) Defendant's obviousness defense, premised on Defendant's assertion that the Asserted Patents "are not new or novel" and instead are "obvious in light of prior art disclosing, among other things, Internet-enabled picture frames" under 35 U.S.C. § 103 (Jt. Stip. 56–59); (2) Defendant's ineligibility defense, premised on Defendant's assertion that the Asserted Patents are directed to subject matter that is not eligible for patenting under 35 U.S.C. § 101

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.559 Filed 03/26/26 Page 139 of 194

Ceiva Logic, Inc. v. Amazon.com, Inc., Not Reported in Fed. Supp. (2021)

(*id.* at 59); and (3) damages (*id.* at 59–60). For the reasons stated below, the Court disagrees.

*a. Mr. Bezos's Knowledge Regarding the CNN Endorsement Is Not Relevant to Defendant's Obviousness Defense.*

Under 35 U.S.C. § 103 ("Section 103"), a patent is obvious "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103. To determine obviousness, a court must review "(1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of nonobviousness." *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1375–76 (Fed. Cir. 2012) (citing *Eli Lilly & Co. v. Teva Pharms. USA, Inc.*, 619 F.3d 1329, 1336 (Fed. Cir. 2010)). These factors must be reviewed from the perspective of a "person having ordinary skill in the art" (also known as a "POSA"). *See* 35 U.S.C. § 103; *see also Vulcan Eng'g Co. v. Fata Aluminium, Inc.*, 278 F.3d 1366, 1373 (Fed. Cir. 2002) ("Appreciation by contemporaries skilled in the field of the invention is a useful indicator of whether the invention would have been obvious to such persons at the time it was made.").

The fourth factor, also known as the "secondary considerations," often may be "the most probative and cogent evidence of nonobviousness in the record." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983); *see also Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008) ("[T]his evidence is not just a cumulative or confirmatory part of the obviousness calculus but constitutes independent evidence of nonobviousness."). An analysis of secondary considerations requires attention to "unexpected results, expert skepticism, copying, commercial success, praise by others (even from the accused infringer ...), failure by others, and long-felt need." *Mintz*, 679 F.3d at 1379; *see also Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1053 (Fed. Cir. 2016) (en banc) ("Evidence that the industry praised a claimed invention or a product that embodies the patent claims weighs against an assertion that the same claimed invention would have been obvious.").

Plaintiff argues that Mr. Bezos's praise of the Ceiva Frame is relevant to the secondary consideration of "industry praise." (Jt. Stip. 56.) Defendant responds that Mr. Bezos's

testimony about the CNN endorsement is not relevant to the inquiry of "industry praise" for four reasons: (1) Mr. Bezos's personal beliefs behind the CNN endorsement are rendered irrelevant because the endorsement already is public and Plaintiff may rely on it without Mr. Bezos's testimony; (2) Mr. Bezos does not qualify as a POSA of the Ceiva Frame; (3) the endorsement was self-serving; and (4) the endorsement was not tied to the claimed invention. Without analyzing the first three reasons, he Court agrees with Defendant with respect to the fourth reason.

**\*17** To be tied to the claimed invention, there must be a nexus between the purported industry praise and the specific feature claimed in the patent. *See Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 306 n.42 (Fed. Cir. 1985). Indeed, high-level remarks about a purportedly practicing product—such as being characterized as "unique" or designated as a "Top Ten FinTech Compan[y] to Watch"— do not have a nexus to specific patent claims. *Centripetal Networks, Inc. v. Cisco Sys.*, 847 F. App'x 881, 888–89 (Fed. Cir. 2021).

Here, nothing that Mr. Bezos said during the CNN interview about the Ceiva Frame was related to the features claimed in the Asserted Patents. As the FAC explains, the claims in the Asserted Patents describe the technologies that enable the digital picture frame "to automatically access[ ] a remote data repository without any further user input." (FAC ¶ 56.) In addition, the patent specifications describe the technological improvements that "enable the claimed digital picture frame to automatically issue a request to the remote server system, and thereby receive images and software updates without any user input." (*Id.*) Mr. Bezos's endorsement of the Ceiva Frame did not even approximate a discussion—let alone praise— about these features. As Ms. Morris explained, and as the video confirms (*see* Def.'s Ex. T), the interview focused on the profitability of Defendant's businesses. As detailed above, Mr. Bezos discussed the profitability of Defendant's businesses, Defendant's goals to make the newer business more profitable by the end of 2000, and its continued investments in the new business units. It was at the end of the interview that Mr. Bezos light-heartedly, and in passing, said: "By the way, I would like to encourage all of your viewers to buy the Ceiva picture frame ...that will help us with profitability." (*Id.*) To which the CNN host responded in laughter: "All right ... we've all decided to go out and buy some ... so that Jeff doesn't go bankrupt." (*Id.*)

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.560 Filed 03/26/26 Page 140 of 194

*Ceiva Logic, Inc. v. Amazon.com, Inc.*, Not Reported in Fed. Supp. (2021)

Notably, contrary to Plaintiff's questioning of Ms. Morris about the CNN endorsement, which suggests Mr. Bezos said the Ceiva Frame was "really great," Mr. Bezos did not say those words. (*See id.*) In any event, without describing it or explaining what it was, Mr. Bezos simply encouraged the CNN viewers to buy the Ceiva Frame. (*Id.*)

Thus, the Court is not convinced that any knowledge Mr. Bezos may have regarding the CNN endorsement would inform the obviousness inquiry, as Plaintiff contends.

### b. Mr. Bezos's Knowledge Regarding the CNN Endorsement Is Not Relevant to Defendant's Ineligibility Defense.

35 U.S.C. § 101 ("Section 101") defines patent-eligible subject matter as follows: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has found an implicit exception to this broad rule of patentability for (1) laws of nature, (2) natural phenomena, and (3) abstract ideas. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l,* 573 U.S. 208, 217, 134 S.Ct. 2347, 189 L.Ed.2d 296 (2014). Here, Defendant claims that the Asserted Patents fall within the third category of unpatentability—abstract ideas. (Jt. Stip. 30–31.)

The first two exceptions—laws of nature and natural phenomena—are not particularly difficult to identify. *Versata Dev. Group, Inc. v. SAP Am., Inc.,* 793 F.3d 1306, 1331 (Fed. Cir. 2015) ("Generally, the courts have found that the task of applying the first two of these judicially-crafted exceptions ... [is] not particularly difficult."). However, the third exception—abstract ideas—is not as easily understood or applied. *Id.* The patent eligibility inquiry involves two steps. *Alice Corp. Pty. Ltd.,* 573 U.S. at 217, 134 S.Ct. 2347. The court first must determine whether the claims are directed to an abstract idea. *Id.* If so, the court must decide whether the claims add an "inventive concept"—"an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [abstract idea] itself.'" *Id.* at 217–18, 134 S.Ct. 2347 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.,* 566 U.S. 66, 72–73, 132 S.Ct. 1289, 182 L.Ed.2d 321 (2012)). The "ultimate question of patent eligibility is one of law," that in some cases may involve a narrow underlying fact issue as to whether individual claim limitations are well

understood, routine, and conventional. *Berkheimer v. HP Inc.,* 890 F.3d 1369, 1370–72 (Fed. Cir. 2018) (en banc) (Moore, J. concurring), *cert. denied,* ––– U.S. ––––, 140 S. Ct. 911, 205 L.Ed.2d 454 (2020).

**\*18** Based upon this framework, Defendant argues that Mr. Bezos's testimony about the CNN endorsement is not relevant to either step of the *Alice* test. (Jt. Stip. 31–32.) Defendant notes that step one of the *Alice* test "presents a legal question that can be answered based on the intrinsic evidence." *CardioNet, LLC v. InfoBionic, Inc.,* 955 F.3d 1358, 1372 (Fed. Cir. 2020). It then argues that "no extrinsic evidence, *i.e.* evidence outside of the patent and its prosecution history—and certainly not the testimony of Mr. Bezos—is relevant to that inquiry." (Jt. Stip. 31.) But Defendant overstates the *Alice* limitation to intrinsic matter in the step one inquiry. Indeed, the court in *CardioNet* expressly stated the contrary. The court rejected the dissent's suggestion that the *CardioNet* holding made it "impermissible for courts to 'look[ ] outside the intrinsic evidence' as part of their *Alice* step one inquiry," or that all such evidence "would be irrelevant to the inquiry." *Id. at 1373* (quoting Dissent Op. 9). It explained that the holding "simply clarif[ies] that step one of the *Alice* framework does not *require* an evaluation of the prior art or facts outside of the intrinsic record regarding the state of the art at the time of the invention." *Id. at 1374* (emphasis added).

Nevertheless, Defendant also argues that Mr. Bezos's testimony would be irrelevant to step two of the *Alice* test because "[p]ublic praise of practicing products ha[s] nothing to do with patent eligibility." (Jt. Stip. 31.) The Court agrees. Even if the CNN endorsement were considered public praise, any testimony by Mr. Bezos about the CNN endorsement would not be relevant to Defendant's ineligibility argument. *See Diamond v. Diehr,* 450 U.S. 175, 188–90, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981) (distinguishing patent novelty from eligibility); *see also Ameranth, Inc. v. Domino's Pizza, LLC,* 792 F. App'x 780, 788 (Fed. Cir. 2019 (finding inventor declaration discussing generic praise of plaintiff's practicing system irrelevant to patent eligibility).

Thus, the Court is not convinced that any knowledge Mr. Bezos may have regarding the CNN endorsement would inform the eligibility inquiry, as Plaintiff contends.

### c. Mr. Bezos's Knowledge Regarding the CNN Endorsement Is Not Relevant to the Georgia-Pacific Damages Analysis.

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.561 Filed 03/26/26 Page 141 of 194

Ceiva Logic, Inc. v. Amazon.com, Inc., Not Reported in Fed. Supp. (2021)

Plaintiff also argues that Mr. Bezos's testimony is relevant to the damages analysis under *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). (*See* Jt. Stip. 59–60.) The court disagrees.

There are two alternative categories of infringement compensation: (1) the patentee's lost profits, and (2) the reasonable royalty the patentee would have received through arms-length bargaining. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). "Determining a fair and reasonable royalty is often ... a difficult judicial chore, seeming often to involve more the talents of a conjurer than those of a judge." *ResQNet.com Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) (quotation marks and citation omitted). To ascertain the reasonable royalty, patentees commonly consider a hypothetical negotiation, in which the asserted patent claims are assumed valid, enforceable, and infringed, and attempt to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began. *Lucent*, 580 F.3d at 1324–25; *see also Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 n.13 (Fed. Cir. 1995) (en banc); *see also Georgia-Pacific*, 318 F. Supp. at 1120–21. Thus, the hypothetical negotiation upon which the reasonable royalty is determined is one that occurs "at the time infringement began." *DataTreasury Corp. v. Wells Fargo & Co.*, No. 2:06-CV-72DF, 2011 WL 8810604, at *7, 2011 U.S. Dist. LEXIS 118443, at *26–27 (E.D. Tex. Aug. 2, 2011); *see also Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1357 (Fed. Cir. 2012) ("The hypothetical negotiation seeks to determine the terms of the license agreement the parties would have reached had they negotiated at arm's length when infringement began.") In *Georgia-Pacific*, the court enunciated fifteen factors that should be considered in the determination of a reasonable royalty. *Georgia-Pacific*, 318 F. Supp. at 1120–21. The Federal Circuit "has sanctioned the use of the *Georgia Pacific* factors to frame the reasonable royalty inquiry." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011).

**\*19** Plaintiff contends that Mr. Bezos's knowledge regarding "the prior history between [Plaintiff] and [Defendant] (including Mr. Bezos's statements)" is relevant to the fifth *Georgia-Pacific* factor.[6] (Jt. Stip. 59–60.) Factor Five considers "[t]he commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promotor." *Georgia-Pacific*, 318 F. Supp. at 1120. Plaintiff urges the Court to not erase from the

hypothetical negotiation Mr. Bezos's knowledge about "the prior history between [Plaintiff] and [Defendant] (including Mr. Bezos's statements)." (Jt. Stip. 59.) The Court disagrees with Plaintiff.

Here, there is no evidence that the CNN endorsement in any way informs the fifth factor's inquiry regarding the commercial relationship between Plaintiff, as the hypothetical licensor, and Defendant, as the hypothetical licensee. As stated above, the CNN endorsement does nothing more than encourage the CNN viewers to buy the Ceiva Frame. Moreover, the CNN endorsement was made in April 2000, while the relationship explored by the fifth factor is one that would have occurred in Fall 2011, the date of the first accused product launch. (Def.'s Ex. X at 18:15–19:3.) *See DataTreasury Corp.*, 2011 WL 8810604, at *7, 2011 U.S. Dist. LEXIS 118443, at *26–27. Despite this eleven-year gap, Plaintiff provides no authority, and the Court is aware of none, for the proposition that the fifth *Georgia-Pacific* factor is not burdened by the temporal requirement that the hypothetical negotiation must be time-placed at just before the first infringement. (*See generally* Jt. Stip.) Nor does Plaintiff provide authority, and again the Court is aware of none, for the proposition that the fifth *Georgia-Pacific* factor includes a review of the parties' "prior history." (*See generally id.*)

Moreover, as to any of the other *Georgia-Pacific* factors and the hypothetical royalty negotiation, the Court notes that there is no indication that Mr. Bezos is the person in the best position to give a deposition on this topic. Rather, it appears that a financial officer would be in a better position to do so.

Thus, the Court is not convinced that any knowledge Mr. Bezos may have regarding the CNN endorsement would inform the damages inquiry, as Plaintiff contends.

On the basis of the foregoing, the Court concludes that a protective order preventing Mr. Bezos's deposition regarding Topic 116 is warranted.

### E. A Protective Order Preventing the Deposition of Mr. Bezos Regarding Topic 117 Is Warranted.

**\*20** Defendant concedes that Ms. Morris could not answer questions about Mr. Bezos's ownership or use of the Ceiva Frame in response to Topic 117, specifically whether he personally owned, used, purchased, acquired or gave to others a Ceiva Frame, whether his family members owned any. (Jt. Stip. 25 (citing Def.'s Ex. K at 148:24–149:16).)

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.562 Filed 03/26/26 Page 142 of 194

Ceiva Logic, Inc. v. Amazon.com, Inc., Not Reported in Fed. Supp. (2021)

Plaintiff takes issue with Ms. Morris's testimony regarding Mr. Bezos's ownership and use of the Ceiva Frame, adding to Defendant's concession that Ms. Morris had no knowledge regarding whether Mr. Bezos's family owned one or if he gave the Ceiva Frame as gifts. (*See* Pl.'s Ex. 21 at 148:24–149:16, 182:18–23.) Plaintiff also takes issue with Defendant's response to Plaintiff's request for admissions, denying that Mr. Bezos owned at least one Ceiva Frame. (Pl.'s Ex. 28 at 3–4.)

As a threshold matter, the Court notes that, in seeking information regarding the ownership and use of the Ceiva Frame by Mr. Bezos's family members, or whether Mr. Bezos gifted the Ceiva Frame to anyone, Plaintiff improperly expands the scope of Topic 117. Topic 117 is limited to the ownership and/or use of the Ceiva Frame by Defendant's founders, board members, employees, or agents. (*See* Jt. Stip. 16.) Accordingly, the Court concludes that a protective order preventing Mr. Bezos's deposition regarding Topic 117 as it relates to his family and friends is warranted.

With respect to whether Mr. Bezos himself owned and/or used the Ceiva Frame, the Court concludes, based on the above testimony, that Defendant failed to produce a Rule 30(b)6) witness who could answer Plaintiff's questions on this topic. Nevertheless, while Defendant's witness may not have been able to answer Plaintiff's questions on this topic, Plaintiff has failed to establish the factual underpinning for Mr. Bezos's first-hand knowledge on Topic 117—that he, in fact, ever owned and/or used the Ceiva Frame. Plaintiff must do so before being allowed to take an apex deposition on this topic.

On this basis, the Court concludes that a protective order preventing Mr. Bezos's deposition regarding Topic 117 as it relates to himself is warranted.

### F. A Protective Order Preventing the Deposition of Mr. Bezos Regarding Topic 118 Is Warranted.

Defendant contends that, because Ms. Morris, its Rule 30(b)(6) designee regarding Topic 118—Defendant's alleged reverse engineering of the Ceiva Frame—fully answered Plaintiff's questions regarding this topic, any knowledge or information Mr. Bezos may have is not "unique," as required for an apex deposition. (Jt. Stip. 22.)

Defendant notes that Ms. Morris testified as follows: that an "editorial team" would have performed "basic testing" of the Ceiva Frame prior to selling it on the Amazon website, and that such testing would not involve Defendant's engineers

(Def.'s Ex. K at 213:2–214: 3); that such testing would have included plugging in the device and figur[ing] out how it rotated ... how it flipped the pictures, or how it displayed the pictures" (*id.* at 213:20–23); that Defendant did not have a team that was responsible for "reverse engineering" of products, that Defendant never reverse engineered the Ceiva Frame or any of Plaintiff's products, and that "[t]here was never one single discussion or conversation" on the topic of reverse engineering (*id.* at 149:17–20, 179:11–24).

Plaintiff takes issue with Ms. Morris's testimony, noting that it was limited to the narrow time frame of 1999–2002 and that, in any event, she testified that she had "no information on ... this subject." (Pl.'s Ex. 21 at 180:14–19, 181:20–182:4.)

**\*21** Based on this testimony, the Court concludes that Defendant failed to produce a Rule 30(b)6) witness who could answer Plaintiff's questions on this topic. Nevertheless, while Defendant's witness may not have been able to answer any of Plaintiff's questions regarding Defendant's alleged reverse engineering of the Ceiva Frame, Plaintiff has failed to establish the factual underpinning for Mr. Bezos's first-hand knowledge on Topic 118—that Defendant, in fact, engaged in the alleged reverse engineering. There is no evidence that Defendant did so. (*See generally* Jt. Stip.) Indeed, the evidence is to the contrary. According to Ms. Morris, Defendant never reverse-engineered the Ceiva Frame or any other product and there were never any discussions about reverse-engineering. Moreover, even if Defendant had engaged in reverse engineering of the Ceiva Frame, Plaintiff has not established that Mr. Bezos was involved or would have any unique, first-knowledge about this.

On this basis, the Court concludes that a protective order preventing Mr. Bezos's deposition regarding Topic 118 is warranted.

### G. A Protective Order Preventing the Deposition of Mr. Bezos Regarding Topic 121 Is Warranted.

Defendant notes that Plaintiff "did not ask a *single* question" of Defendant's witness regarding Topic 121—the alleged use by Defendant's founders, board members, or employees of Plaintiff's subscription service. (Jt. Stip. 14–15.) Plaintiff does not dispute this. (*See generally* Jt. Stip.)

Because Plaintiff provides no evidence that it attempted to obtain discovery about Topic 121 through a less-intrusive means, it has not demonstrated the exhaustion that is required for an apex deposition on this topic.

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.563 Filed 03/26/26 Page 143 of 194

Ceiva Logic, Inc. v. Amazon.com, Inc., Not Reported in Fed. Supp. (2021)

On this basis, the Court concludes that a protective order preventing Mr. Bezos's deposition regarding Topic 121 is warranted.

## IV. CONCLUSION

For the reasons stated above, the Court **ORDERS** as follows:

1. Defendant's Motion is **GRANTED**, and Mr. Bezos need not sit for deposition regarding Plaintiff's Rule 30(b)(6) Topics 18 and 114 through 122.

2. The November 5, 2021 hearing is hereby **VACATED**.

3. The Court provisionally seals this Order. Within seven days after the issuance of this Order, the parties shall file a joint statement as to whether any matter stated in this Order is information that should remain under seal, consisted with this Court's order granting Defendant's request for leave to file under seal. (ECF No. 154.) Thereafter, the Court will determine whether any portions of this Order should be redacted in the version filed on the public docket.

## All Citations

Not Reported in Fed. Supp., 2021 WL 12349625

---

### Footnotes

1   Some exhibits are filed under seal. The sealed exhibits appear in their redacted form in ECF No. 152, and in their unredacted form in ECF No. 155.

2   Pinpoint citations in this Order refer to the page numbers appearing in the ECF-generated headers of cited documents.

3   The Court summarizes the allegations and claims in the FAC and the exhibits in support of the Joint Stipulation. In doing so, the Court neither opines on the veracity or merit of the parties' allegations and claims nor makes any findings of fact.

4   TED is a nonprofit organization "devoted to spreading ideas, usually in the form of short, powerful talks (18 minutes or less)." *Our Organization*, TED https://www.ted.com/about/our-organization (last visited Oct. 25, 2021). Its "agenda is to make great ideas accessible and spark conversation." *Id.* "TED" stands for "Technology, Entertainment, Design." *Conferences*, TED, https://www.ted.com/about/conferences (last visited Oct. 25, 2021). TED describes its conferences, which occur two or more times per year, as "a unique multi-day TED experience" attended by "industry leaders and impactful people" that showcase "important research and ideas from all disciplines," including the "signature TEDTalks," which are short lectures on a particular topic, as well as "interviews, debates, workshops, activities, interactive exhibits, evening events and parties." (*Id.*)

5   For purposes of this Motion, Plaintiff does not pursue information regarding Mr. Bezos's involvement in the design and development of the Kindle e-Reader family of products. (ECF No. 144 at 2; Jt. Stip. 16 n.6.)

6   Defendant notes that during the June 4 IDC, Plaintiff advised that Mr. Bezos's testimony is relevant to the ninth *Georgia-Pacific* factor. (Jt. Stip. 32 (citing Def.'s Ex. U at 8:25–9:3).) In that Plaintiff appears to have abandoned this argument, the Court does not address it. "[O]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Greenlaw v. United States*, 554 U.S. 237, 244, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008) (quoting *Castro v. United States*, 540 U.S. 375, 386, 124 S.Ct. 786, 157 L.Ed.2d 778 (2003) (Scalia, J., concurring). Courts "review only issues which are argued specifically and distinctly ...." *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (quoting *Greenwood v. Fed. Aviation*

*Admin.,* 28 F.3d 971, 977 (9th Cir. 1994)). Courts have "refused to address claims that were only argue[d] in passing, or that were bare assertion[s] ... with no supporting argument." *Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu,* 626 F.3d 483, 487 (9th Cir. 2010) (alterations in original) (quotation marks and citations omitted).

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Fox v. Amazon.com, Inc., Not Reported in Fed. Supp. (2017)

🚩 KeyCite Yellow Flag

Declined to Follow by [Woods v. Standard Fire Insurance Company,](#) E.D.Ky., March 7, 2022

2017 WL 9476870
Only the Westlaw citation is currently available.
United States District Court, M.D.
Tennessee, Nashville Division.

Charles Brian FOX and Megan Fox Plaintiffs,

v.

AMAZON.COM, INC., W2M
Trading Corporation Defendants.

No. 3:16–cv–3013
|
Filed 09/21/2017

**Attorneys and Law Firms**

[Kaylin L. Hart](#), [Mark Spear](#), Spear, Spear & Hamby, P.C., Mobile, AL, [Sara F. Reynolds](#), [Steven E. Anderson](#), Anderson & Reynolds, PLC, Nashville, TN, for Plaintiffs.

[Brendan Murphy](#), Rachel Elizabeth Constantino–Wallace, Perkins Coie LLP, Seattle, WA, [Charles Frederick Spainhour](#), [Lela M. Hollabaugh](#), [William F. Goodman, III](#), Bradley Arant Boult Cummings LLP, Nashville, TN, for Defendants.

**ORDER**

[JEFFERY S. FRENSLEY](#), U. S. Magistrate Judge

**\*1** Pending before the court is Amazon's Motion for Protective Order Regarding Depositions of Senior Executives and Irrelevant Witnesses and Deposition Topics (Docket No. 71), to which Plaintiffs have filed a response in opposition (Docket No. 73), and Amazon has filed a reply. (Docket No. 79). For the reasons stated herein, the Motion is GRANTED in part, and DENIED in part.

This action arises out of a fire that destroyed Plaintiffs' residence allegedly caused by a hoverboard purchased from W–Deals on the Amazon.com Marketplace. In their complaint, Plaintiffs assert numerous claims of negligence against Amazon and others regarding safety issue associated with hoverboards generally and the version purchased by Plaintiffs specifically. As it undisputed that Amazon did not manufacture, sell, store or ship the product in question. The claims against Amazon focus primarily on their knowledge and response to safety issues regarding the hoverboard products sold by third party sellers.

The parties engaged in written discovery and based in part on responses provided by the Defendant, Plaintiffs seek to take certain depositions of various Amazon employees and corporate representatives. [1] Specifically, Plaintiff has noticed the deposition of seven witnesses along with a request under [Rule 30 (b)(6) of the Federal Rules of Civil Procedure](#) to depose a corporate witness on 14 deposition topics. Docket No. 71–2, 71–3. Defendant's motion seeks a protective order to preclude the deposition of certain executive level employees and to limit the scope of the 30(b)(6) deposition. As grounds, Defendant asserts that the deposition of certain employees who they contend had limited roles in the hoverboard investigation is unduly burdensome especially since, they assert, the information sought can be obtained through the deposition of members of the product safety team who were responsible for identifying and responding to reports of safety issues with the hoverboards. Similarly, Defendant objects to the [Rule 30(b)(6)](#) deposition notice as containing topics not relevant to the claims or the defenses asserted in the litigation.

[Federal Rule of Civil Procedure 26(b)(2)](#) allows the court to relieve any undue burden on a responding party. The court can limit discovery if the information sought is overly broad or imposes an undue burden upon the party from whom discovery is sought. In [*Surles v. Greyhound Lines, Inc.*, 474 F. 3d 288, 305 (6th Cir. 2007)](#), the Sixth Circuit observed that: "the desire to allow broad discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant." (quoting [Scales v. J. C. Bradford, 925 F. 2d 901, 906 (6th Cir. 1996)](#). As to the judge's role in discovery disputes "[t]he revisions in [Rule 26(b)(2)](#) are intended to provide the court with broader discretion to impose additional restrictions on the scope and extent of discovery." *Surles*, 474 F. 3d 305. That sentiment has continued through subsequent revisions to [Rule 26](#) including the most recent ones.

**\*2** The court also possesses inherent authority to manage litigation. As noted by the First Circuit, "[a]s lawyers became more adept in utilizing the liberalized rules," "[t]he bench began to use its inherent powers to take a more active, hands on approach to the management of pending litigation. [*In re San Juan DuPont Plaza Hotel Fire Litigation*, 859 F. 2d 1007,](#)

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.566 Filed 03/26/26 Page 146 of 194

Fox v. Amazon.com, Inc., Not Reported in Fed. Supp. (2017)

1011 (1st Cir. 1988). "The judiciary is 'free, within reason to exercise this inherent judicial power in flexible pragmatic ways.' " *Id.* at 1011, n. 2 (quoting *HMG Property Investors, Inc. v. Parque Indust. Rio Canas, Ins.*, 847 F. 2d 908, 916 (1st Cir. 1988).

### A. The Individual Deponents.

#### 1. Jeff Bezos.

Plaintiffs have noticed the deposition of Amazon's founder, CEO, President and Chairman of the Board Jeff Bezos, to be limited to one hour. Docket No. 71–2. The grounds for taking Mr. Bezos' deposition are two emails produced during discovery sent to Mr. Bezos' email account by customers reporting hoverboard fires. Docket No. 73, p. 6. Plaintiffs assert they "should be allowed to explore with Mr. Bezos–*the only recipient of the email at issue*—how he responded, to whom he sent the email or communicated the information regarding the customer's concerns, and how he followed up, if at all." *Id.* at pp. 6–7 (emphasis in original). Defendant contends that Plaintiffs should be precluded from deposing Mr. Bezos, "because he had no involvement in the hoverboard events, and any conceivable relevance of his testimony is dwarfed by the burden and inconvenience on Amazon and Mr. Bezos." Docket No. 71, p. 4. In support of its position, Amazon filed the Declaration of Damon Jones, an Amazon employee who was the manager of product safety and recalls which was responsible for identifying and responding to reports of safety issues at all times relevant to this action. Docket No. 71–1. Mr. Jones explains that Mr. Bezos had no involvement in the hoverboard events, attended no meetings and was not on any emails or other communications regarding Amazon's response to safety concerns about hoverboards. *Id* at p. 3. Mr. Jones went on to explain that Mr. Bezos receives many emails daily which are monitored and addressed by assistants not indicating he had any knowledge or participation in any hoverboard events and in fact, "it is possible that he never saw them considering that executive assistants handle many of his incoming emails." *Id.* [2]

While the court does not find the Declaration of Mr. Jones particularly compelling regarding his qualified statement that it is possible that Mr. Bezos never saw the emails. Counsel for the defendant has represented in its pleadings as officers of the court that Mr. Bezos had no involvement in the hoverboard events. Even if Mr. Bezos saw the emails in question there is no evidence at this point establishing that he had any involvement in any matters relevant to this litigation. The court agrees with the Defendant based upon the limited record before it that the testimony of Mr. Bezos, even with the time limitation on his testimony proposed by Plaintiffs are not proportional to the burden and inconvenience on Amazon and Mr. Bezos. It is clear that there are individuals who will be deposed with whom Plaintiffs can explore the company's response to the emails and its follow up. Similarly, nothing precludes Plaintiffs from inquiring of any deponents of what role if any Mr. Bezos played and /or communications they had with him regarding the hoverboard events. In making this ruling the Court is mindful of the fact that these depositions are occurring in Seattle at great expense to Plaintiffs however, in the event defense counsel's representation regarding Mr. Bezos' involvement are ultimately inaccurate the Plaintiffs can address that with the court and the court has the authority to fashion an appropriate remedy.

#### 2. Doug Herrington and Carletta Ooton

**\*3** Amazon also seeks a protective order precluding the depositions of Mr. Herrington and Ms. Ooton on the grounds they "have no relevant knowledge that is not readily available, and in more detail, from Mr. Jones and Mr. Pelley, who headed and directly participated in the product safety team's evaluation and response to reports of hoverboard incidents." Docket No. 71, p. 4. Again relying on the Declaration of Damon Jones, Defendant asserts that these individuals while "involved in the hoverboard events" obtained their information from others and were not "personally involved in analyzing the hoverboard incidents or planning the details of Amazon's response." Docket No. 71–1, pp. 4–5.

In their support for deposing Mr. Herrington and Ms. Ooton, Plaintiffs rely on an email sent by each, the language of which is virtually identical in December of 2015 identifying information known to Amazon regarding the hoverboards and the actions taken. Importantly both emails state that there are more details behind the "decision and next steps" and that they were individually willing to have further discussions, answer questions or meet with the recipients of the email. Docket No. 75, pp. 4, 10–11.

Defendant concedes that these individuals were involved in the hoverboard events and thus clearly have knowledge relevant to this litigation. As with Mr. Bezos, the Declaration of Mr. Jones is not particularly compelling on this issue. His statements appear to be contradicted by the emails of Mr. Herrington and Ms. Ooton neither of which state that they lack the personal involvement to discuss the hoverboard incidents or details of Amazon's current response. Further,

unlike Amazon's position with regard to this issue they do not direct the recipients of the email to Mr. Jones or Mr. Pelley or any other member of the product safety team. The email indicates there is more information, they are personally aware of it and they are personally willing to discuss it with the email recipients. The court is mindful of the Defendant's arguments with regard to the burden on high level employees however, unlike Mr. Bezos who Defendant represented had no involvement in the hoverboard events and apparently has never acknowledged any involvement either through email or otherwise Mr. Herrington and Ms. Ooton did and have and therefore should sit for depositions. Defendant's Motion as to Mr. Herrington and Ms. Ooton is DENIED.

### 3. Lena Bryant and Rachel Moss

Plaintiffs seek to depose Lena Bryant and Rachel Moss, who are employed by Amazon's "Dangerous Goods Department." Defendant asserts that the hoverboard in this case was sold and shipped by an entity other than Amazon and therefore the Dangerous Goods Department had no role relevant to this case. As such, requiring the depositions would constitute an undue burden and Plaintiffs should be precluded from taking the depositions. Docket No. 71. Plaintiffs acknowledge the fact that the hoverboard in question was not shipped or stored by Amazon however they assert that "Amazon had extensive knowledge of the dangers of hoverboards and other products with lithium ion batteries." Docket No. 73, p. 9. Based on that assertion, they contend that the knowledge of the employees within the Dangerous Goods Department is relevant and discoverable "as to what Amazon knew about the dangers of hoverboards in advance of the Plaintiffs' fire." *Id.*

Based on Plaintiffs' assertion that the Dangerous Goods Department was aware of the dangers of hoverboards and other products with lithium ion batteries a deposition of someone within the department knowledgeable of that information is appropriate. It is reasonable to assume that the director of the department would be knowledgeable of such information and therefore Defendant's Motion for Protective Order with respect to Lena Bryant is DENIED. However, Plaintiffs have failed to assert any rationale for why it is necessary to depose Rachel Moss, a chemist within the department. Therefore, Defendant's Motion for Protective Order with respect to Ms. Moss is GRANTED.

### B. Rule 30(b)(6) Notice Topics.

### 1. Topics 5 and 11, Dangerous Goods Department

**\*4** Topics 5 and 11 relate to information about the Dangerous Goods Department. The parties rely upon their arguments regarding the deposition of Ms. Bryant and Ms. Moss for their position regarding these topics. With the exception of topic 11(a) requesting the identity of each employee, their respective supervisor, and each such person's job duties during the period September 2015 through February 2016, Defendant's Motion to Strike these topics is DENIED.

Defendant's knowledge and treatment of dangerous goods is an appropriate area of discovery and is not unduly burdensome. Presumably Ms. Bryant as the department director would be knowledgeable about these topics and would be questioned about them in her deposition. Therefore, Defendant's request with respect to these items is DENIED.

### 2. Topic 9, Total dollar amount of refund or returns

Plaintiffs assert that Defendant has produced information regarding this topic in discovery but that Amazon should produce a witness to "testify definitively on this topic." Docket No. 73, p. 10. In support of its motion, Defendant asserts that the information is totally irrelevant and unfairly intrusive into Amazon's business. Plaintiffs make no argument of relevance and the relevance of this information is not readily apparent to the court. Therefore, the Defendant's motion with respect to this topic is GRANTED. However, to the extent that documents have been produced, Defendant has a continuing duty to supplement its responses and it appears this issue can be addressed through the document production in this case. Therefore, a Rule 30(b)(6) deposition to "definitively" address this issue is unnecessary.

### 3. Topic 12, J.C. Berg Dispute

Topic 12 of the Plaintiffs' Rule 30(b)(6) Notice of Deposition concerns information related to Amazon's relationship with J. C. Berg Inc. in 2015 and 2016 regarding the sale of hoverboards and various information related to a dispute ultimately resulting in a lawsuit filed by Berg against Amazon in the state of New York alleging breach of contract. Docket No. 73, p. 11; 71–3, pp. 4–5. Citing an allegation in the Berg lawsuit that Amazon had requested "all safety and compliance documentation" regarding Berg's hoverboard inventory in an effort to escape the contract, Plaintiffs contend this creates a "reasonable area of inquiry in this case." Docket No. 73, p. 12. They further contend that Amazon's actions alleged in the Berg litigation contradict Amazon's denial in this action of knowledge that hoverboards posed

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.568 Filed 03/26/26 Page 148 of 194

Fox v. Amazon.com, Inc., Not Reported in Fed. Supp. (2017)

a substantial and unjustifiable risk prior to January 9, 2016; knowledge that battery packs utilized in hoverboards were poorly manufactured; and that Defendant knew of multiple fires caused by hoverboards prior to January 9, 2016. *Id.*

Defendant responds that the dispute with Berg is a contract claim having nothing to do with the issues in this case and therefore the discovery sought is irrelevant. They further assert that the information that Plaintiffs seem to be seeking through the Berg dispute regarding Amazon's knowledge about hoverboard safety issues is available through Amazon's extensive document production, depositions of the product safety team members who will be deposed and the other 30(b)(6) deposition topics. Docket No. 79, p. 10.

While it is clear that Amazon's knowledge about hoverboard safety issues, the timing of when it became aware of those issues and its response to those issues are all relevant concerns in this litigation, the scope of topic 12 goes far beyond that limited and relevant inquiry. The court is satisfied that Plaintiffs can obtain the information relevant to Amazon's knowledge of the safety concerns alluded to in the Berg litigation through the scheduled depositions and document production without the burden of Defendant producing a witness under Rule 30(b)(6) to address those issues. Therefore Defendant's Motion for Protective Order to strike topic 12 of the Rule 30(b)(6) notice is GRANTED.

### C. Topic 13, Basis of Denials

**\*5** Topic 13 seeks "all facts, information, or evidence upon which Amazon based its denial in paragraphs 29, 30, 38, 45, 46, and 48 of its answer to first amended complaint." Docket No. 71–3. Defendant contends that its Answer to the

complaint was drafted by counsel and the decisions made as to how to respond are protected by the Attorney/Client Privilege and Work Product Doctrine. Docket No. 71, p. 14. Plaintiffs respond that the "facts, information or evidence" upon which the denial is based is not privileged and they are not seeking information regarding privileged communications in any way.

While Plaintiffs are generally correct that the factual basis for a denial in the complaint is discoverable the court has reviewed the allegations of the Amended Complaint along with the responses and the Answer to the Amended Complaint and does not believe that the Rule 30(b)(6) is the appropriate means for obtaining the requested information. As Defendant notes, the decision to admit or deny the allegations in the complaint is a decision made by counsel at the time the answer was filed. That decision by counsel is privileged. In this case, what is sought and the decision of counsel seem difficult to separate. Therefore, Defendant's motion to strike this topic from the 30(b)(6) notice is GRANTED. This ruling does not preclude Plaintiffs from asking the other individuals who will be deposed what if any information they possess that would support a denial of any allegation pled in the complaint. The court's decision merely protects the process whereby counsel answer the complaint and assert positions therein.

For the foregoing reasons, Defendant's Motion for Protective Order (Docket No. 71) is GRANTED in part and DENIED in part.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 9476870

---

### Footnotes

1   The court held a status conference on September 12, 2017 with the parties and confirmed that depositions are scheduled for September 26 through September 28, 2017 in Seattle, Washington.

2   Plaintiffs suggest the court should strike the Declaration of Mr. Jones with respect to what other employees know or do not know. The court declines to strike the Declaration but as noted herein will afford it only the weight it is entitled based on the limitations of Mr. Jones' personal knowledge.

---

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.569 Filed 03/26/26 Page 149 of 194

Haydar v. Amazon Corporate, LLC, Not Reported in Fed. Rptr. (2021)

**2021 WL 4206279**
Only the Westlaw citation is currently available.
United States Court of Appeals, Sixth Circuit.

Abdullah HAYDAR, Plaintiff-Appellant,
v.
AMAZON CORPORATE, LLC;
Peter Faricy, Defendants-Appellees.

No. 19-2410
|
FILED September 16, 2021

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT OF MICHIGAN

**Attorneys and Law Firms**

David A. Nacht, Law Offices, Joseph Xavier Michaels,
Croson, Taub, & Michaels, Ann Arbor, MI, for Plaintiff-
Appellant.

Michael Alan Chichester, Jr., Littler Mendelson, Detroit, MI,
Jay Andrew Inman, Littler Mendelson, Lexington, KY, for
Defendants-Appellees.

BEFORE: BATCHELDER, STRANCH, and
NALBANDIAN, Circuit Judges.

OPINION

JANE B. STRANCH, Circuit Judge.

**\*1** In this employment discrimination case, Abdullah
Haydar, a senior technology manager at Amazon
Marketplace, sued Amazon and the manager he claims
was responsible for the discrimination, Peter Faricy. Haydar
brought claims under Title VII, the Elliot-Larsen Civil
Rights Act, and Michigan's public policy. The district
court granted summary judgment to Amazon and Faricy
(collectively "Amazon") on the retaliation, marital status
discrimination, and public policy claims. Haydar's national
origin and religious discrimination claims proceeded to trial
and resulted in a verdict for Defendants. Haydar appeals
the dismissal of his marital status and retaliation claims at
summary judgment, and he challenges several evidentiary and
procedural decisions the district court made in advance of and
during trial. For the reasons that follow, we **AFFIRM**.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

**A. Factual Background**

Abdullah Haydar, a practicing Muslim of Syrian descent,
began working for Amazon in November of 2012 as a senior
technology manager. He initially relocated from Detroit,
Michigan to Seattle while his wife remained in Detroit, but he
subsequently transferred back to Detroit.

Haydar initially reported to Ramiah Kandasamy, whose
manager was Peter Faricy, the head of Amazon Marketplace.
During Haydar's first performance review in 2013,
Kandasamy told him that he had "serious concerns" about
whether Haydar could succeed at his job or at Amazon,
unless he took "immediate action to improve on [his] effective
communication, active listening, diving deep, earning the
trust of others, insisting on the highest standards and being
right a lot." Kandasamy rated Haydar's performance as "needs
improvement" (a lower rating) and his leadership at "solid
strength" (a middle rating). Amazon regularly solicits peer
reviews ("360 Feedback") for performance reviews, and
Haydar's were mixed. After receiving the review, Haydar
wrote to Faricy and criticized Kandasamy for not providing
him with adequate guidance.

In December 2013, Haydar met with his new supervisor, Jim
Joudrey, to discuss his upcoming performance review. Haydar
sent a follow-up email noting their agreement that his rating
would be "achieves" (a middle rating) or "solid strength"
and that he would need improvement in certain areas of
leadership. In January 2014, before the actual performance
review, Joel Mosby became Haydar's supervisor. In a meeting
reviewing Haydar's proposed rating, Faricy advocated for
lowering the ratings that Joudrey had proposed. In the
end, Haydar's performance rating was "[a]chieves," and his
leadership principles rating was "[d]evelopment needed" (a
lower rating), which resulted in Haydar being categorized
as "least effective." Mosby specified that Haydar needed to
improve his communication skills and noted that although
at times he seemed to be improving, he sometimes fell back
into his old problematic conduct. At this point, Amazon
considered placing Haydar on a Performance Improvement
Plan, a PIP. After this review, Haydar escalated his concerns
about his rating and the fairness of his evaluation process
to human resources. A human resources representative
investigated the complaint and informed Haydar that his
rating would not be changed. Soon thereafter, Haydar became
embroiled in a prolonged argument with Mosby over the

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.570 Filed 03/26/26 Page 150 of 194

Haydar v. Amazon Corporate, LLC, Not Reported in Fed. Rptr. (2021)

transfer of another employee. Haydar again escalated his criticism of Mosby to human resources.

 **\*2** Haydar's third performance review was conducted by Garret Gaw, his manager as of December 2014. This review followed the same pattern of consistently negative feedback as previous reviews. Haydar received a performance rating of "achieves" and a leadership principles rating of "development needed," again placing him in the category of "least effective." Gaw articulated the same criticisms as previous managers. On February 10, 2015, [1] at the meeting finalizing performance reviews, Faricy noted:

> Was doing better, but recently "fell off the bus" and is being managed out. How do we ensure his team/ leadership structure is prepared for him leaving the company? Issues in Earns Trust, Disagree and Commit and Vocally Self-critical. We are working on coaching him out.

On February 17, Gaw discussed the process for Haydar's termination with human resources. On February 20, a human resources representative recommended placing Haydar on a PIP because he had never been put on the initial PIP in 2014 due to briefly improved performance. When Haydar was informed of his negative performance review on February 24, he sent an email to Shelly Cerio in human resources. He claimed that he had "faced a pattern of biased treatment for the past 18+ months" at Amazon and that he believed this "bias exist[ed] with Peter Faricy himself as well as his directs...." Haydar also said that Faricy made discriminatory comments in front of groups of employees based on his marriage, including the following:

> Peter has made subtle comments over the past 2.5 years, which in totality show a pattern of biased perspective regarding me. When I joined Amazon in late 2012, I began a slow transition process to Seattle since my wife is currently finishing up her mid-life career change to become a dentist. As part of this process, I traveled back

and forth regularly between Detroit and Seattle, which my family and I had planned properly and worked through successfully. Peter seems to have thought that this was somehow a mistreatment of my wife, as he made multiple inappropriate comments on this topic. Most notably, during a June 2013 leadership offsite, Peter jokingly made me stand next to my peer who was getting married soon and have us recite lines that would convey to our wives to make them feel loved. This was done repeatedly during the 4 day offsite in front of the entire group and was embarrassing, to say the least.

Haydar then had a phone call with Cerio on March 5 in which he complained about Mosby, Faricy, and Stefan Haney, Haydar's peer who worked with him in Detroit. According to Haydar's notes made during the call, he told Cerio that Faricy was "picking on" him, acting as if he had "an inherently bad relationship with [his] wife due to [his] ethnicity or religion." When Cerio asked him to elaborate, Haydar's notes reflect that he said: "I have no idea who has what religious or ethnic biases, all I know is that peter has made inappropriate remarks about me all the way through my time at amazon and that others are receiving very positive reviews and promotions even though they're failing in their projects, operations, and hiring and I am receiving negative reviews despite being very successful." Cerio's notes reflect a slightly different exchange —that Haydar conveyed:

> Bias – it is not racial or anything like that; Bias that nobody standing up for me; I am the fall guy because I do not have anyone standing up for me.... Peter focuses those who manage upward; People leave because they don't want t[o] manage upward.

 **\*3** Cerio suggested that Anne DeCleene, an attorney working outside Marketplace, serve as a neutral investigator. She did so, conducting interviews and reviewing Haydar's performance reviews and 360 Feedback, which resulted in

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.571 Filed 03/26/26 Page 151 of 194

Haydar v. Amazon Corporate, LLC, Not Reported in Fed. Rptr. (2021)

a 309-page report delivered on April 15, 2015. DeCleene did not corroborate Haydar's claims that he had been subject to any biased treatment. She likewise did not corroborate that Faricy in particular displayed any bias towards Haydar. While she did conclude that Faricy's statements about Haydar's relationship with his wife were not "tasteful," she determined that they did not indicate any discriminatory animus. DeCleene thus recommended putting Haydar on a PIP.

On April 17, Haydar emailed several members of human resources and Gaw, accusing Mosby and Haney of harassment, retribution, and creating a hostile work environment. DeCleene investigated, and again did not corroborate Haydar's allegations.

Later that month, on April 29, Faricy emailed human resources and asked, "What is the status with Abdullah? ... Are we moving fast enough here?" The human resources representative noted Haydar's recent allegations and stated: "All that to say we will want to be buttoned up at every step with this one. It wouldn't be quick or easy, but if we manage it effectively—like the EB case—we'll get to a good outcome as quickly as possible." "EB" referred to a former Amazon Marketplace employee who made allegations of sex discrimination. She was subsequently terminated and sued Amazon.

On May 17, Haydar sent an email to Amazon CEO Jeff Bezos. He laid out the allegations noted above, complaining that different metrics had been used in his reviews than he had been told, and concluding that this practice was "illegal" because he had experienced "detrimental reliance." He also flagged "illegal favoritism" of employees who "excel in behaving sycophantically" and a human resources department that does "everything possible to protect senior leaders from reproach for their unethical and illegal activities rather than protecting me from their mistreatment and thereby also protecting Amazon." Jana Lien, one of Bezos's Executive Assistants, forwarded the email to Holly Swanson in human resources.

Although Haydar's PIP had been written on April 17, he was not formally placed on the PIP until May 26. He had a 30-day check-in with Gaw on July 7, and Haydar noted that the most likely outcome would be extension of the PIP. Haydar later testified that in late August, he realized Amazon was not going to "agree that [he] satisfactorily completed the PIP[.]" After 60 days, his PIP was extended

another 30 days, to September 25. His review stated that if he did not "immediately conform [his] conduct to Amazon's Leadership Principles at the level expected for an L7 leader," his employment would be terminated.

Haydar sent a second email to Bezos on September 16. He detailed how his situation had worsened and said that it was "irrefutably clear" based on data that had become available to him that he had "been the subject of illegal management abuse for the past 10 months, including a fraudulent review process and PIP process." He threatened to go to the media and pursue legal action if his concerns were not addressed. Lien forwarded the email to Swanson that day, who forwarded it to Cerio. Later that day, a human resources representative generated a ticket for Haydar's severance from Amazon. The representative testified that he learned about this message to Bezos verbally from a supervisor, after Haydar was terminated.

On September 22, Haydar's employment with Amazon was terminated, three days before his PIP was set to expire. Gaw made the decision to terminate, with support from human resources. He testified that Faricy had no input into the decision to terminate Haydar's employment. Haydar's replacement was male, Syrian American, and a practicing Muslim.

**\*4** Haydar sent Bezos a third email on October 20 characterizing the message as the "final opportunity to resolve [his] abusive management situation before it enters the public media and legal processes." He forwarded to Bezos a lengthy email he had sent the entire company detailing his grievances. One of Bezos's Executive Assistants, John Connors, forwarded this email to Swanson, who in turn forwarded it to Cerio. Haydar sent a similar final email to Bezos on February 20, 2016. Lien forwarded this email to Swanson and Cerio.

### B. Procedural History

On October 14, 2016, Haydar filed a complaint in federal district court in Michigan, alleging religious and national origin discrimination and retaliation under Title VII and the ELCRA, marital status discrimination under the ELCRA, and termination in violation of Michigan public policy. Haydar contends that Faricy demonstrated bias against Haydar based on his status as a married Syrian/Muslim man, claiming that Faricy repeatedly "made references to you people, to you people need to learn how to treat your wives better."

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.572 Filed 03/26/26 Page 152 of 194

Haydar v. Amazon Corporate, LLC, Not Reported in Fed. Rptr. (2021)

During discovery, Haydar sought to depose Bezos. His counsel agreed not to move to compel Bezos's deposition until the other depositions were conducted. These other depositions were pushed back, and the district court allowed Haydar to propound five interrogatories to Bezos. In response to these interrogatories, Bezos stated that he had no personal knowledge of Haydar or his allegations prior to the lawsuit, that he had not participated in any decisions regarding Haydar, that he did not recall receiving Haydar's emails, and that all such emails were handled according to a "routine process." Ultimately, Bezos was not deposed.

Haydar then sought to depose Lien. Defendants moved for a protective order and submitted a declaration from Lien stating that she had reviewed three of Haydar's emails to Bezos and forwarded them to Swanson in human resources and that she had not communicated with Bezos about the content of the emails. She also declared that she had no other personal knowledge of anything to do with Haydar or his lawsuit. The district court granted the motion for a protective order, concluding that Lien had no knowledge relevant to whether the decisionmakers concerning Haydar's employment acted with discriminatory or retaliatory intent.

After voluminous discovery, Defendants moved for summary judgment on all eight of Haydar's counts, and the district court granted the motion on four of them. As to Haydar's marital status discrimination claim, the district court found that "the heart of [Haydar's] discrimination theory relies on stereotypes about married Syrian or Muslim men, not married men generally." The court granted summary judgment, concluding that Faricy's statements did not demonstrate that he acted with animus toward Haydar because he was married. In fact, all the employees that Haydar contended received better treatment than he did were also married.

The district court also granted summary judgment to Defendants on Haydar's retaliation claims. Concluding that Haydar's claim failed on causation, the district court identified Haydar's March 5, 2015, call to Cerio and his written communications with her as the potentially protected activity. The court determined that the PIP could not have been retaliation for the protected activity because the decision to place Haydar on the PIP was made in February 2015, before Haydar made his complaints to Cerio. And Haydar was terminated more than six months after the call to Cerio, which did not support a causal link between the call and his termination. The district court noted Haydar's other theory of retaliation—that a ticket for his termination was created

by human resources two minutes after Cerio was sent a copy of his September 2015 email to Bezos—but explained that the record showed that the human resources employee who created the ticket had not seen the email until after Haydar was fired.

**\*5** Haydar's national origin discrimination and religious discrimination counts proceeded to trial. He appeals a series of evidentiary rulings in which the court declined to permit Haydar to introduce specific evidence. In particular, the district court did not allow Haydar to call Bezos and Lien as witnesses, for largely the same reasons the depositions had not been permitted. The court allowed the introduction of evidence concerning who EB was, that she had brought complaints of sex discrimination, and that she had sued Amazon, but ruled that the details of her allegations were not admissible under Fed. R. Evid. 403. Similarly, the court did not allow evidence of Haney's performance reviews after he transferred from Faricy to another manager, citing Rule 403. But it allowed the admission of Haydar's performance reviews under the business records hearsay exception. The district court did not allow Haydar to introduce the performance reviews of several comparators through Faricy, holding that no proper foundation was established. The jury ultimately found for Amazon and Faricy on the national origin and religious discrimination claims.

## II. DISCUSSION

### A. Standard of Review

This court reviews a district court's grant of summary judgment de novo, viewing all the evidence in the light most favorable to the nonmoving party and drawing "all justifiable inferences" in his favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The central question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251–52, 106 S.Ct. 2505.

We "review[ ] a district court's decisions regarding discovery matters for abuse of discretion" and "reverse only if we are firmly convinced of a mistake that affects substantial rights and amounts to more than harmless error." Hohman v. Eadie, 894 F.3d 776, 781 (6th Cir. 2018) (quoting Pressman v. Franklin Nat'l Bank, 384 F.3d 182, 187 (6th Cir. 2004)). Similarly, "[w]e review evidentiary rulings for an abuse of discretion" and "check whether the district court (1)

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.573 Filed 03/26/26 Page 153 of 194

Haydar v. Amazon Corporate, LLC, Not Reported in Fed. Rptr. (2021)

misunderstood the law (here, the Federal Rules of Evidence), (2) relied on clearly erroneous factual findings, or (3) made a clear error of judgment." *United States v. Chavez,* 951 F.3d 349, 357–58 (6th Cir. 2020). "This standard of review is 'deferential' because a trial judge has 'broad discretion on evidentiary rulings.' " *Flagg v. City of Detroit,* 715 F.3d 165, 175 (6th Cir. 2013) (quoting *United States v. Hart,* 70 F.3d 854, 858 (6th Cir. 1995)).

**B. Analysis**

1. Summary Judgment

*a. Retaliation Claims*

"To demonstrate a prima facie case of retaliation under Title VII and the ELCRA, the plaintiff bears the initial burden of establishing that '(1) he ... engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action.' " *Khalaf v. Ford Motor Co.,* 973 F.3d 469, 488–89 (6th Cir. 2020) (quoting *Beard v. AAA of Mich.,* 593 F. App'x 447, 451 (6th Cir. 2014)). Amazon argues that Haydar has failed to demonstrate the causation element. "To establish a causal connection between the protected activity and the adverse employment action, a plaintiff must present evidence 'sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action.' " *Id.* at 493 (quoting *In re Rodriguez,* 487 F.3d 1001, 1011 (6th Cir. 2007)). This means that the "unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 360, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013).

The earliest activity that could constitute protected activity is Haydar's communications with Cerio, the HR manager: his message to her on February 24, 2015, and his call with her on March 5. However, the record indicates that Amazon had decided to place Haydar on a PIP by February 20, before Haydar had even been informed of his "least effective" rating and before he had raised any issue of national origin or religious discrimination with Cerio. Thus, Haydar's placement on the PIP cannot be considered a retaliatory adverse employment action against him.

**\*6** Haydar also relies on the April 29 email conversation between Faricy and human resources, during which Faricy asked if Amazon was "moving fast enough" and the HR representative mentioned prior employee EB. Haydar claims that this email is evidence that Amazon had decided to retaliate against him for his conversations with Cerio and had decided to fire him. He argues that the delay between his communications with Cerio and his termination supports an inference of causation because Amazon decided to fire him directly after he engaged in protected activity and then engaged in a "scheme to follow a process before termination."

But Faricy's notes from February 10 already reflected that Haydar was being "managed out," i.e., separated from employment. These notes were taken at a meeting that occurred before Haydar made his complaints to human resources, and before Haydar even knew about his performance rating. Similarly, Gaw approached human resources on February 17 to discuss Haydar's termination and then placed Haydar on a PIP. The evidence shows that Amazon decided to terminate Haydar in February 2015, before Haydar made his complaint, and that Amazon continued the course it had already elected. When assessing causation under Title VII, we are to "change one thing at a time and see if the outcome changes." *Bostock v. Clayton County,* —— U.S. ——, 140 S. Ct. 1731, 1739, 207 L.Ed.2d 218 (2020). If we remove Haydar's email to and call with Cerio from the record, the outcome is the same.

Haydar contends that his emails to Bezos also constitute protected activity. These emails are much closer in time to his termination. "Title VII protects only opposition to discrimination based on 'race, color, religion, sex, or national origin' Magic words are not required, but protected opposition must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue." *Brown v. United Parcel Serv., Inc.,* 406 F. App'x 837, 840 (5th Cir. 2010) (citation omitted) (quoting 42 U.S.C. § 2000e-2(a)(1)); *see Crawford v. Chipotle Mexican Grill, Inc.,* 773 F. App'x 822, 828 (6th Cir. 2019) (a charge of discrimination "need not 'be lodged with absolute formality, clarity, or precision' " (quoting *Stevens v. St. Elizabeth Med. Ctr., Inc.,* 533 F. App'x 624, 631 (6th Cir. 2013))). Haydar contends that while he did not use the "magic words," the emails were sufficient to put Amazon on notice of his complaints of discrimination on the basis of his protected characteristics.

Haydar's emails to Bezos focus on cronyism at Amazon. In the first email, Haydar alleges illegal activity, but he

explains the illegal activity as managers providing him with improper guidance on which he detrimentally relied. Because Haydar provides no basis for concluding that these emails put Bezos or Amazon on notice of national origin or religious discrimination, they cannot constitute protected activity. And even if they had included protected activity, the record shows that Amazon had already decided to manage Haydar out in February 2015, before his contacts with Cerio or these emails.

Accordingly, we AFFIRM the district court's grant of summary judgment on Haydar's retaliation claims.

### b. Marital Status Discrimination Claim

MCL 37.2202(1)(a) prohibits an employer from discriminating "against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, sex, height, weight, or marital status." Haydar challenges the grant of summary judgment on this claim, contending that his marital status was a cause of his termination, i.e., a reasonable jury could find that Faricy would not have singled him out for mistreatment had he been a single Muslim man without a wife whom Faricy could insinuate he treated poorly. Haydar cites *Bostock*, 140 S.Ct. at 1740–41, for the proposition that the causation analysis should consider whether he was discriminated against based on his marital status, not whether Faricy had animus toward married people in general. Appellees respond that Haydar has not demonstrated that he was treated differently from other employees who were similarly situated except that they were single.

**\*7** At bottom, the gravamen of Haydar's complaint is not discrimination against him because he is married, but rather discrimination against him because he is Muslim and/or of Syrian descent. The stereotype he complains about is that Muslim and/or Syrian men mistreat women, not that such married men are worse than comparable single ones. The district court correctly determined that the core of Haydar's complaint was the national origin and religious discriminations claims, which Haydar concedes: "Faricy's comments evidence a very specific and insidious stereotype: that 'you people,' *i.e.*, *Arabs and Muslims*, are domineering, abusive, and otherwise poor husbands to their wives." The issue here would be the racial and religious stereotype, not marital status.

Haydar is correct that the analysis of discrimination should occur on an individual basis. *See Bostock*, 140 S.Ct. at 1741 (affirming that the Title VII analysis focuses on the individual, noting that it would be no excuse for an employer to fire a woman "for refusing his sexual advances" and assert in his defense that "he gives preferential treatment to female employees overall") The district court correctly determined that Faricy's comments went to Haydar's national origin and religion, noted that the colleagues Haydar claimed were treated preferentially were also married, and concluded that Haydar had not been discriminated against on the basis of his marital status. A reasonable jury could not conclude, on this record, that Haydar's marital status was a but-for cause of his termination. Accordingly, we affirm the district court's summary judgment on Haydar's marital status discrimination claim.

### 2. Discovery and Trial Rulings

### a. Bezos and Lien

Haydar challenges the district court's grant of a protective order preventing him from deposing Lien and its grant of Amazon's motion to prevent Bezos and Lien from testifying at trial. Haydar maintains that Bezos and Lien "were personally involved in the circumstances leading to [his] termination." He speculates that Lien may have spoken to Faricy about Haydar's termination, but offers no evidence supporting his speculation. He claims that without being able to depose Lien, he could not develop a timeline of what happened after he sent the second email to Bezos. Haydar also argues that the district court did not specify what prejudice Amazon would suffer if Bezos and Lien were called as witnesses at trial when it conducted the balancing under Fed. R. Evid. 401 and 403.

The district court permitted Haydar to propound interrogatories to Bezos, who confirmed that he had no personal knowledge of the emails Haydar sent. Lien's declaration demonstrated that the extent of her involvement was forwarding the emails to human resources. The record does not contain evidence that either had information relevant to Haydar's claim. And the district court concluded that the risk of prejudice to Amazon—that calling Bezos and Lien as witnesses would imply to the jury that the alleged discrimination reached to the highest levels of the company —outweighed the minimal probative value because neither had any personal knowledge of Haydar's case. Haydar also had ample opportunity to depose members of the human

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.575 Filed 03/26/26 Page 155 of 194

Haydar v. Amazon Corporate, LLC, Not Reported in Fed. Rptr. (2021)

resources team who could have had information relevant to establishing the timeline for his retaliation claim. The district court's decision to prohibit the deposition of Lien and the trial testimony of Bezos and Lien was not an abuse of its discretion.

### b. Stefan Haney

Haydar also sought to introduce evidence that Haney, a manager in Amazon Marketplace, was disciplined and terminated for sex discrimination after he was transferred out of Faricy's supervision. He claims that because other people evaluated Haney's performance as poorer than Faricy did, Faricy excused leadership deficiencies in white, non-Muslim men. The district court excluded this evidence under Fed. R. Evid. 403, determining that the evidence was unduly prejudicial, as sex discrimination was not at issue in the case, and the evidence risked distracting and confusing the jury. Employing a comparable analysis, the district court noted that it had previously excluded Haydar's post-Amazon employment history—during which he had issues with two other employers—using essentially the same balancing analysis and reasons.

**\*8** Amazon points out that the district court admitted evidence of Haney's performance from when he was supervised by Faricy that showed that Haney displayed problems with leadership skills that were "materially identical" to Haydar's. The district court, however, found that the misconduct for which Haney was terminated was not relevant because it could not be compared to Haydar's performance review, and the court excluded only evidence of that misconduct.

The district court weighed the probative value of the evidence regarding Haney against its potential for unfair prejudice and entered appropriate restrictions to temper that prejudice. It did not bar Haydar from using Haney as a comparator for performance while he worked under Faricy at Amazon. This balancing under Rule 403 was not an abuse of discretion.

### c. EB

Haydar attempted to introduce at trial the details of EB's allegations against Amazon, her prior employer. In its balancing analysis under Rule 403, the district court concluded that the details of E.B.'s allegations were not

relevant to Haydar's complaint and risked undue prejudice to Amazon and limited the evidence admitted. It allowed Haydar to introduce the April 2015 email referencing EB and basic background about her claims, termination, and lawsuit as context, without allowing him to introduce the prejudicial details of her unrelated claims. Again, the court tailored the information Haydar could introduce to avoid undue prejudice to Amazon without preventing Haydar from making relevant arguments. This is a reasonable application of Rule 403 and is not an abuse of the court's broad discretion.

### d. 360 Feedback

Haydar raised two complaints concerning the admission at trial of "360 Feedback," Amazon's peer review system. First, he argues that the district court abused its discretion when it denied his motion to exclude the negative feedback he received at Amazon. Haydar contends that the feedback used was given by people who did not testify at trial and could not be cross-examined, was offered for the truth of the matter asserted, and was therefore hearsay. He claims these reviews presented a hearsay within hearsay problem, as the feedback was (1) submitted by Amazon employees and then (2) used in the evaluations.

The district court concluded that the Feedback fell within the business records exception because the feedback was solicited, and the evaluations conducted, in the regular course of business. Haydar now asserts that the district court failed to consider that the feedback was unreliable.

Fed. R. of Evid. 803(6) provides: "A record of an act, event, condition, opinion, or diagnosis" is admissible as an exception to the prohibition on hearsay when, among other requirements, "the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit[.]" Both the solicitation of the feedback from Amazon employees and the production of the performance reviews by the evaluated person's immediate supervisor were plainly conducted in the regular course of business, because the feedback formed a part of the performance reviews, and the reviews occurred annually. *See United States v. Gurr*, 471 F.3d 144, 152 (D.C. Cir. 2006) (records are "excepted from the hearsay rule provided 'both the source and the recorder of the information, as well as every other participant in the chain producing the record, are acting in the regular course of business.' " (quoting *United States v. Baker*, 693 F.2d 183, 188 (D.C. Cir. 1982))). The

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.576 Filed 03/26/26 Page 156 of 194

Haydar v. Amazon Corporate, LLC, Not Reported in Fed. Rptr. (2021)

district court, moreover, explicitly considered the reliability and trustworthiness of the feedback. Finally, Haydar argues that the feedback was not limited to the state of mind of the decision-makers when it was introduced. The part of the trial transcript referenced in his brief, however, indicates that the evidence was offered for that very purpose:

**\*9** In their opening, Defendants stated, "You'll see evidence, lots of evidence of people *unhappy* with Mr. Haydar.... They were *unhappy* that he was constantly undermining and insulting managers and peers." [Trial Transcript Vol. II, R. 158 PageID 13139] (emphasis added).

Haydar's second complaint is that the district court prevented him from introducing the evaluations of some of his comparators through Faricy on the basis that he failed to lay the proper foundation. Faricy testified that he had not seen the performance review documents in question. He indicated that he may have participated in a discussion concerning that particular Amazon employee's resulting ratings, but had not seen the actual document or the 360 Feedback it contained. The district court concluded that this exchange did not provide a sufficient foundation for Faricy's knowledge of how the records were maintained.

Business records must be admitted through "the testimony of the custodian or another qualified witness." Fed. R.

Evid. 803(6)(D). Haydar does not contend that Faricy was the custodian. When analyzing whether a witness is a "qualified witness" under the rule, we ask whether the witness is "familiar with the record keeping procedures of the organization." *Dyno Constr. Co. v. McWane, Inc., 198 F.3d 567, 576 (6th Cir. 1999).* If so, the witness need not have personal knowledge of the preparation of the records. *Id.* The record does not show that Faricy was asked about his knowledge of Amazon's record-keeping procedures; however, Haydar successfully introduced evidence concerning two of his comparators through another witness. The district court's decision that Haydar failed to lay the proper foundation to introduce the 360 Feedback regarding other comparators through Faricy was not an abuse of discretion.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgments of the district court regarding summary judgment and its evidentiary rulings during discovery and at trial.

**All Citations**

Not Reported in Fed. Rptr., 2021 WL 4206279

---

### Footnotes

1    These notes are dated "February 10, 2014" but they reference "Notes from Q1 2015 Marketplace OLR."

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 1660862
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Northern Division.

HEMLOCK SEMICONDUCTOR
CORPORATION, et al., Plaintiff,
v.
KYOCERA CORPORATION, Defendant.

Case No. 15-cv-11236
|
Signed April 27, 2016

**Attorneys and Law Firms**

Alvin Lee, Orrick, Herrington and Sutcliffe, New York, NY, Craig W. Horn, Braun, Kendrick, Saginaw, MI, for Plaintiff.

Brent W. Warner, Keefe A. Brooks, Brooks Wilkins Sharkey & Turco PLLC, Birmingham, MI, Bryan H. Heckenlively, Emily C. Curran-Huberty, Munger, Tolles & Olson LLP, San Francisco, CA, Christian G. Andreu-Von Euw, Jessica Anne Roberts, Mark Andrew Woodmansee, William V. O'Connor, David C. Doyle, Morrison & Foerster LLP, San Diego, CA, Daniel Benjamin Levin, Erin J. Cox, Gregory P. Stone, Munger, Tolles & Olson LLP, Los Angeles, CA, Robert A. Hahn, Jungerheld, Hahn, Saginaw, MI, for Defendant.

### ORDER DENYING MOTION TO COMPEL

THOMAS L. LUDINGTON, United States District Judge

**\*1** The immediate dispute between Plaintiff Hemlock Semiconductor ("Hemlock") and Defendant Kyocera arises from a series of contracts for the sale of quantities of industrial-grade polycrystalline silicon by Hemlock to Kyocera. Following changes in global solar market conditions, Kyocera sought to excuse its performance under a force majeure provision in the parties' contracts. In response, Hemlock sought adequate assurances that Kyocera would perform its obligations under the agreements. When Hemlock concluded that Kyocera had not provided adequate assurances that it would perform its contractual commitment, it initiated this suit.

Hemlock filed its initial complaint on April 1, 2015, and an amended complaint on April 29, 2015, asserting that

Kyocera had failed to provide adequate assurances of performances under MCLA § 440.2609 and had repudiated Supply Agreements I–III. ECF No. 4. Hemlock also seeks a declaratory judgment that Supply Agreements I–III are not unconscionable and an anti-suit injunction to prevent Kyocera from further prosecuting a related action in Tokyo. *Id.* Kyocera filed its answer together with six counterclaims on July 10, 2015. ECF No. 9. On January 6, 2016 the Court granted Hemlock's motions to dismiss Kyocera's counterclaims and strike Kyocera's Japanese antitrust defense. ECF No. 61. On March 11, 2016, this matter was consolidated with a related action between Hemlock Semiconductor LLC ("Hemlock LLC") and Kyocera regarding the enforceability of Supply Agreement IV. ECF No. 83.

Now before the Court is Kyocera's motion to compel responses to its discovery Request No. 60. Because the privileged information Kyocera seeks is not relevant to this action, and because Kyocera can obtain the information it seeks from another source, its motion to compel will be denied.

### I.

The facts as set forth in the Court's January 6, 2016 order are, in relevant part, as follows. Hemlock, Plaintiff in this action, is involved in the manufacture and sale of polycrystalline silicon ("polysilicon") and photovoltaic solar cells and modules. ECF No. 4 at ¶¶ 1, 3, 7. Kyocera, Defendant in this action, describes itself as "one of the world's largest vertically-integrated producers and suppliers of solar energy panels." ECF No. 4 at ¶ 8.

### A.

Beginning in 2005, in the face of a worldwide polysilicon shortage, Hemlock and Kyocera entered into four long-term polysilicon supply contracts. The first Long Term Supply Agreement ("Agreement I") is effective from August 30, 2005 to December 31, 2015. The second Long Term Supply Agreement ("Agreement II") is effective from July 21, 2006 to December 31, 2018. The third Long Term Supply Agreement ("Agreement III") is effective from July 18, 2007 to December 31, 2019. Finally, the fourth Long Term Supply Agreement ("Agreement IV") is effective from November 13, 2008 to December 31, 2020. Am. Compl. at ¶¶ 12–13. The

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.578 Filed 03/26/26 Page 158 of 194

Hemlock Semiconductor Corporation v. Kyocera Corporation, Not Reported in Fed....

agreements require Kyocera to make large initial payments to assist Hemlock's expansion of its existing polysilicon production facilities in the United States.

**\*2** After the parties entered into the agreements, the global solar industry was affected by the Chinese government's intervention. Specifically, the Chinese government provided subsidies to Chinese solar-based companies and facilitated large-scale "dumping" of Chinese solar panels into the global market in order to increase Chinese market share in the solar industry. In response, in 2012 the United States government imposed anti-subsidy and anti-dumping import tariffs of 24–36 percent on Chinese solar components. These state actions caused the prices of both polysilicon and solar panels to drop precipitously.

In response to the falling market prices, the parties agreed to short-term contract modifications in 2011 and 2012 that lowered the gross price and the advance payment for those years. These modifications did not affect any other contract terms or future pricing schedules. While the short-term price amendments came to an end, the Chinese market saturation and resulting trade war did not. From mid–2014 to early 2015, Kyocera proposed additional price modifications, all of which Hemlock rejected.

### B.

After failing to reach a modification agreement, Kyocera sent notice to Hemlock in February 2015 that it was exercising a force majeure provision of Agreement IV. Hemlock refused to recognize Kyocera's invocation of any force majeure rights, contending that the force majeure provision in Agreement IV did not excuse Kyocera from performance because of the changing solar-market conditions. Consequently, on February 13, 2015 Kyocera filed suit in Michigan State Court seeking a declaration that its contractual performance could be excused by Agreement IV's force majeure clause.

On June 16, 2015, the Michigan State trial court granted Hemlock's motion for summary disposition, finding that the change in market conditions did not implicate Agreement IV's force majeure clause. On December 3, 2015, the Michigan Court of Appeals affirmed, explaining that Kyocera had assumed the market risks that gave rise to the alleged liability and that "the plain language of the force majeure clause at issue does not permit relief to plaintiff on the grounds that the market for polysilicon has shifted, regardless of the cause

of that shift." *Kyocera Corp. v. Hemlock Semiconductor,* 15–025786–CK \*2 (Mich. Ct. App. Dec. 3, 2015), ECF No. 58 Ex. A.

### C.

On February 26, 2015 Hemlock sent Kyocera a demand for adequate assurances that it would perform under Agreements I–III pursuant to MCLA § 440.2609. Compl. ¶ 28. Kyocera sent Hemlock a response on March 26, 2015, arguing that Kyocera had no obligation to provide written assurances to Hemlock and that MCLA § 440.2609 did not apply to the supply agreements. *Id*. at ¶ 29. Hemlock then initiated the instant suit on April 1, 2015 alleging that Kyocera had failed to provide Hemlock with adequate assurances that it would make purchases under the supply agreements in 2015. Am. Compl. ¶ 28.

Two days later, on April 3, 2015, Kyocera filed a complaint against Hemlock in the Civil Division of Tokyo District Court in Japan. The Tokyo complaint alleges that Hemlock violated Japanese antitrust law by abusing a superior position of bargaining power in entering into the supply agreements. That case remains pending.

Then, on October 7, 2015 Hemlock Semiconductor LLC ("Hemlock LLC") filed suit in Saginaw County circuit court alleging that Kyocera had violated supply agreement IV, seeking a declaratory judgment that supply agreement IV is not unconscionable, and seeking an anti-suit injunction to prevent Kyocera from further prosecuting the Tokyo Action. Kyocera removed that action to this Court on February 3, 2016. *See* Case No. 1:16–cv–10376, ECF No. 1. Pursuant to the parties' stipulation, that matter was consolidated with the above-captioned action on March 8, 2016. ECF No. 82.

**\*3** After Kyocera filed its answer, together with six counterclaims, Hemlock moved to dismiss Defendant Kyocera's counterclaims. ECF Nos. 9, 21. Hemlock also moved to strike an affirmative defense alleged by Kyocera based on Japanese antitrust law. ECF No. 22. On January 6, 2016, the Court granted both of Hemlock's motions, dismissed Kyocera's seven counterclaims, and struck Kyocera's Japanese antitrust defense. ECF No. 61. Kyocera then brought a motion for clarification of that order, which was denied, and a motion for leave to file a first amended answer and counterclaims, which was granted in part and denied in part. ECF No. 75.

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.579 Filed 03/26/26 Page 159 of 194

Hemlock Semiconductor Corporation v. Kyocera Corporation, Not Reported in Fed....

## II.

Kyocera filed its motion to compel discovery on February 9, 2016. Kyocera seeks an order compelling Hemlock to respond to the following request for production of discovery:

**REQUEST NO. 60:**

ALL transcripts and audio or video recordings of testimony (in deposition, trial, or other form) given by Denise Beachy, Robert Hansen, Andrew Tometich, James Studelberg, Joseph Rinaldi, Cindy Yuan, Hidenori Yanagi, Hiromi Ida, Gary Homan, Greg Bausch, Hitoshi Takahashi, or Chikatoshi Kasa in connection with any SOLAR MANUFACTURING LITIGATION.

Instead of responding to the request, Hemlock objected as follows:

**RESPONSE TO REQUEST NO. 60:**

See General Objections and Responses 1—8, which are incorporated by reference as though set forth fully herein. In particular, Hemlock objects to this Request because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Moreover, the information sought is not relevant to this litigation and covered by protective orders in those other litigations. See generally Opinion and Order dated January 6, 2016, Hemlock Semiconductor Corp. v. Kyocera Corp., No. 15–11236, Dkt. No. 61 (E.D. Mich.). Hemlock will not search for or produce documents in response to this Request.

*See* Mot. to Compel Ex. 10. Kyocera notes that it has since narrowed Request No. 60 to seek only deposition transcripts, and not audio or video recordings.

### A.

Federal Rule of Civil Procedure 26(b)(1), as effective on December 1, 2015, governs the scope of discovery. The rule provides the following:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery

regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

*Id*. The rule's previous language allowing discovery of relevant but inadmissible information that appeared "reasonably calculated to lead to the discovery of admissible evidence" has been deleted from the new rule to address concerns that the exception was swallowing the limitations placed on the scope of discovery. See Rule 26, 2015 Advisory Committee Notes.

Under Rule 34, a party may serve on any other party a request to produce documents within the scope of rule 26(b). If a party from which production is sought fails to make the requested disclosures, the party seeking discovery may move for an order compelling discovery under Rule 37(a)(3)(B).

### B.

The touchstone of Rule 26(b)(1) is relevance. Under Federal Rule of Evidence 401, evidence is relevant if "(a) it has any tendency to make a fact that more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." At the discovery stage, information sought need not be ultimately admissible at trial, so long as it appears reasonably calculated to lead to the discovery of admissible evidence. Fed.R.Civ.P. 26(b)(1). Where, as here, a party objects to the relevancy of the information sought, the party seeking discovery bears the burden of demonstrating its relevance. *See Hennigan v. Gen. Elec. Co*., No.2010 WL 4189033, at *3 (E.D. Mich. Aug. 3, 2010), adopted, 2010 WL 4179376 (E.D. Mich. Oct. 20, 2010). The initial issue is thus whether privileged discovery material from actions involving Hemlock and third parties is relevant to any valid claim or defense in this matter.

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.580 Filed 03/26/26 Page 160 of 194

Hemlock Semiconductor Corporation v. Kyocera Corporation, Not Reported in Fed....

**\*4** Kyocera argues that the deposition transcripts are relevant because they were created in the course of related and substantially similar litigation. Specifically, Kyocera claims that the litigation in which the transcripts were produced is substantially similar to the current case because those cases involved similarly situated parties, almost identical supply agreements for the purchase of the same product, and the same affirmative defenses asserted by Kyocera. Kyocera argues that the witnesses in those matters will be witnesses in this matter, and that the cases involve similar claims, defenses and underlying contract language. Kyocera asserts that any testimony the witnesses gave in those matters regarding Hemlock's understanding of contractual terms or events is therefore relevant in this matter. Finally, Kyocera argues that the testimony is relevant for credibility determinations.

Hemlock responds that Kyocera has not carried its burden of proving relevance. Hemlock argues that because the contracts at issue are not ambiguous, evidence regarding the interpretation of any contract provisions is irrelevant. Hemlock further argues that any deposition testimony about "key events" is irrelevant, since this Court has already dismissed Kyocera's counterclaims regarding alleged disruptions of the solar industry due to interference by the Chinese Government, and "key events" are otherwise unique to each of Hemlock's different customers. Hemlock concludes that Kyocera's discovery request is merely an attempt to abuse and harass Hemlock's witnesses, and that credibility alone is not a sufficient ground to allow discovery of the confidential transcripts.

Kyocera has not met its burden of showing relevance. Kyocera has not explained why witness testimony concerning claims in similar matters would be relevant in this breach of contract action, and has not explained what overlapping factual questions those witnesses would be examined about here. To the extent Kyocera seeks testimony regarding events involving Chinese Governmental action in the solar industry, this Court has already found such events irrelevant to the Parties' valid claims and defenses, and so facts involving such events are not of consequence in determining this action. *See* Fed.R.Evid. 401; *See also* ECF Nos. 61, 75. To the extent Kyocera seeks testimony regarding interpretation of the parties' contracts, "an unambiguous contractual provision is reflective of the parties' intent as a matter of law", and therefore witness interpretations of unambiguous contractual provisions are irrelevant. *See Quality Products and Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 362, 369 (Mich. 2003). Because the contractual provisions at issue in the present action are unambiguous, witness interpretations of the provisions are not relevant.

Because Kyocera has not carried its burden of demonstrating the transcripts' relevance, Kyocera cannot show that the relevance of the transcripts outweighs the privilege they are covered by. The fact that non-parties have waived their claims of privilege does not in any way affect Hemlock's claimed privilege. Importantly, Kyocera can obtain access to the information contained in those documents through another source: Kyocera can simply depose the witnesses in this matter. Similarly, Kyocera can determine the credibility of the witnesses by subjecting them to cross-examination, which is the crucible of credibility determinations. *See Crawford v. Washington,* 541 U.S. 36 (2004).

### III.

Accordingly, it is **ORDERED** that Kyocera's Motion to Compel, ECF No. 67, is **DENIED**.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 1660862

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

McCracken v. Ford Motor Company, Not Reported in Fed. Supp. (2009)

2009 WL 10700999
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Ted MCCRACKEN, Plaintiff,
v.
FORD MOTOR COMPANY, Defendant.

CIVIL ACTION NO. 07-CV-2018
|
Filed 04/21/2009

**Attorneys and Law Firms**

Ted Aaron McCracken, North Wales, PA, pro se.

Sharon L. Caffrey, Duane Morris LLP, Philadelphia, PA, Tiffany M. Alexander, Sedgwick LLP, Malvern, PA, for Defendant.

**ORDER**

ANITA B. BRODY, Judge

**\*1 AND NOW**, this 21st day of April, 2009, it is **ORDERED** that Defendant Ford Motor Company's Motion to Quash Plaintiff's Notice of Deposition Directed to Ford Motor Company and Alan Mulally and for a Protective Order (the "Motion") (Doc. #51) is **GRANTED** in part and **DENIED** in part as follows:

Defendant's Motion to Quash Plaintiff's Notice of Deposition Directed to Alan Mulally is **GRANTED**.[1]

Defendant's Motion for a Protective Order is **DENIED**.

**All Citations**

Not Reported in Fed. Supp., 2009 WL 10700999

---

**Footnotes**

1    In general, discovery is permissible with respect to "any nonprivileged matter that is relevant to any party's claim." Fed. R. Civ. P. 26(b)(1). However, discovery may be limited if it is "unreasonably cumulative or duplicative," can be obtained from a more convenient source, or if "the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b). The Defendant's Motion asks the Court to bar the deposition of Alan Mulally, the Chief Executive Officer of Ford Motor Company. Although high-ranking corporate officials are not *per se* immune from discovery, when an "apex" executive lacks unique or superior knowledge of the facts in dispute, court have found good cause exists to prohibit the deposition. *See e.g., Halderman v. Pennhurst State Sch. And Hosp.*, 96 F.R.S. 60, 64 (E.D. Pa. 1982) ("[H]ighranking officials should not ordinarily be compelled to testify unless it has been established that the testimony to be elicited is necessary and relevant and unavailable from a lesser ranking officer."). *See also Reif v. CNA*, 248 F.R.D. 448, 451 (E.D. Pa. 2008) (remarking that although the Third Circuit has not yet decided this issue, the courts which have, "have focused their decisions on whether the executives' possess personal or superior unique knowledge" and "whether the information could be obtained from lower level employees or through less burdensome means, such as interrogatories."). The Plaintiff has not yet deposed any other lower ranking employees in this case, and in fact served his first demand for Interrogatories and Document Requests on the same date as Mr. Mullaly's subpoena. (Motion ¶ 5.) There is no indication that Mr. Mulally has any direct knowledge of the facts at issue in this action or that the information sought from Mr. Mullaly cannot be obtained more easily through other less obtrusive discovery. I therefore find that the deposition of Mr. Mulally at this time would be overly burdensome to the Defendant, without providing any information to the Plaintiff that cannot be obtained by more convenient means.

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.582 Filed 03/26/26 Page 162 of 194

McCracken v. Ford Motor Company, Not Reported in Fed. Supp. (2009)

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:24-cv-10216-TGB-DRG   ECF No. 35-1, PageID.583   Filed 03/26/26   Page 163 of 194

Mitchell v. Arnold, Not Reported in Fed. Supp. (2023)

2023 WL 7711478

Only the Westlaw citation is currently available.

United States District Court, W.D. Kentucky,

Louisville Division.

Toni MITCHELL, et al. Administratrix of the
Estate of D'Juantez Anthony Mitchell, Plaintiffs

v.

Bryan ARNOLD, et al., Defendants

CIVIL ACTION NO. 3:20-CV-00530-DJH

|

Signed November 14, 2023

|

Filed November 15, 2023

**Attorneys and Law Firms**

Gregory D. Simms, Murphy & Associates PLC, Louisville, KY, Hal Daniel Friedman, Cooper & Friedman PLLC, Louisville, KY, for Plaintiffs.

Andrew S. Miller, Kristie Babbitt Walker, Richard David Elder, Jefferson County Attorney, Louisville, KY, for Defendants.

## **MEMORANDUM OPINION AND ORDER**

Regina S. Edwards, Magistrate Judge

**\*1**  Before the Court in this 42 U.S.C. § 1983 civil rights action is Plaintiffs Toni Mitchell and Courtney Jewell Moore's ("Plaintiffs") Motion to Compel the deposition of former Louisville/Jefferson County Metropolitan ("Louisville Metro") Mayor Greg Fischer and the Rule 30(b)(6) deposition of a Louisville Metro and/or Louisville Metro Police Department ("LMPD") representative regarding the Department of Justice ("DOJ") investigative report on these institutions. (DN 77). Defendants Bryan Arnold, Steve Conrad, Robert Schroeder, and the Louisville Metro/LMPD ("Defendants") have filed a Motion for Protective Order in response. (DN 78). This matter has been referred to the undersigned United States Magistrate Judge for resolution of all non-dispositive matters, including discovery issues. (DN 12).

I. Background

This lawsuit arises from the fatal shooting of D'Juantez Anthony Mitchell on May 15, 2019 by law enforcement officers during an investigative stop of Mitchell's vehicle. (DN 1, at ¶¶ 17-31). Plaintiffs Toni Mitchell (administratrix for Mitchell's estate) and Courtney Jewell Moore (guardian for Mitchell's minor children) bring claims of excessive force, battery, wrongful death, and gross negligence in violation of 42 U.S.C. § 1983 against Defendants Steve Conrad (former Louisville Metro Police Chief); Robert Schroeder (former interim Louisville Metro Police Chief); the LMPD/Louisville Metro; and Officer Bryan Arnold in his individual and official capacity. (*Id.* at ¶¶ 37-59). Plaintiffs also assert a municipal liability (*Monell*) claim against Defendants for failure to supervise and train Officer Arnold in the use of deadly force. (*Id.* at ¶¶ 40-44).

On January 10, 2022, after over a year of discovery, Defendants moved for judgment on the pleadings as to Plaintiffs' *Monell* claim. (DN 48). Defendants also moved to stay discovery on the *Monell* claim pending resolution of their motion. (*Id.*). The undersigned stayed discovery in the case pending a ruling by the Court on Defendants' motions (DN 55), and Plaintiffs filed their response in opposition. (DN 56). Upon review of these motions and oral arguments by counsel, the Court converted Defendants' Motion for Judgment on the Pleadings into a Motion for Summary Judgment. (DN 68). The Court directed the undersigned "to determine whether the previous stay of discovery ... should be lifted and to set a final briefing schedule for the converted motion." (*Id.*). After several status conferences to resolve the parties' discovery disputes, the undersigned lifted the stay. (DN 73). The parties ultimately reported that they had made some progress concerning outstanding discovery but were unable to reach a complete agreement as to certain depositions sought by Plaintiffs. [1] (DN 76).

Since the parties were unable to resolve their discovery disputes, the Court ordered Plaintiffs to file a Motion to Compel these depositions (DN 75). On June 7, 2023, Plaintiffs filed their Motion to Compel both the deposition of former Mayor Fischer regarding the reasoning behind Defendant Conrad's termination in 2020 and a Rule 30(b)(6) deposition of a Louisville Metro/LMPD representative regarding the DOJ report. [2] (DN 77). Defendants filed a combined response in opposition and Motion for Protective Order. (DN 78).

Case 2:24-cv-10216-TGB-DRG   ECF No. 35-1, PageID.584   Filed 03/26/26   Page 164 of 194

Mitchell v. Arnold, Not Reported in Fed. Supp. (2023)

## II. Legal Standard

 **\*2**  Discovery matters are "committed to the sound discretion of the district court." *In re Air Crash Disaster*, 86 F.3d 498, 516 (6th Cir. 1996) (citations and quotations omitted). Discovery is limited to matters that are nonprivileged, relevant to a claim or defense, and proportionate to the needs of the case. Fed. R. Civ. P. 26(b)(1). Relevance is to be "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on" a party's claim or defense. *Hadfield v. Newpage Corp.*, No. 5:14-CV-00027-TBR-LLK, 2016 WL 427924 at \*3, 2016 U.S. Dist. LEXIS 12744 at \*9 (W.D. Ky. Feb. 3, 2016) (quoting *Oppenheimer Fund v. Sanders*, 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978)).

Pursuant to Rule 37 of the Federal Rules of Civil Procedure, "a party may move for an order compelling disclosure or discovery," provided that the party certifies to the court that it has, in good faith, conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action. Fed. R. Civ. P. 37(a)(1). The nonmoving party that objects to the discovery request has the burden of showing that "the discovery requests are improper." *Polylok, Inc. v. Bear Onsite, LLC*, No. 3:12-CV-00535-DJH-CHL, 2017 WL 1102698 at \*3, 2017 U.S. Dist. LEXIS 41960 at \*12 (W.D. Ky. Mar. 23, 2017). If the nonmoving party "raises an objection to discovery based on relevance, the burden shifts to the party seeking the information to demonstrate that the requests are relevant to the subject matter involved in the pending action." *Strategic Mktg. & Research Team, Inc. v. Auto Data Sols., Inc.*, No. 2:15-cv-12695, 2017 WL 1196361 at \*2, 2017 U.S. Dist. LEXIS 48375 at \*7 (E.D. Mich. Mar. 31, 2017) (quoting *GCA Servs. Grp., Inc. v. ParCou, LLC*, No. 2:16-cv-02251-STA-cgc, 2016 WL 7192175, at \*3, 2016 U.S. Dist. LEXIS 171349, at \*10 (W.D. Tenn. Dec. 12, 2016)).

In contrast, upon a showing of good cause, courts may issue a protective order that "forbid[s] the disclosure or discovery" of certain material to prevent "annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). Under Rule 26(c)(1), showing good cause requires the moving party "to make a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements[,]" with respect to the potential of the material to annoy, embarrass, oppress, unduly burden, or

unduly cost the party. *HD Media Co., LLC v. United States DOJ*, 927 F.3d 919, 929 (6th Cir. 2019) (quotation omitted); *see Nemir v. Mitsubishi Motors Corp.*, 381 F.3d 540, 550 (6th Cir. 2004) (quotation omitted).

## III. Analysis

### A. Deposition of Former Mayor Fischer

Plaintiffs are seeking to depose former Louisville Mayor Fischer regarding "all of the reasons" why he terminated former LMPD Chief Conrad on June 1, 2020. (DN 77-1, at PageID # 1904). Specifically, they argue that, if "[Conrad's] termination had anything to do with the Chief's failure to enforce policies as to race or use of force," this information would bolster their *Monell* claim. (*Id.* at PageID # 1922).

In their response, Defendants argue that former Mayor Fischer should not be subject to a deposition because he is a former high-ranking government official, he has no personal knowledge of the claims at issue in this case, and the information that Plaintiffs seek from former Mayor Fischer has already been provided by Conrad. (DN 78, at PageID # 2028-32). Defendants urge the Court to apply the "extraordinary circumstances test" adopted by a number of circuits and by some district courts within the Sixth Circuit. [3] (*Id.* at PageID # 2030; *see also EMW Women's Surgical Ctr., P.S.C. v. Glisson*, No. 3:17CV-00189-GNS, 2017 WL 3749889, 2017 U.S. Dist. LEXIS 139725 (W.D. Ky. Aug. 30, 2017) (listing cases)).

 **\*3**  Plaintiffs, on the other hand, ask the Court to apply the analysis used in the Sixth Circuit's *Serrano* decision to the instant matter. (DN 77-1, at PageID # 1912) (citing *Serrano v. Cintas Corp.*, 699 F.3d 884, 901 (6th Cir. 2012)). In *Serrano*, the Sixth Circuit held that the "apex doctrine" [4] did not preclude the deposition of the defendant corporation's chief executive officer. *Id.* at 902. Plaintiffs assert that former Mayor Fischer has personal knowledge regarding Conrad's dismissal and is the only person who can explain the reasoning behind his termination. (DN 77-1, at PageID # 1923). Additionally, Plaintiffs point to the fact that former Mayor Fischer is no longer an active government official as support for their contention that the extraordinary circumstances test does not apply in this case. (*Id.* at PageID # 1913).

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.585 Filed 03/26/26 Page 165 of 194

Mitchell v. Arnold, Not Reported in Fed. Supp. (2023)

Regardless of whether the Court applies the extraordinary circumstances test or the strict adherence to Rule 26 as outlined in *Serrano*, former Mayor Fischer should not be deposed.

First, under the extraordinary circumstances test, the general rule across the circuits is "that absent extraordinary circumstances, high-ranking officials may not be subjected to depositions or called to testify regarding their official actions." *Coleman v. Schwarzenegger*, Nos. CIV S-90-0520 LKK JFM P, C01-1351 TEH, 2008 WL 4300437 at *2, 2008 U.S. Dist. LEXIS 70224 at *19-20 (E.D. Cal. Sep. 15, 2008) (collecting cases). These extraordinary circumstances may be met where (1) the official has first-hand knowledge related to the claim being litigated, and (2) it is shown that other persons cannot provide the necessary information. *EMW Women's Surgical Ctr.*, 2017 WL 3749889, at *2, *P.S.C.*, 2017 U.S. Dist. LEXIS 139725, at *6-7 (citing *Boudreau v. Bouchard*, No. 07-10529, 2008 WL 4386836, at *2, 2008 U.S. Dist. LEXIS 75611, at *4 (E.D. Mich. Sep 25, 2008); *Baine v. Gen. Motors Corp.*, 141 F.R.D. 332, 335 (M.D. Ala. 1991); *In re United States (Holder)*, 197 F.3d 310, 314 (8th Cir. 1999)).

The rationale behind this doctrine considers "the responsibilities and time constraints incumbent on high-ranking officials" and concerns that "testifying in every case to which the agency or administration is a party would monopolize the official's time." *EMW Women's Surgical Ctr.*, 2017 WL 3749889, at *2, *P.S.C.*, 2017 U.S. Dist. LEXIS 139725, at *6 (quoting *In re United States (Kessler)*, 985 F.2d 510, 512 (11th Cir. 1993); *Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 586 (1985); *United States v. Morgan*, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941)).

The parties do not dispute that Fischer's former governmental position as Louisville mayor would have qualified him as a high-ranking official under the framework of the extraordinary circumstances test. *See Scott v. Louisville/Jefferson Cty. Metro Gov't*, No. 3:20-CV-00535-BJB-CHL, 2023 WL 5250963 at *5, 2023 U.S. Dist. LEXIS 142301 at *12 (W.D. Ky. Aug. 14, 2023) ("Mayor Greenberg is considered a high-ranking official not normally subject to the burden of depositions."); *see also Elvis Presley Enters., Inc. v. City of Memphis*, No. 2:18-cv-02718, 2020 WL 4015476 at *14, 2020 U.S. Dist. LEXIS 125534 at *7 (W.D. Tenn. July 16, 2020). Instead, Plaintiffs argue that Fischer no longer serving in office is a "factor" when considering whether the deposition will interfere with his duties. (DN 77-1, at PageID # 1913).

Although some courts find that the rationales behind protecting state officials from deposition apply "with less force" when the proposed deponent no longer holds that position, federal courts largely appear in agreement that the extraordinary circumstances protections apply equally to current and former high-ranking officials. *Burgess v. United States*, No. 17-11218, 2022 WL 17725712 at *5, 2022 U.S. Dist. LEXIS 226358 at *16 (E.D. Mich. Dec. 15, 2022); *see also United States v. Wal-Mart Stores, Inc.*, Civil Action No. PJM-01-1521, 2002 WL 562301 at *4, 2002 U.S. Dist. LEXIS 6929 at *11 (D. Md. Mar. 29, 2002) ("In the absence of controlling case law to the contrary, this Court is of the opinion that the Morgan doctrine is applicable to efforts by parties to depose former high-ranking officials."); *Presti v. City of N.Y.*, 609 F. Supp. 3d 204, 207 n.2 (E.D.N.Y. 2022) (noting that the Second Circuit applies the test to former officials). While the concern that depositions would take away from the official's duties in office is no longer present, the need to protect the integrity of the underlying decision-making process and encourage people to pursue careers in public service continues to persist after the official leaves government service. *United States v. Newman*, 531 F. Supp. 3d 181, 188 (D.D.C. 2021). Because the extraordinary circumstances test applies to former Mayor Fischer, the inquiry then becomes whether (1) Fischer possesses information essential to the case; and (2) Plaintiffs cannot obtain that information through other means.

**\*4** As to the first factor, Plaintiffs argue that former Mayor Fischer has unique, first-hand knowledge of the facts at issue. (DN 77-1, at PageID # 1923). They specifically rely on Conrad's deposition, claiming that "Conrad testified he was told he was fired due to an 'institutional failure' within the LMPD." (*Id.* at PageID # 1906). Plaintiffs intend to depose Fischer about "what institutional failures the Mayor was concerned with ... as such failures clearly could support Plaintiffs' *Monell* Claim." (*Id.*). But Plaintiffs fail to acknowledge that, earlier in the deposition, Conrad revealed exactly which institutional failure prompted Fischer to terminate him: "[t]he fact that the two officers that were involved in [the David McAtee] shooting didn't have their body cameras on ... the mayor saw **that** as an institutional failure on my part and—and that I was—was being dismissed." [5] (DN 78-1, at PageID #2041) (emphasis added). Rather than establishing extraordinary circumstances which warrant Fischer's deposition, Conrad's deposition testimony demonstrates that Fischer's decision to terminate Conrad was not related to the facts of this case. Further,

Case 2:24-cv-10216-TGB-DRG  ECF No. 35-1, PageID.586  Filed 03/26/26  Page 166 of 194

Mitchell v. Arnold, Not Reported in Fed. Supp. (2023)

former Mayor Fischer has submitted an affidavit stating that he has no personal knowledge of "the events surrounding the shooting of D'Juantez Mitchell, the investigation thereof or the claims at issue in the above lawsuit." (DN 78-2, at PageID # 2051).

Plaintiffs also cite to *Herrera* as persuasive authority, where the Southern District of New York determined that a former mayor had unique first-hand knowledge related to the plaintiffs' race-based employment discrimination case to justify deposing him. *Herrera v. N.Y.C. Dep't of Educ., No. 1:21-cv-7555-MKV, 2022 WL 2719186, 2022 U.S. Dist. LEXIS 107107 (S.D.N.Y. June 15, 2022)*. But the circumstances here are distinguishable because there is no evidence that the LMPD was under "mayoral control," that former Mayor Fischer was the "ultimate decision-maker" in relation to the Mitchell investigation, or that Fischer was a "micro-manager" directly involved in the department's management and operation. *Id.* at *3. Although Conrad testified that Fischer "could have gotten rid of me for any reason[,]" Plaintiffs' own motion identifies Conrad as the "chief policy maker for the LMPD." (DN 78-1, at PageID # 2049; DN 77-1, at PageID # 1915).

Plaintiffs have also not met the second extraordinary circumstances factor—that no other person possesses the information in question or that such information may not be obtained by other means. *See Watson v. City of Cleveland, 202 F. App'x 844, 852 (6th Cir. 2006)* (denying motion to compel mayor's deposition because information could be obtained from other members of the mayoral administration and through less burdensome forms of discovery). Conrad was informed of the reasoning behind his termination and has already testified to that effect. (DN 78-1, at PageID # 2041). Conrad further testified that he was given this reasoning by Deputy Mayor Ellen Hesen, another person who possesses the information that Plaintiffs seek; however, they have not attempted to depose her. (*Id.*). Finally, although Fischer has offered to respond to interrogatories or requests for admission, Plaintiffs have refused to consider these less intrusive methods without explaining why they are inadequate. (DN 78, at PageID # 2026). Thus, the Court finds that extraordinary circumstances do not exist to warrant the deposition of former Mayor Fischer.

Second, even if the extraordinary circumstances doctrine does not apply, Defendants have sufficiently specified the harm that former Mayor Fischer would suffer from being deposed as required by the strict adherence to Rule 26 outlined in

*Serrano.* Defendants allege that the former mayor's deposition is a fishing expedition "into a collateral issue that is too irrelevant and attenuated from the case" to be justified. (*Id.* at PageID # 2021).

In support of their assertion, Defendants point to *Graves*, in which the Sixth Circuit affirmed the District Court's ruling that a protective order was proper where the mayor, who had previously demanded the resignation of the police chief for unrelated reasons, had no relevant knowledge of the plaintiff's excessive force claim. *Graves v. Bowles, 419 Fed. Appx. 640 (6th Cir. 2011)*. Like the mayor in *Graves*, Fischer does not appear to have any information relevant to Plaintiffs' claims. Although Plaintiffs assert that "the dismissal may (and likely did) result from other reasons which are not yet known[,]" the record in no way establishes that Conrad's termination was related to anything other than the McAtee shooting. (DN 81, at PageID # 2016). The facts giving rise to this action occurred on May 15, 2019, but Conrad was not terminated until June 1, 2020. (DN 1, at ¶¶ 17-31; DN 78-1, at PageID # 2040). In a televised press conference, former Mayor Fischer reported that Conrad's termination resulted from the McAtee shooting. (DN 77-1, at PageID # 1910). Despite "extensive discovery," it appears that Plaintiffs only rely on Conrad's deposition and speculative arguments to draw a tenuous connection between the two events. (DN 77-1, at PageID # 1907).

**\*5** As Plaintiffs have failed to provide a factual basis supporting their contention that Fischer's deposition could produce relevant information to bolster their *Monell* claim, subjecting the former mayor to a deposition appears to serve no other purpose than to harass, annoy, or unduly burden him. Defendants' specific demonstrations of harm to former Mayor Fischer justify entry of a protective order under both Rule 26 and *Serrano.*

### B. Rule 30(b)(6) Deposition Concerning DOJ Report

In their Rule 30(b)(6) notice submitted to Defendants, Plaintiffs stated that they are seeking to depose a designated representative of Louisville Metro and/or the LMPD about "the Department of Justice Investigation into the conduct of Louisville/Metro Government and its police force and those findings and conclusions set forth in the Department of Justices' [sic] investigation and report into policing practices of the LMPD, and any consent decree related thereto." (DN 78-3, at PageID # 2053). In their reply, Plaintiffs narrowed

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.587 Filed 03/26/26 Page 167 of 194

Mitchell v. Arnold, Not Reported in Fed. Supp. (2023)

the scope of their previous notice, stating that the deposition's focus:

> [W]ould include, for example, the underlying data developed by the LMPD and sent to the DOJ; the people involved in collecting the data; the methods used to collect the data; the discussions between the DOJ personnel and LMPD personnel concerning the data collected; discussions between the DOJ and the LMPD and the conclusions reached in the report; and the LMPD's agreement or disagreement regarding the findings of the DOJ, etc.

(DN 81, at PageID # 2067).

Defendants seek a protective order to prohibit the deposition. (DN 78). In support of their motion, Defendants allege that Plaintiffs' Rule 30(b)(6) notice is facially invalid as it does not meet the standard of particularity required by the rule.[6] (*Id.* at PageID # 2032).

Rule 30(b)(6) governs the requirements for a notice or subpoena directed to a governmental entity. Fed. R. Civ. P. 30(b)(6). It requires the party seeking the deposition of a government entity to describe "with reasonable particularity the matters for examination." *Id.* Upon receipt of the list of matters or topics, the entity is then tasked with producing a witness "knowledgeable about the subjects described in the notice and to prepare the witness or witnesses to testify not simply to their own knowledge," but the knowledge of the entity. *Janko Enters. v. Long John Silver's, Inc.*, No. 3:12-CV-345-S, 2014 U.S. Dist. LEXIS 185334 at *12 (W.D. Ky. Apr. 2, 2014).

The test for reasonable particularity is "whether the request places the party upon reasonable notice of what is called for and what is not." *Alvey v. State Farm Fire & Cas. Co.*, No. 5:17-CV-00023-TBR-LLK, 2018 WL 826379, at *7, 2018 U.S. Dist. LEXIS 21356, at *20 (W.D. Ky. Feb. 9, 2018) (quoting *St. Paul Reinsurance Co. v. Commercial Fin. Corp.*, 198 F.R.D. 508, 514 (N.D. Iowa 2000)). There is some disagreement among the federal courts as to the

exact meaning of the "reasonable particularity" requirement of Rule 30(b)(6). *See Green v. Platinum Rests. Mid-America, LLC*, No. 3:14-CV-439-GNS, 2017 WL 11682937, at *8, 2017 U.S. Dist. LEXIS 237096, at *20 (W.D. Ky. Oct. 23, 2017) (discussing the various judicial standards). However, there is no dispute that topics must be stated with enough specificity to allow the entity to designate and prepare a representative to testify. *See Alvey*, 2018 WL 826379, at *7, 2018 U.S. Dist. LEXIS 21356, at *7 (finding that the corporate defendant could not "reasonably designate and prepare a corporate representative to testify on its behalf regarding these broad lines of inquiry."). Further, "topics not reasonably calculated to lead to the discovery of admissible evidence are likewise not within the scope of discovery." *Green*, 2017 WL 11682937, at *8, 2017 U.S. Dist. LEXIS 237096, at *21.

**\*6** The Court agrees with Defendants that neither Plaintiffs' original deposition notice nor its narrowed revision are reasonably particular enough to withstand Rule 30(b)(6)'s requirements. First, the open-ended nature of the notice is concerning. The terms "for example" and "etc." act as catch-alls that render the deposition focus essentially limitless. (DN 81, at PageID # 2067); *see also Green*, 2017 WL 11682937, at *19, 2017 U.S. Dist. LEXIS 237096, at *48 ("[T]he better rule in the opinion of this Court is to strike ["including but not limited to"] language as being overbroad since it imposes virtually no limitation on the questioning party."); *Tri-State Hosp. Supply Corp. v. United States*, 226 F.R.D. 118, 125 (D.D.C. 2005) ("Listing several categories and stating that the inquiry may extend beyond the enumerated topics defeats the purpose of having any topics at all."). The notice's over-inclusive language fails to place Defendants on reasonable notice of what is called for and what is not.

Second, although some information in the DOJ report is relevant to Plaintiffs' *Monell* claim, their notice includes information which is outside the scope of these claims. As Plaintiffs' *Monell* claim alleges that the LMPD failed to train and supervise Officer Arnold in the use of deadly force, information concerning the LMPD's use of excessive force or its failure to adequately support and supervise officers would be relevant. (DN 77-2). However, the majority of the report includes findings which are not relevant to Plaintiffs' claims and concern, for example, invalid search warrants, First Amendment violations, violations of the Americans with Disabilities Act, and inadequate responses to sexual assault and domestic violence cases. (*Id.*). Plaintiffs' notices, both original and revised, fail to differentiate between the DOJ's

Case 2:24-cv-10216-TGB-DRG   ECF No. 35-1, PageID.588   Filed 03/26/26   Page 168 of 194

Mitchell v. Arnold, Not Reported in Fed. Supp. (2023)

findings and the LMPD's data which pertain to Plaintiffs' claims and those which do not. Not only would it be unreasonable to expect Louisville Metro or the LMPD to designate and prepare a representative to testify about these broad topics, it would also be outside of the scope of discovery. As such, the Court cannot compel Louisville Metro or the LMPD to designate a representative to testify regarding the topics in Plaintiffs' Rule 30(b)(6) notice as submitted.

Even if Plaintiffs' notice was sufficient, however, none of their justifications for seeking a Rule 30(b)(6) designee from Louisville Metro or the LMPD are compelling. Plaintiffs mainly assert two arguments in support of compelling the deposition. First, Plaintiffs state that "[t]here can be no real argument that the information sought by Plaintiffs does not go to the *Monell* Claim or potentially [sic] defenses the Defendants might assert against that Claim." (DN 77-1, at PageID # 1926). As discussed above, the Court finds that a majority of the topics included in Plaintiffs' Rule 30(b)(6) notices include information that is irrelevant to their *Monell* claim. Even though some of the DOJ's findings could be beneficial to their claim, it would still be inappropriate for Plaintiffs to depose a representative about these findings because the DOJ report is conclusory. The report largely consists of broad assertions against the LMPD and its practices with a few references to specific examples supporting these assertions, none of which discuss the Mitchell shooting. (DN 77-2). As the report gives little indication about the underlying data used by the DOJ to reach its conclusions, it is dubious what information a representative could provide to Plaintiffs that would bolster their *Monell* claim.

Second, Plaintiffs' stated purpose in pursuing this deposition is to discover which occurrences of misconduct the DOJ relied on to reach the conclusions in its report. (DN 77-1, at PageID # 1927). Specifically, because the investigation covered the time during which Mitchell was shot, "[t]here could even be specific information known to the LMPD and provided to the DOJ regarding Mr. Mitchell and his shooting." (*Id.* at PageID # 1925). In support of their contention that the LMPD can testify as to this information, Plaintiffs cite to a section of the report in which the DOJ states that its findings are based on Louisville Metro's and the LMPD's own data. (*Id.* at 2070). This data included "thousands of documents," "thousands of hours of body-worn camera footage[,]" "conversations with hundreds of LMPD officers, Louisville Metro employees, and community

members[,]" "numerous onsite tours[,]" and other types of evidence (*Id.*).

**\*7**  Rather than persuade the Court that Louisville Metro or the LMPD is capable of designating a representative to testify at a Rule 30(b)(6) deposition, Plaintiffs' reliance on the preceding information supports the opposite conclusion. Although the data relied on by the DOJ came largely from the LMPD, the vast amount of information which comprised that data would make it virtually impossible for the LMPD to designate a representative or representatives to testify as to it all, much less prepare them adequately for the deposition. Further, Defendants assert that, "[i]n response to the DOJ's request for information, LMPD primarily provided the DOJ direct access to existing LMPD databases, and the DOJ ... drew its own conclusions as to what was relevant and significant without curation by Metro." (DN 82, at PageID # 2195). As the LMPD did not engage in any organized collection or transfer of data to the DOJ, it cannot provide information about the specific examples of misconduct on which the DOJ based its conclusions. Indeed, authorizing this deposition would essentially give Plaintiffs permission to question the designee about the entirety of the information located in the LMPD's databases, which far exceeds the scope of Plaintiff's *Monell* claim in this case.

Plaintiffs also point out that the DOJ and LMPD are engaging in negotiations for a consent decree as support for their assertion that there must be someone at the LMPD knowledgeable enough about the data behind the report's findings to testify. (DN 77-1, at PageID # 1925). However, alleging that a LMPD employee is informed about the report's findings is not the same as alleging that they have specific knowledge about the information utilized by the DOJ in reaching those findings. It is possible for the LMPD to negotiate a consent decree with the DOJ without being privy to all the facts supporting the DOJ's conclusions. Moreover, the Court is not convinced that information pertaining to the consent decree is relevant to Plaintiffs' claims. Again, the consent decree would relate to all the issues discussed in the DOJ's report—most of which have no connection to Plaintiff's *Monell* claim. But even as to sections of a potential decree relating to Plaintiffs' claim, it is difficult to see how Plaintiffs would be entitled to depose an LMPD representative about negotiations relating to future resolutions to the issues described in the report.

Lastly, Defendants have met their burden of establishing good cause for a protective order under Rule 26(c)(1) to prohibit

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.589 Filed 03/26/26 Page 169 of 194

Mitchell v. Arnold, Not Reported in Fed. Supp. (2023)

the Rule 30(b)(6) deposition. Defendants allege that Plaintiffs request a deposition that is "unduly burdensome, infeasible, unreasonably cumulative and concerns information not reasonably attributable to the organization." (DN 82, at PageID # 2195). Most of the topics included in Plaintiffs' notices are irrelevant and not important to resolve the case. The information about which Plaintiffs seek to depose a LMPD representative covers thousands of documents, hours of footage, and hundreds of interviews of both LMPD employees and community members. Requiring Louisville Metro or the LMPD to designate and prepare a witness to testify as to this vast amount of largely irrelevant information would only serve to unduly burden Defendants. Thus, Defendants have articulated specific facts demonstrating the harm they would suffer in accordance with the requirements of Rule 26(c)(1) and *Serrano* and a protective order preventing this deposition is appropriate.

### IV. Conclusion

The Court declines to compel either the deposition of former Mayor Fischer or a Rule 30(b)(6) deposition of a Louisville Metro or LMPD representative. Defendants have put forth particularized statements of fact establishing sufficient harm to justify a protective order prohibiting these depositions. Fischer's lack of personal knowledge about the Mitchell shooting and the fact that the information sought by Plaintiffs can be obtained by deposing other people or through less burdensome means satisfies the elements of the extraordinary circumstances test. But even if the test was inapplicable, the record demonstrates that Conrad's termination was unrelated to the facts of this case; thus, deposing Fischer would only serve to annoy, harass, or cause him undue burden. Regarding

Plaintiffs' Rule 30(b)(6) deposition, the overly broad nature of Plaintiffs' request is not "reasonably particular" as required by the Rule. Additionally, given the conclusory nature of the DOJ report, the large volume of data underlying its findings, and the DOJ's direct access to the LMPD databases during its investigation, Defendants could neither designate nor prepare a witness to testify as to the data behind the DOJ report. To subject Defendants to Plaintiffs' requested deposition concerning such a large amount of largely irrelevant information would be unduly burdensome. Since the Court denies Plaintiffs' Motion to Compel, they are not entitled to an award of reasonable costs and attorney's fees.

### ORDER

 **\*8 IT IS HEREBY ORDERED** that Plaintiffs' Motion to Compel the deposition of former Mayor Fischer and a Rule 30(b)(6) representative deponent from Louisville Metro or the LMPD (DN 77) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Request for Reasonable Costs and Attorney's Fees (DN 77) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Protective Order to prevent the deposition of former Mayor Fischer and Plaintiffs' Rule 30(b)(6) deposition (DN 78) is **GRANTED**.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 7711478

---

### Footnotes

1     The parties agreed to proceed with the deposition of former LMPD Chief Yevette Gentry and to Defendants' production of additional documents. (DN 76).

2     The DOJ conducted a comprehensive investigation of LMPD conduct spanning nearly six years and issued a report on March 8, 2023 which found that Louisville Metro and LMPD are engaged in a pattern or practice of conduct that deprives people of their rights under the Constitution and federal law.

**Mitchell v. Arnold, Not Reported in Fed. Supp. (2023)**

3       The Sixth Circuit recognized the protection given to nonjudicial high-ranking government officials in *Warren Bank v. Camp*, but it did not elaborate on the protection, and it appears to have not addressed the issue since. 396 F.2d 52, 56-57 (6th Cir. 1968).

4       The "extraordinary circumstances test" outlined below is very similar to the so-called "apex" or "Morgan doctrine."

5       During a large protest in downtown Louisville relating to Breonna Taylor's death, LMPD officers and National Guard members fired multiple shots at restaurant owner David McAtee, with a Guard member firing the round that ultimately killed him. (DN 77-2, at PageID # 1987).

6       Defendants also argue that Plaintiffs cannot revise their notice in their reply brief. (DN 82, at PageID # 2192). Because the Court finds that neither Plaintiffs' original nor revised notice complies with Rule 30(b)(6)'s "reasonable particularity" standard, it need not address Defendants' additional argument.

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Overall v. Oakland County, Not Reported in Fed. Supp. (2022)

🚩 KeyCite Yellow Flag

Distinguished by [Harris v. Midtown Center for Health and Rehabilitation, LLC,](#) W.D.Tenn., February 21, 2023

2022 WL 351068
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Sonja M. OVERALL individually
and as personal representative of the
Estate of Eric Brian Overall, Plaintiff,
v.
OAKLAND COUNTY, et al., Defendants.

Case No. 20-12869
|
Signed 02/04/2022

**Attorneys and Law Firms**

[Cora L. Morgan](#), [Andrew W. Mychalowych](#), Siciliano Mychalowych & Van Dusen, PLC, Bloomfield Hills, MI, for Plaintiff.

[Robert C. Clark](#), Potter DeAgostino O'Dea & Patterson, [Steven M. Potter](#), Trevor S. Potter, Potter, DeAgostino, O'Dea & Clark, Auburn Hills, MI, for Defendant Oakland County.

[Carlito H. Young](#), Johnson, Rosati, [Holly S. Battersby](#), [Michael T. Berger](#), Rosati Schultz Joppich & Amtsbuechler PC, Farmington Hills, MI, for Defendants Lapeer County, Deputy [Kenneth A. Paul](#), Deputy Chirstopher J. Boshell, Deputy [Christopher Bowman](#), Deputy Harry G. Lutze.

[Audrey J. Forbush](#), Plunkett & Cooney, Flint, MI, [Michael Dean Hanchett](#), [Rochelle Latoya Clarke](#), Plunkett Cooney, PC, Bloomfield Hills, MI, for Defendant Genesee County.

Christopher J. Berak, Ionia, MI, Pro Se.

**ORDER ON MOTION FOR
PROTECTIVE ORDER (ECF No. 61)**

[CURTIS IVY, JR.](#), United States Magistrate Judge

**\*1** Plaintiff Sonja Overall ("Plaintiff"), individually and as representative of the Estate of Eric Brian Overall, brings this action pursuant to [42 U.S.C. § 1983](#) for the November 2017 death of her husband former deputy Eric Overall, while acting in his capacity as an Oakland County Sheriff's Deputy. (ECF No. 1). Defendant Oakland County moves this court to enter a protective order which would preclude Plaintiff Overall from deposing Sheriff Michael Bouchard. (ECF No. 61). Oakland County's justification for this request is that Sheriff Bouchard is protected by a type of limited immunity that shields high government officials from depositions unless the party seeking the deposition first proves that the evidence is unavailable from some other deponent. Though this matter was originally set for hearing, the parties later agreed a hearing would not be necessary. Thus, the motion is ready for determination without oral argument. For the reasons discussed herein, the Court finds that the motion for a protective order is due to be granted.

**I. Background**

Sonja Overall launched this suit against the defendants alleging violations of decedent Deputy Overall's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution and Michigan law. Plaintiff seeks to depose Bouchard.

Oakland County has moved for a protective order that would preclude Plaintiff from deposing Bouchard. Oakland County argues that he is entitled to such protection because he is a high-ranking official who lacks any personal knowledge that would be relevant to Plaintiff's claims. Plaintiff, however, contends that Bouchard likely possesses relevant knowledge.

**II. Legal Standard**

Discovery provides a mechanism for making relevant information available to the litigants. [Fed. R. Civ. P. 26](#) Advisory Committee note to 1983 amendment. "Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession." *[Hickman v. Taylor,](#) 329 U.S. 495, 507 (1947).* Liberal discovery rules allow litigants to see the full breadth of the evidence that exists in a case. This helps litigants avoid surprises, leads to the speedier settlement of cases, and helps prevent miscarriages of justice in cases where evidence would otherwise be available to only one party. *[Brown Badgett, Inc. v. Jennings,](#) 842 F.2d 899, 902 (6th Cir. 1988).* Rules favoring broad discovery help "make a trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *[United States v. Procter & Gamble Co.,](#) 356 U.S. 677, 682 (1958).*

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.592 Filed 03/26/26 Page 172 of 194

Overall v. Oakland County, Not Reported in Fed. Supp. (2022)

The Federal Rules of Civil Procedure strongly favor full discovery whenever that is possible. *Republic of Ecuador v. Hinchee*, 741 F.3d 1185, 1189 (11th Cir. 2013); *Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1547 (11th Cir. 1985). Federal Rule of Civil Procedure 26(c), however, allows a court to issue an order to protect a party or person from undue burden. *In re Ohio Execution Protocol Litigation*, 845 F.3d 231, 235 (6th Cir. 2016). To satisfy the requirements of Rule 26(c), "the moving party must show 'good cause' for protection from one (or more) harms identified in Rule 26(c)(1) 'with a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements.' " *In re Ohio Execution Protocol Litig.*, 845 F.3d 231, 236 (6th Cir. 2016) (quoting *Serrano v. Cintas Corp.*, 699 F.3d 884, 901 (6th Cir. 2012)); *Beckman Indus., Inc., v. International Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992) ("Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test."). "To show good cause, a movant for a protective order must articulate specific facts showing 'clearly defined and serious injury' resulting from the discovery sought and cannot rely on mere conclusory statements." *Nix v. Sword*, 11 F. App'x 498, 500 (6th Cir. 2001) (quoting *Avirgan v. Hull*, 118 F.R.D. 252, 254 (D.D.C. 1987)) (citations omitted); *see also Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002); *United States v. Garrett*, 571 F.2d 1323, 1326 n.3 (5th Cir. 1978). Furthermore, "[t]o justify restricting discovery, the harassment or oppression should be unreasonable, but 'discovery has limits and these limits grow more formidable as the showing of need decreases." *Serrano* at 901 (quoting 8A Charles Alan Wright & Arthur R. Miller *et al.*, Federal Practice and Procedure § 2036 (3d ed. 2012)). When the Federal Rules assign a burden to a party, conclusory statements will not suffice to carry that burden. *See Garrett*, 571 F.2d at 1326 n.3 ("The burden is upon the movant to show the necessity of" a protective order, which "contemplates a particular and specific demonstration of fact as distinguished from ... conclusory statements.").

 **\*2** Under the "good cause" standard, the court must balance the competing interests of the parties. *Faktor v. Lifestyle Lift*, 2009 WL 1440795, at \*1 (N.D. Ohio May 20, 2009) (citing *York v. Am. Med. Sys., Inc.*, 1998 WL 863790, at \*4 (6th Cir. Nov. 23, 1998)); *Farnsworth*, 758 F.2d at 1547. Courts have broad discretion at the discovery stage to determine whether a protective order is appropriate and what degree of protection is required. *Seattle Times v. Rinehart*, 467 U.S. 20, 36 (1984).

Considering the importance of depositions, courts have stated that a "party has a general right to compel any person to appear at a deposition." *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 993 (7th Cir. 2002) (citing Fed. R. Civ. P. 30(a)); *Nat'l Life Ins. Co. v. Hartford Accident & Indem. Co.*, 615 F.2d 595, 599 (3d Cir. 1980) ("The Federal Rules of Civil Procedure specifically give a party the right to question a witness by oral deposition."). "The burden of showing good cause to preclude a deposition altogether is a heavy one." *Dunford v. Rolly Marine Serv. Co.*, 233 F.R.D. 635, 637 (S.D. Fla. 2005). "It is very unusual for a court to prohibit the taking of a deposition altogether and absent extraordinary circumstances, such an order would likely be in error." *Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979); *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975) (noting that a "strong showing is required before a party will be denied entirely the right to take a deposition"); *Apple Inc. v. Samsung Elecs. Co.*, 282 F.R.D. 259, 263 (N.D. Cal. 2012) ("[I]t is very unusual 'for a court to prohibit the taking of a deposition altogether absent extraordinary circumstances.' ") (citation omitted).

Despite a civil litigant's broad right to depose an opposing party, because depositions can be used to harass parties, the federal courts have adopted a rule that generally exempts "high-ranking" government officials from depositions when the individual lacks personal knowledge relevant to the case or some other witness could provide sufficient testimony. *See generally United States v. Morgan*, 313 U.S. 409, 421-22 (1941) (opining that the district court should not have required the Secretary of Agriculture to submit to a deposition); *Sensient Colors*, 649 F. Supp. 2d at 321 ("*Morgan* stands for the proposition that high-ranking government officials should not be subject to the taking of depositions absent extraordinary circumstances.").

The rationale is that "high-ranking" officials could be burdened unduly if they were needed to submit to a deposition in the multitude of civil actions that some government agencies and businesses face. *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007); *In re United States*, 985 F.2d 510, 512-13 (11th Cir. 1993). Depositions can be burdensome for parties both temporally and financially. *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1367-68 (11th Cir. 1997); *Olivieri v. Rodriguez*, 122 F.3d 406, 409 (7th Cir. 1997). For high-ranking government officials, the time consumed by depositions necessarily cannot be devoted to important governmental responsibilities. *Lederman v. New York City Dep't of Parks & Recreation*, 731 F.3d 199, 203 (2d Cir. 2013).

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.593 Filed 03/26/26 Page 173 of 194

Overall v. Oakland County, Not Reported in Fed. Supp. (2022)

Unless afforded some protection, high-ranking officials could be overwhelmed by appearances at depositions—not to mention the time that is required to prepare for depositions—which necessarily would inhibit performance of their official duties. *Sun Cap. Partners, Inc. v. Twin City Fire Ins. Co.*, 310 F.R.D. 523, 527 (S.D. Fla. 2015) ("Courts have generally restricted parties from deposing high-ranking officials because (by virtue of their position) they 'are vulnerable to numerous, repetitive, harassing, and abusive depositions, and therefore need some measure of protection from the courts.' "). Public officials "should not have to spend their time giving depositions in cases arising out of the performance of their official duties unless there is some reason to believe that the deposition will produce or lead to admissible evidence." *Olivieri*, 122 F.3d at 409-10.

**\*3** This Court has determined that the position of sheriff is a high-ranking official to whom the apex doctrine may apply. *See, e.g., Boudreau v. Bouchard*, 07-10529, 2008 WL 4386836, at \*2 (E.D. Mich. Sept. 25, 2008); *Greco v. Livingston Cnty.*, 12-12212, 2014 WL 349103, at \*8 (E.D. Mich. Jan. 31, 2014). Given the lack of dispute over Bouchard's status as the Sheriff, the Court finds he is entitled to the heightened protection from discovery often afforded to high-ranking officials. The question, then, is whether the likelihood that Sheriff Bouchard has personal knowledge of pertinent facts is sufficiently remote to constitute good cause to proscribe his deposition with a protective order.

Because a high-ranking official has both substantial demands on his time and a duty to serve the public, such an official should be subject to deposition only after: (1) a litigant seeking his deposition has exhausted other sources that might yield the information sought, and (2) a showing by the litigant that the official has " 'first-hand knowledge related to the claim being litigated.' " *See Greco*, 2014 WL 349103, at \*8 (citing *Boudreau*, 2008 WL 4386836, at \*2).

### III. Application

Oakland County takes the position that because he lacks firsthand knowledge of relevant facts, Bouchard's position as the Sheriff of the County of Oakland should preclude his deposition. He does not claim prejudice or harm would result from having to submit to a deposition. That said, a purpose to harass or annoy may be inferred where there is no showing the high-ranking official has relevant and personal knowledge about the facts at issue. *Google Inc. v. Am. Blind & Wallpaper Factory, Inc.*, 2006 WL 2578277, at \*3 n.3 (N.D. Cal. Sept.

6, 2006). The Court recognizes the many demands on Sheriff Bouchard's time and the obstacles that no doubt must be overcome in scheduling his deposition. Yet this Court must decide whether Plaintiff has established that he possesses unique personal knowledge of pertinent facts that cannot be obtained through less intrusive means. To that end, Plaintiff has delineated four categories of "unique knowledge" that she maintains Sheriff Bouchard possesses. As these are the only topics Plaintiff argues would justify a deposition, each will be addressed in turn.

### A. Events surrounding a meeting in which fundraiser funds were discussed.

Plaintiff's first category of "unique knowledge" possessed by Sheriff Bouchard centers on a meeting in which the use of fundraiser funds was explained. More specifically, Plaintiff first argues that following the death of Deputy Overall, a meeting occurred between Sheriff Bouchard, Lt. Greg Glover and Plaintiff in which the distribution of moneys raised via a GoFundMe account were discussed. It is alleged during this meeting that Sheriff Bouchard requested information related to Plaintiff's mortgage and allegedly threatened Plaintiff to not file any lawsuits. Plaintiff asserts Sheriff Bouchard has personal knowledge on this meeting, and how the fundraiser funds were distributed. Oakland County responds that the fact that they and/or the Oakland County Sheriff's Office held fundraisers and distributed such money to Plaintiff following Deputy Overall's death has no relevance to the claims being litigated. Oakland County also points out that during discovery, Plaintiff identified no statements made by Sheriff Bouchard that would constitute a threat. Defendant Oakland County also emphasizes they offered to produce a representative for deposition on relevant subject areas identified by Plaintiff.

**\*4** The allegations in the complaint suggests this litigation concerns alleged violations of decedent's constitutional rights and his wrongful death. As such, it appears to the Court that Plaintiff has failed to first establish the fundraiser funds and their subsequent distribution is relevant. It is also not at all clear how a statement related to suing relates to this wrongful death litigation. Notably, though Plaintiff was asked at her deposition to describe or identify the threat made by Bouchard, her declaration makes clear she could not do so. And even if it were relevant to a claim being litigated, Plaintiff has failed to point to any unique knowledge Sheriff Bouchard may have about those funds that someone else would not have known, had they questioned that person. It appears to this Court that Plaintiff could have obtained this information

Case 2:24-cv-10216-TGB-DRG   ECF No. 35-1, PageID.594   Filed 03/26/26   Page 174 of 194

Overall v. Oakland County, Not Reported in Fed. Supp. (2022)

by other means, so Plaintiff will not be permitted to depose Sheriff Bouchard on this particular issue.

### B. Statements made during press conferences following the death of Deputy Overall.

Plaintiff's second category of "unique knowledge" possessed by Sheriff Bouchard relates to press conferences held by Sheriff Bouchard following Deputy Overall's death. Plaintiff contends statements made during these press conferences constitute statements by an opposing party on behalf of Oakland County and therefore qualify as exceptions to the rule against hearsay. Defendant Oakland County contends that Bouchard possesses no first-hand or direct knowledge of a claim being litigated, the investigation of the incident, or the later criminal investigation involving Defendant Berak. Rather, Oakland County asserts Steve Zdravkovsky is most knowledgeable as he led the investigation and has been made available for deposition.

Plaintiff's argument simply misses the mark. Plaintiff again fails to allege facts to support comments made at the press conferences are relevant and relate to a claim being litigated. Nor is there any indication that Sheriff Bouchard participated in or directed the investigation related to the decedent. Merely holding a press conference over the events surrounding the death of the decedent is not evidence that Sheriff Bouchard was personally involved or possesses unique knowledge. Nor has Plaintiff demonstrated that she took reasonable measures to obtain the necessary information. Even as it relates to orders given the night of Deputy Overall's death, Plaintiff has not demonstrated that Bouchard likely has information from first-hand experiences, which no other witness likely would possess. At bottom, Plaintiff relies on conclusory allegations and, as such, cannot compel the deposition of Sheriff Bouchard. As a result, Plaintiff will not be permitted to depose Sheriff Bouchard on this particular issue.

### C. Plaintiff's fitness for duty as a reserve officer for the Oakland County Sheriff's Office.

Plaintiff's third category of "unique knowledge" possessed by Sheriff Bouchard concerns Plaintiff's fitness for duty as a reserve officer for the Oakland County Sheriff's Office. Plaintiff asserts that during this litigation, Defendant Oakland County scheduled Plaintiff for a fitness for duty interview. The premise for the interview was "in light of her deposition testimony given in prior litigation." (ECF No. 64, PageID.881). In response, Oakland County argues Plaintiff's role as a reserve officer is unrelated to the claims at issue.

Oakland County further states even if it were, Plaintiff is not seeking lost wages and damages related to the role as they are fixed as of the date of the death.

Here, there is a likelihood that an executive leader like Sheriff Bouchard would have personal knowledge about staffing matters at the Oakland County Sheriff's Office. Even so, while presumably within his personal knowledge, there is no indication the fitness interview was scheduled at Bouchard's behest or that he knows about the communication between the attorneys.

At this stage, no witness has signified that only Bouchard would have the necessary information. Nor is there any indication such was sought during other methods of discovery such as the propounding of interrogatories.

**\*5** Plaintiff also has not sufficiently demonstrated the importance of the evidence. As Plaintiff has returned to work and this topic does not appear to relate to damages, it is unclear how it is relevant to the claims at issue. Thus, the Court agrees with Defendant Oakland County and Sheriff Bouchard may not be deposed on that topic.

### D. Presumed change in policy related to deployment of stop sticks

Plaintiff's fourth category of "unique knowledge" possessed by Sheriff Bouchard concerns an alleged policy change in which Sheriff Bouchard ordered that all Stop Sticks be removed from Oakland County Sheriff's Office vehicles and that their use be halted. If such was declared and the policy exists, the Court will not say it is wholly irrelevant to Plaintiff's claims. The Federal Rules of Civil Procedure strongly favor full disclosure whenever possible. Given Sheriff Bouchard's executive oversight and high-level leadership and command responsibility over the Oakland County Sheriff's Office, Sheriff Bouchard would likely have personal knowledge over matters such as policy making that typically occur at an executive level within an organization. *See Balfour Beatty Rail. Inc. v. Vaccarello*, 06-cv-5551-J-20 (MCR), 2007 WL 842765, at \*3 (M.D. Fla. 2007) ("The reason why alleged lack of knowledge is not a sufficient ground to prevent a deposition is obvious. The very purpose of the deposition discovery is to test the extent of the deponent's knowledge and claims of ignorance.") (citation omitted). That said, Plaintiff has not sufficiently alleged facts which would demonstrate such a policy exists.

Case 2:24-cv-10216-TGB-DRG   ECF No. 35-1, PageID.595   Filed 03/26/26   Page 175 of 194

Overall v. Oakland County, Not Reported in Fed. Supp. (2022)

As to whether the desired information could be obtained from other sources, Plaintiff has not demonstrated that she took reasonable measures to obtain the necessary information.

The Court may refuse to allow the deposition of the apex employee before the party makes effort to depose lower-level employees who are more closely tied to the issues to be addressed. *See* *Salter v. Upjohn,* 593 F.2d 649, 651 (5th Cir. 1979). Thus, the Court will **GRANT** the protective order. In the event that Plaintiff takes the depositions of, or propound other discovery to, those actually involved in the development and implementation of the relevant issues *and* Plaintiff makes a showing that she made reasonable efforts to obtain the needed evidence but cannot do so except via a

deposition of Sheriff Bouchard, the Court will consider lifting the protective order at that time.

**IV. Conclusion**

For the reasons set forth above, Oakland County's motion for a protective order (ECF No. 61) is hereby **GRANTED**.

**\*6  IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 351068

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 4435256
United States District Court, W.D.
Tennessee, Eastern Division.

Tiffney PENLEY, individually and on behalf of others
similarly situated, and Ashley Lewis, individually
and on behalf of others similarly situated, Plaintiffs,

v.

NPC INTERNATIONAL, INC., Defendant.

No. 13-1031
|
Signed 08/22/2016

**Attorneys and Law Firms**

James L. Holt, Jr., Jackson Shields Yeiser Holt Speakman & Lucas, Timothy A. Perkins, Timothy A. Perkins, Attorney at Law, Memphis, TN, Joseph Russ Bryant, Paula Rachelle Jackson, Gordon E. Jackson, Jackson Shields Yeiser & Holt, Cordova, TN, for Plaintiffs.

Audrey M. Calkins, Thomas L. Henderson, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Russell W. Jackson, FordHarrison LLP, Memphis, TN, for Defendant.

**ORDER ADOPTING IN PART THE MAGISTRATE JUDGE'S ORDER AND GRANTING PLAINTIFFS' REQUESTED ALTERNATE RELIEF**

J. DANIEL BREEN, CHIEF UNITED STATES DISTRICT JUDGE

**\*1** Before the Court are the June 3, 2016 objections of Defendant, NPC, Inc., to the May 18, 2016 order of Magistrate Judge Edward G. Bryant, granting a protective order against individualized discovery. (Docket Entry ("D.E.") 163.) For the following reasons, the magistrate judge's order is ADOPTED in part and OVERRULED in part.

*I. BACKGROUND*

The procedural history and factual basis for this case, one of five Fair Labor Standards Act ("FLSA") cases,[1] is lengthy and has been thoroughly discussed by both the Sixth Circuit Court of Appeals and this Court. *See Gunn v. NPC Int'l, Inc., 625 Fed.Appx. 261, 263 (6th Cir. 2015); Gunn v. NPC Int'l,*

*Inc., No. 13-1035, 2014 WL 1224396 (W.D. Tenn. Mar. 24, 2014).* For this reason, the Court's background discussion here is limited to facts directly related to the instant motion. On November 9, 2015, Plaintiffs, Tiffney Penley and Ashley Lewis, individually and on behalf of others similarly situated, requested the following relief: 1) a protective order against individualized discovery of all opt-in Plaintiffs, or in the alternative, for an order staying discovery until after the Court rules on Plaintiffs' second motion for conditional certification, and 2) that the Court limit discovery to a representative sampling once a class has been formed through the court-approved notice process. (D.E. 139.) Defendant opposed the motion (D.E. 148), and Plaintiffs replied (D.E. 152). On May 18, 2016, Judge Bryant, pursuant to an order of reference (D.E. 147), granted the protective order but denied without prejudice the request to limit the scope of discovery (D.E. 163). As he granted the Plaintiffs' primary requested relief, the stay of discovery was not considered.

The next day, Defendant moved for an emergency order to stay the magistrate judge's order pending review by this Court. (D.E. 165.) Moreover, it asserted that, pursuant to Court order (D.E. 112 at 2), NPC's response to the renewed motion for conditional certification should not be due until thirty days after either the response of the last Plaintiff to Defendant's discovery requests or the entry of an order addressing NPC's objections to the granting of the protective order. The Court granted the motion to stay to the extent that "compliance with the terms of an order subject to appeal or objection is [always implicitly] deferred until resolution of the objection or appeal." (D.E. 166 at 2.)

In accordance with Local Rule 72.1(g) and Rule 72(a) of the Federal Rules of Civil Procedure, Defendant filed written objections to the portion of the magistrate judge's order granting protection from individualized discovery on June 3. (D.E. 167.) NPC argues its objections should be sustained because: 1) named Plaintiffs should be required to respond to Defendant's discovery requests, 2) Plaintiffs did not meet their burden of demonstrating need for the protective order and NPC needs discovery, and 3) the scheduling order requires that the parties conclude all discovery in one phase before responding to the renewed motion for conditional certification.[2]

*II. APPLICABLE LAW*

*Standard of Review*

Penley v. NPC International, Inc., Not Reported in Fed. Supp. (2016)

2016 Wage & Hour Cas.2d (BNA) 271,751

**\*2** Twenty-eight U.S.C. § 636(b)(1)(A) permits a district judge to, subject to certain exceptions not relevant here, "designate a magistrate judge to hear and determine any pretrial matter pending before the court." Furthermore, "[a] magistrate judge may be assigned such additional duties as are not inconsistent with the Constitution and laws of the United States." 28 U.S.C. § 636(b)(3). Upon a timely objection to a magistrate judge's order, the district judge is instructed to "modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a); *see* 28 U.S.C. § 636(b)(1)(A). "The clearly erroneous standard applies only to factual findings made by the magistrate judge, while his legal conclusions [are] reviewed under the more lenient contrary to law standard." *E.E.O.C. v. Burlington N. & Santa Fe Ry. Co.*, 621 F. Supp. 2d 603, 605 (W.D. Tenn. 2009) (quoting *Gandee v. Glaser*, 785 F. Supp. 684, 686 (S.D. Ohio 1992), *aff'd*, 19 F.3d 1432 (6th Cir. 1994)). A legal conclusion is contrary to law when it "contradicts or ignores applicable precepts of law, as found in the Constitution, statutes, or case precedent." *Steede v. Gen. Motors, LLC*, No. 11-2351-STA-dkv, 2012 WL 2089755, at \*2 (W.D. Tenn. June 8, 2012); *see also* 32 Am. Jur. 2d Federal Courts § 143 (2008) ("A magistrate judge's order is contrary to law when it fails to apply or misapplies relevant statutes, case law, or rules of procedure.").

*FLSA Cases and Discovery*

Under Rule 26, parties requesting a protective order bear the burden of showing that the discovery sought would be "of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure." *Monsanto Co. v. Ralph*, No. 01-MC-1004, 2001 WL 35957201, at \*2 (W.D. Tenn. May 10, 2001). However, the Sixth Circuit has stated that a party's relative need for discovery can also influence this inquiry:

> To justify restricting discovery, the harassment or oppression [of discovery] should be unreasonable, but discovery has limits and these limits grow more formidable as the showing of need decreases. Thus even very slight inconvenience may be unreasonable if there is no occasion for the inquiry and it cannot benefit the party making it.

*Serrano v. Cintas Corp.*, 699 F.3d 884, 901 (6th Cir. 2012) (citing 8A Charles Alan Wright & Arthur R. Miller et al., *Federal Practice and Procedure* § 2036 (3d ed. 2012)). Discovery, however, may serve a slightly different function depending on the type of case, and FLSA cases are unique in structure. *See* 29 U.S.C. §§ 201-219. Courts in this and other circuits use a two-step approach to certifying FLSA cases. *See* *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567 (6th Cir. 2009) *abrogated on other grounds by* *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016). In this first stage, the court determines "whether the opt-in plaintiffs and lead plaintiffs were similarly situated. After the initial conditional certification of the class, the parties enter[ ] into discovery. At the second stage, the district court review[s] the evidence produced during discovery," and decides whether to certify or decertify the class. *Id.* at 583; *see generally* Christopher C. Murray, *Beneath the Radar: The Seventh Circuit Quietly Overhauls FLSA Collective Action Litigation*, (March 1, 2013), http://www.ogletreedeakins.com/sharedcontent/content/blog/2013/march/beneath-the-radar-the-seventh-circuit-quietly-overhauls-flsa-collective-action-litigation (indicating that class discovery is not completed unless and until after conditional certification is granted). The conditional certification, also known as the notice period, is that which allows for the dissemination of Court-approved communications notifying potential opt-in plaintiffs of possible FLSA claims and providing instructions for opting into the litigation. *See, e.g.*, *Monroe v. FTS USA, LLC*, 257 F.R.D. 634 (W.D. Tenn. 2009) *aff'd*, 815 F.3d 1000 (6th Cir. 2016). This period routinely lasts several months, *see, e.g.*, *Beetler v. Trans-Foam, Inc.*, No. 5:11CV132, 2011 WL 6130805, at \*5 (N.D. Ohio Dec. 8, 2011) (granting forty-five-day opt-in period), and logically cannot begin until *after* a Court grants conditional certification.

**\*3** In *Monroe v. FTS USA, LLC*, the Sixth Circuit explained the function of discovery within the specific context of FLSA cases:

> Courts typically bifurcate certification of FLSA collective action cases. At the notice stage, conditional certification may be given along with judicial authorization to notify similarly situated employees of the action. *Once discovery has concluded*, the district court—with more information

**Penley v. NPC International, Inc., Not Reported in Fed. Supp. (2016)**

2016 Wage & Hour Cas.2d (BNA) 271,751

on which to base its decision and thus under a more exacting standard —looks more closely at whether the members of the class are similarly situated.

815 F.3d 1000, 1008 (6th Cir. 2016) (emphasis added). In an opinion from this district, the court explained that during the conditional certification stage, it "does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations." *Brasfield v. Source Broadband Servs., LLC*, No. 2:08-2092-JPM/DKV, 2008 WL 2697261, at *1 (W.D. Tenn. June 3, 2008). Instead, the goal is simply to determine whether the Plaintiffs are similarly situated. *O'Brien*, 575 F.3d at 584. Although conclusory declarations only alleging that a defendant violated the FLSA are inadequate for this inquiry, *see* *O'Neal v. Emery Fed. Credit Union*, No. 1:13CV22, 2014 WL 6810689, at *8 (S.D. Ohio Dec. 3, 2014), affidavits providing some factual basis for establishing FLSA violations may be sufficient, *Anderson v. Perdue Farms, Inc.*, No. 106-CV-01000-MEF-WC, 2007 WL 4554002, at *1 (M.D. Ala. Dec. 20, 2007). Indeed, the leniency of plaintiffs' burden at this first procedural stage may render initial discovery unnecessary. *Brasfield*, 2008 WL 2697261, at *1; *see, e.g.*, *Alderoty v. Maxim Healthcare Servs., Inc.*, No. CIV.A. TDC-14-2549, 2015 WL 5675527 (D. Md. Sept. 23, 2015) (finding similarity in the plaintiffs' declarations probative to determining whether they were comparably situated); *Enkhbayar Choimbol v. Fairfield Resorts, Inc.*, 475 F. Supp. 2d 557, 563 (E.D. Va. 2006) (concluding that an affidavit suggesting a common policy affecting plaintiffs to be supportive in determining whether they were similarly situated).

## III. ANALYSIS

### The Named Plaintiffs

The Court first addresses the issue of whether the magistrate judge committed clear error in not requiring the named Plaintiffs to answer the discovery requests. Plaintiffs requested a protective order only as to the opt-in Plaintiffs. (D.E. 139) ("Plaintiffs ... move this Honorable Court for an Order granting a protective order against individualized discovery of opt-in Plaintiffs ....."). As Judge Bryant's order did not directly address discovery of the original Plaintiffs, this objection is not well taken and thus, is OVERRULED.

### Burden of Proof under Rule 26(c) and Defendant's Need for Discovery

NPC next objects to Judge Bryant's order on the following grounds: 1) it needs discovery to respond to the motion for conditional certification; and 2) Plaintiffs did not meet their burden under Rule 26(c) of showing that individualized discovery of the opt-in Plaintiffs would have been annoying, embarrassing, oppressive, or an undue burden or expense, such as to warrant a protective order. *See* *Serrano*, 699 F.3d at 901. In their motion, Plaintiffs argued that individualized discovery—especially at this stage—would defeat the policy and goals of the FLSA by delaying the proceedings and creating an undue burden. (D.E. 139-1 at 3-6.) They contend that this would thwart Congress's intent of providing an efficient collective legal mechanism for remedying wage violations. (*Id.* at 5.) Moreover, Plaintiffs point to the burdensome reality of responding to NPC's 2,380 discovery requests. Defendant seeks to obtain information "relating to [individual] Plaintiffs' alleged attendance at job training without pay, meetings without pay, and off-the-clock work" before it responds to the motion for conditional certification. (D.E. 167 at 7.)

**\*4** In his order, Judge Bryant balanced the requirements of Rule 26(c) against the purpose and procedure of the FLSA. (D.E. 163 at 4.) He reviewed the request for the protective order in light of the two-part FLSA certification process, discussed *supra*, and explained that the conditional certification stage is for the specific purpose of providing to potential Plaintiffs notice and an opportunity to opt in. (*Id.*) It is not until after this period that a court conducts a more rigorous factual analysis of the case. The magistrate judge found that the discovery sought by NPC is "clearly directed toward second-stage arguments and [was] not necessary for the pre-conditional certification stage." (D.E. 163 at 5.) Given the already lengthy delays in this case, the low bar to conditional certification, and the potentially heavy burden of responding to NPC's individualized discovery requests of opt-in Plaintiffs, the Court finds that Judge Bryant's factual findings were not clearly erroneous and the legal conclusions were not contrary to law. Accordingly, Defendant's objections on this score are OVERRULED.

### The Scheduling Order

Defendant next objects to what it argues was the magistrate judge's implicit failure to enforce the scheduling order pursuant to Rule 26(f) by granting the protective order

2016 Wage & Hour Cas.2d (BNA) 271,751

and directing NPC to respond to the renewed motion for conditional certification before concluding discovery. Rule 16(b)(4) controls scheduling orders in cases such as this. Fed. R. Civ. P. 16(b)(4). A judge may modify a Rule 16(b) scheduling order for "good cause." *Id.* Good cause is defined as "the moving party's diligence in attempting to meet the case management order's requirements." *Moore v. Indus. Maint. Serv. of Tenn., Inc.*, 570 Fed.Appx. 569, 577 (6th Cir. 2014) (citing *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002)). "Another relevant consideration is possible prejudice to the party opposing the modification." *Id.*

NPC asserts that the scheduling order impliedly required discovery to be handled in one wave, instead of in phases, and did not allow for the possibility of holding discovery in abeyance until the resolution of the motion for conditional certification. Defendant highlights the dates listed in the scheduling order to support the proposition that the parties intended to complete discovery before the deadline for the motion for conditional certification—i.e., deadline to complete all discovery: May 16, 2014; deadline to file a motion for conditional certification: June 16, 2014. NPC protests that Judge Bryant's ruling alters the scheduling order in a manner that is contrary to law and that would be prejudicial.

Entered on August 16, 2013, the scheduling order in this case is over three years old. (D.E. 55.) While it is clear, given the passage of time, that the deadlines referenced are no longer valid, the sequence of and time between events are still binding, absent good cause shown. The parties agreed that Plaintiffs would file their motion for conditional certification by June 16, 2014. (D.E. 55 at 2.) Discovery, in contrast, was to be completed by "May 16, 2014, *or ninety (90) days after the close of the conditional certification period, whichever is later.*" [3] (D.E. 55 at 3) (emphasis added). Thus, to trigger the discovery deadline, the Court first would have to rule on the conditional certification motion, and if granted, then set dates for the notice/opt-in period. This case has not yet reached that point; therefore, the discovery deadline logically cannot have already passed. The Court agrees with Defendant that no good cause has been shown to alter or amend the essential details of the scheduling order. (D.E. 167 at 4.) Nevertheless, NPC has not demonstrated that Magistrate Judge Bryant's order changed the scheduling order in any way. Accordingly, the Court OVERRULES Defendant's objections on this point.

*Alternate Relief*

**\*5** The question remains how best to give effect to the intent of the parties as expressed in the text of the scheduling order and ensure that these five cases continue on their path towards resolution. The United States Supreme Court has stated explicitly that district courts have at their disposal many case management options. *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998). Vested under Rule 26 and implemented through Rule 16, this authority includes the ability to "tailor discovery narrowly and to dictate the sequence of discovery." *Id.* "[J]udges," the Supreme Court has exhorted, "should not hesitate to exercise appropriate control over the discovery process." *Herbert v. Lando*, 441 U.S. 153, 177 (1979).

Plaintiffs first requested conditional certification in April 2014. (D.E. 71.) This request was dismissed without prejudice due to NPC's pending appeal of the Court's denial of its motion to dismiss or to compel arbitration. (D.E. 114.) In November 2015, Plaintiffs again moved for conditional certification, and that motion remains unresolved. (D.E. 138.) The Court finds that enough delays have been produced in this case. *See Gunn*, 625 Fed.Appx. at 265 (stating that Defendant's actions support the conclusion that NPC has engaged in a campaign of "employing dilatory tactics and creating expense for the Plaintiffs"). No legally convincing argument has been made that discovery is needed at this juncture and, indeed, Plaintiffs have demonstrated that it would be inappropriate.

Accordingly, the Court GRANTS Plaintiffs' requested alternate relief to stay discovery until resolution of the motion for conditional certification. Defendant is hereby ORDERED to respond to the motion for conditional certification (D.E. 138) within thirty days of the entry of this order. No extensions shall be granted. In the event that conditional certification is granted and the magistrate judge's order on this motion is adopted by the Court, the parties are ORDERED to participate in a second scheduling conference within twenty-one days of the entry of the Court's order. This order shall set out in detail the deadlines for any discovery and for motions in relation to that discovery.

IT IS SO ORDERED this 22nd day of August, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 4435256, 2016 Wage & Hour Cas.2d (BNA) 271,751

2016 Wage & Hour Cas.2d (BNA) 271,751

---

## Footnotes

1   *See Penley v. NPC Int'l*, No. 13-1031 (W.D. Tenn. filed Jan. 29, 2013) ("current and former shift managers"); *Harris v. NPC Int'l*, No. 13-1033 (W.D. Tenn. filed Jan. 29, 2013) ("current and former cooks"); *Gunn v. NPC Int'l*, No. 13-1035 (W.D. Tenn. filed Jan. 30, 2013) ("current and former tipped employees"); *Jowers v. NPC Int'l*, No. 13-1036 (W.D. Tenn. filed Jan. 30, 2013) ("current and former delivery drivers"); and *Redmond v. NPC Int'l*, No. 13-1037 (W.D. Tenn. filed Jan. 30, 2013) ("current and former customer service representatives").

2   NPC also avers that Judge Bryant employed an improper analysis when considering the motion for conditional certification in the companion *Gunn* case—an order that was withdrawn well before the Defendant's objections were filed. *See* R. & R. on Pls.' Second Mot. to Certify Class (D.E. 165) and Text Order Withdrawing R. & R. (D.E. 167), *Gunn v. NPC Int'l*, No. 13-1035 (W.D. Tenn. filed Jan. 30, 2013). As Defendant will have an opportunity to respond to the motion, objections related to conditional certification are OVERRULED as moot.

3   The Court notes that in its objections, Defendant pointed to the deadlines for discovery and the motion for conditional certification to support its proposition. However, it is disingenuous at best for NPC to omit the crucial second half of the sentence contained in the scheduling order: "or ninety (90) days after the close of the conditional certification period, whichever is later." (D.E. 55 at 2.)

---

**End of Document**                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 2323528
Only the Westlaw citation is currently available.
United States District Court,
S.D. Ohio,
Eastern Division.

PROSONIC CORPORATION, et al., Plaintiffs,

v.

Eric STAFFORD, Defendant.

No. 2:07–CV–0803.
|
June 2, 2008.

**Attorneys and Law Firms**

James M.L. Ferber, Thomas M.L. Metzger, Littler Mendelson PC, Columbus, OH, Colleen Elizabeth Cook, Theisen, Brock, Frye, Erb & Leeper, Marietta, OH, for Plaintiffs.

Jeffrey Alan Lipps, Angela M. Paul, Carpenter Lipps & Leland LLP, Columbus, OH, for Defendant.

*OPINION AND ORDER*

TERENCE P. KEMP, United States Magistrate Judge.

**\*1** This case is currently before the Court by way of defendant Eric Stafford's motion to compel Rule 30(b)(6) depositions. The gravamen of Mr. Stafford's motion is that the single individual which plaintiff Boart Longyear produced in response to a 30(b)(6) deposition notice—L. Mark Knolle, a former Prosonic employee—knew little or nothing about many of the subjects described in the notice. Boart does not dispute that basic fact, but contends that many of the subjects described in the notice are not relevant to this case and that Mr. Stafford has already garnered much of the information sought in the Rule 30(b)(6) deposition through other discovery. For the following reasons, the Court concludes that Mr. Stafford has the better argument and that he is entitled to a new Rule 30(b)(6) deposition.

I.

By way of very brief background, Mr. Stafford used to work for Prosonic, a company engaged in the sonic drilling business. He left and went to work for a competitor. Prosonic

sued him for breach of a non-competition agreement and for disclosure of trade secrets. At some point, Boart acquired Prosonic's stock and created a new division (the E & I Division) to carry on the sonic drilling business.

Boart subsequently became a plaintiff in this case. Mr. Stafford then served Boart with a deposition notice which, as authorized by Fed.R.Civ.P. 30(b)(6), described a number of subjects to be inquired about at the deposition. The deposition took place on March 7, 2008, a month after the notice was served. The only witness designated by Boart to testify on the subjects described in the notice was Mr. Knolle, who also used to work for Prosonic and who has worked for Boart only since January, 2007. Mr. Knolle candidly admitted at the deposition that he knew nothing about many of the subjects described in the notice and that he had not done any investigation to become informed about those subjects. Mr. Stafford now seeks an order which would compel Boart to produce witnesses at a reconvened deposition who do know something about those matters.

II.

In support of his motion, Mr. Stafford cites to substantial case authority for the proposition that an organization which is served with a Rule 30(b)(6) deposition notice is obligated to produce a witness knowledgeable about the subjects described in the notice and to prepare that witness to testify not just to his or her own knowledge, but the corporation's knowledge. As the court in *Starlight Intern. Inc. v. Herlihy,* 186 F.R.D. 626, 638 (D.Kan.1999) explained,

"[f] or a Rule 30(b)(6) deposition to operate effectively, the deposing party must designate the areas of inquiry with reasonable particularity, and the corporation must designate and adequately prepare witnesses to address these matters." *United States v. Taylor,* 166 F.R.D. 356, 360 (M.D.N.C.), aff'd, 166 F.R.D. 367 (1996). "If the rule is to promote effective discovery regarding corporations the spokesperson must be informed." *Dravo Corp. v. Liberty Mut. Ins. Co.,* 164 F.R.D. 70, 75 (D.Neb.1995) (quoting *Protective Nat'l Ins. Co. v. Commonwealth Ins. Co.,* 137 F.R.D. 267, 278 (D.Neb.1989)).

**\*2** There is no serious dispute that cases such as this accurately state the law. Thus, once Mr. Stafford served a deposition notice that invoked Rule 30(b)(6) and described with particularity the subjects his counsel would be asking about at the deposition, Boart became obligated to produce an

"informed spokesperson" for him to examine. As noted, Boart does not seriously dispute that it failed to do so, at least for a number of the subjects at issue. It offers several reasons why, despite this failure, it should not have to comply with the 30(b)(6) notice. Upon close examination, none of those reasons are sufficient to allow it to escape its discovery obligations.

### A.

In the Court's view, the primary issue raised by the motion to compel is whether Boart should be required to produce a witness who either knows, or has become informed about, many of the subjects which fell outside Mr. Knolle's scope of knowledge. Before delving into that issue, however, the Court will first address a conceptually distinct issue that has been lumped together with the primary issue. That issue, described in sections II(B)(3), (5) and (6) of the motion to compel, is the sufficiency of Mr. Knolle's testimony about Boart's allegations that Mr. Stafford solicited business from Boart's customers, caused Boart to lose certain projects upon which it had bid, attempted to lure employees away from Boart, or disclosed Boart's confidential materials.

Many of the other matters described in the deposition notice are directed toward matters of defense such as Boart's standing to enforce the restrictive covenant at issue or its practices concerning including such covenants or non-disclosure language in the contract of its current employees. However, the subjects discussed in section II(B)(3), (5) and (6) of the motion to compel were included in the deposition notice in order to allow Mr. Stafford to find out what, if any, evidence Boart possesses to support its affirmative claims against him. Mr. Knolle reaffirmed some prior evidence disclosed concerning one customer (Mike's Beer Barn) but said he knew of nothing beyond that which would support these particular claims.

One of the primary concerns of the drafters of the discovery and disclosure provisions of the Federal Rules of Civil Procedure was the potential that one party to litigation would withhold until trial evidence that supports its claims or defenses, thus depriving the other party of the opportunity to learn the basis of those claims or defenses during discovery and to prepare fairly to meet those claims or defenses at trial. So, for example, the initial disclosures required to be made by Rule 26(a)(1) include the identity of witnesses and the location of documents that the disclosing party "may use to support its claims or defenses...." The drafters also provided

that such initial disclosures, as well as responses to discovery requests served during the course of the litigation, must be seasonably supplemented as new information comes to light. Fed.R.Civ.P. 26(e). If a party fails to disclose such information during discovery, it may not use that information against the opposing party at trial. *See, e.g.,* Fed.R.Civ.P. 37(c)(1).

**\*3** These concepts clearly apply to questioning at a Rule 30(b)(6) deposition. In other words, if a party designates someone to testify on that party's behalf on the issue of evidence possessed by the party to support its claims or defenses, and the witness either disclaims any knowledge of such evidence or provides a limited amount of testimony on the subject, the organization may not use any evidence beyond that at trial (unless, of course, it has provided it in another way such as through initial disclosures or discovery responses and the testimony at the 30(b)(6) deposition is not inconsistent with those other disclosures).

Here, Boart put Mr. Knolle forth as its witness on these topics. He told Mr. Stafford's counsel that he knew either nothing, or next to nothing, which would support Boart's affirmative claims. In its response to the motion to compel, Boart reaffirms that, with respect to each of these matters, it and Prosonic "*have provided Defendant with all information known to date on this topic.*" Opposing memorandum, at 8, 9 & 11 (emphasis in original). It has also resisted the effort to have it designate another witness to testify about these subjects.

Given this background, whether Boart did or did not designate its most knowledgeable employee on these subjects is beside the point. Boart had the opportunity to provide a company spokesperson who could tell Mr. Stafford that Boart had some additional support for these claims beyond what had already been provided. It did not avail itself of that opportunity and clearly does not want another chance to supplement its position. Under these circumstances, it is only Boart that will be disadvantaged if it possesses more information supporting its claims but failed to make Mr. Knolle aware of that information in advance of the Rule 30(b)(6) deposition. Consequently, there is no reason to grant Boart an additional opportunity (which it clearly does not want) to disclose such information so that it can be used against Mr. Stafford at trial. The Court notes Mr. Stafford's request that, if Mr. Knolle's testimony is taken at face value, these claims should be withdrawn or dismissed, but that is not a decision which can be made in the context of a motion to compel a new Rule 30(b)(6) deposition. Boart will simply have to determine whether

it can, in good faith, proceed with these claims in light of Mr. Knolle's testimony and the other information it has disclosed in support of these particular claims, and if it believes that it can, Mr. Stafford will have to file an appropriate dispositive motion.

B.

The more significant issue relates to Mr. Knolle's failure to provide meaningful testimony about matters pertaining to certain defenses raised by Mr. Stafford. In this situation, if Boart actually possesses more information than it shared with Mr. Knolle, Mr. Stafford will have been disadvantaged by not having been able to plumb the depths of Boart's knowledge through its designated witness. If that has occurred, the usual remedy would be to direct Boart to provide a more knowledgeable witness at a second Rule 30(b)(6) deposition.

**\*4** Boart's response to Mr. Stafford's arguments on this issue has two parts. First, Boart claims that the very same information has already been provided through other depositions and other discovery. Second, Board contends that much of it is irrelevant. The Court will address these arguments in reverse order.

With respect to the issue of relevance, the Court notes first that Boart neither made written objection to the deposition notice nor moved for any type of protection from its scope prior to producing Mr. Knolle as a witness. As a general matter, of course, a witness at a deposition is required to answer even irrelevant questions, subject to objection, because the circumstances under which a witness may refuse to answer deposition questions are quite limited. *See* Fed.R.Civ.P. 30(d)(1). That rule is not different for Rule 30(b)(6) depositions. *Banks v. Office of Senate Sergeant–at–Arms,* 222 F.R.D. 7 (D.D.C.2004). Certainly, a party may not circumvent this rule simply by producing a witness without knowledge of the subjects believed to be irrelevant. Such "self-help," especially when no notice has been given to opposing counsel that certain subjects were deemed by the responding party to be irrelevant and that no knowledgeable witness would be produced to address them, is inconsistent with the spirit of the Civil Rules. To permit a party to use such an argument as an after-the-fact justification for not producing an appropriate witness is equally inconsistent with the rules governing discovery. For these reasons, Boart's relevancy argument has no merit.

With respect to the question of whether the 30(b)(6) deposition was essentially duplicative of other discovery, a party may, under certain circumstances, successfully argue that all or a portion of the subject matter of such a deposition has already been addressed and that prior depositions may be deemed to be the organization's response. Thus, for example, the court in *EEOC v. Boeing,* 2007 WL 1146446 (D.Ariz.2007) acknowledged that a corporate deponent may, in response to a 30(b)(6) notice, designate prior depositions as responsive and offer to be bound by the testimony given in those depositions in lieu of having to produce the same witnesses to answer the same questions again. However, such an intent should be clearly indicated as part of a response to a 30(b)(6) notice, as was done in that case, so that opposing counsel (and, if necessary, the Court) can evaluate whether the prior testimony is sufficiently on point to make a subsequent deposition superfluous. Further, at least one court has concluded that the issue of duplication is usually no reason to prevent the 30(b)(6) deposition from going forward, and that any issues of duplication or unnecessary expenditure of time can be addressed once the deposition has been taken. *See* *Tri–State Hosp. Supply Co. v. United States,* 226 F.R.D. 118 (D.D.C.2005).

Again, Boart does not appear to have responded to the deposition notice by offering to substitute prior deposition testimony for the production of a knowledgeable witness on any of the subjects addressed in the notice, nor did it make any objection that portions of the deposition would be duplicative. Further, there are genuine disputes about the extent to which the testimony in those prior depositions actually addresses the subjects about which Mr. Stafford wished to inquire at the 30(b)(6) deposition. As his reply memorandum points out, Boart did not become a party to this case or assert affirmative claims against Mr. Stafford until those depositions were completed, and a number of the prior witnesses clearly did not have knowledge of some of the subjects under discussion, such as the due diligence performed by Boart prior to its acquisition of Prosonic's stock or its historic hiring practices. Thus, it is clear that even if Mr. Stafford had been offered the prior depositions as binding on Boart, he would have wished to ask additional questions of a knowledgeable witness at the 30(b)(6) deposition. However, he was prevented even from being aware that Boart considered prior depositions to be responsive to his notice because that fact does not appear to have been communicated in advance of the 30(b)(6) deposition. The failure to raise these issues in advance, the production of a witness who clearly does not meet the requirements of the rule, and the attempt to justify these

failures with after-the-fact excuses, is precisely the type of gamesmanship that the drafters of the Civil Rules have tried so diligently to prevent, and it simply will not be countenanced by this Court.

### III.

**\*5** The remedy in this situation is quite straightforward. Boart did not do what Rule 30(b)(6) requires, so Mr. Stafford did not get the deposition to which he was entitled. Boart must therefore act in compliance with the rule and produce, at a time and location to be agreed to by counsel, one or more witnesses who possess Boart's knowledge about the subjects listed in the notice—with the exception of those matters discussed in Section II(A) of this order. In an effort to streamline the procedure, Boart may offer to stipulate that certain prior testimony or other discovery is the equivalent of 30(b)(6) testimony with respect to the exact questions asked and answered, so that the 30(b)(6) inquiry need not repeat *verbatim* the prior questioning, but to the extent that Mr. Stafford has different or additional questions even on those subjects, he is entitled to ask them of a witness who stands a reasonable chance of knowing the answer. The parties shall make every effort to accomplish this deposition within the next thirty days.

This order resolves Mr. Stafford's motion to compel (# 93) and that motion shall be removed from the Court's pending motions list.

Any party may, within ten (10) days after this Order is filed, file and serve on the opposing party a motion for reconsideration by a District Judge. 28 U.S.C. § 636(b)(1)(A), Rule 72(a), Fed.R.Civ.P.; Eastern Division Order No. 91–3, pt. I., F., 5. The motion must specifically designate the order or part in question and the basis for any objection. Responses to objections are due ten days after objections are filed and replies by the objecting party are due seven days thereafter. The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.

This order is in full force and effect, notwithstanding the filing of any objections, unless stayed by the Magistrate Judge or District Judge. S.D. Ohio L.R. 72.4.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2323528

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.605 Filed 03/26/26 Page 185 of 194

Sgaggio v. Diaz, Not Reported in Fed. Supp. (2023)

2023 WL 22188
Only the Westlaw citation is currently available.
United States District Court, D. Colorado.

Delbert SGAGGIO, Plaintiff,
v.
Mario DIAZ, in his personal and professional
capacity, and The City of Pueblo, a
municipal corporation, Defendants.

Civil Action No. 22–cv–02043–PAB–MDB
|
Signed January 3, 2023

**Attorneys and Law Firms**

Delbert Elmer Sgaggio, Jr., Colorado Springs, CO, Pro Se.

Sara Ludke Cook, Vaughan & DeMuro, Colorado Springs, CO, for Defendants.

## ORDER

Maritza Dominguez Braswell, United States Magistrate Judge

 **\*1** This matter is before the Court on the "Defendants' Motion for Stay of Discovery Pending Ruling on Motion to Dismiss." (["Motion"], Doc. No. 14.) Plaintiff has responded in opposition to the Motion, and Defendants have replied. (["Response"], Doc. No. 21; ["Reply"], Doc. No. 22.) For the following reasons, the Motion is **GRANTED**.

## SUMMARY FOR *PRO SE* PLAINTIFF

The Court is granting the Defendants' request to stay discovery in this matter until after resolution of the pending motion to dismiss. The Court has made this decision after applying a liberal standard to your filings and after applying the factors set forth in the case, *String Cheese Incident, LLC v. Stylus Shows, Inc.*, No. 02-cv-01934-WYD, 2006 WL 8949955, at \*2 (D. Colo. Mar. 30, 2006). The *String Cheese* factors help the Court consider all the relevant circumstances and interests at issue in this case. Although the Court will not grant a stay simply because a defendant has filed a motion to dismiss or made qualified immunity arguments, the Court finds that in this case, and under these circumstances, a temporary stay is appropriate. The stay will be lifted as soon

as the motion to dismiss is resolved. This is only a summary of the Court's decision. The Court's full decision is set forth below.

## STATEMENT OF THE CASE

Plaintiff Delbert Elmer Sgaggio[1] brings this action against Defendants Mario Diaz and the City of Pueblo, alleging First Amendment violations in connection with an incident that occurred in August 2020. (Doc. No. 1.) According to the Complaint, Mr. Sgaggio was with his father-in-law, Daniel Aguilera, when Mr. Aguilera received a call from his wife, Crystal Casias, telling Mr. Aguilera that the Pueblo Police Department was in Mr. Aguilera's backyard. (Doc. No. 1 at 2-4.) According to Mr. Sgaggio, Officer Mario Diaz "[gave] Crystal 24 hours to move marijuana plants that [were] growing in the back yard." (*Id.* at 4.) Mr. Sgaggio alleges that Crystal had her phone on speaker and that the telephonic communications between Mr. Sgaggio and Mr. Diaz were captured "on the Code Enforcement officers Body Cam." (*Id.*) Mr. Sgaggio alleges the following colloquy:

> The first question I asked detective Mario Diaz is 'What is the infraction?'
>
> Mario Diaz refuses to answer the question. Mario Diaz states the following 'I've already discussed everything with Mrs. Casias.'
>
> Crystal then speaks out 'Its [sic] because they are not in an enclosed space.' You can then here [sic] me on speaker phone 'They are not in an enclosed space?'
>
> Mario Diaz 'That is correct sir'
>
> I reply to Defendant Diaz 'well there's a lock on the gate, and you know it's protected by the Colorado Constitution right?'
>
> Mario Diaz 'it is not sir. We are given [sic] [M]iss Casias an opportunity, to correct the issue if not, we will come back and issue some tickets. And we will destroy the plants. So I'm thinking we are being pretty fair as to not taking the plants right now. And not issuing a citation. So we will be back about this time tomorrow. And if they're not gone. And you haven't complied, and then we, can moved some other way.'

**\*2** I then ask Mario Diaz 'OK did you go to her door and knock on it first? Or did you go and step on the property and look in the back?'

Mario Diaz refuses to answer the question. He says 'have a nice day' and then gives the phone back to Crystal. At this point you can tell on the body Cam video that Mario Diaz is pissed off. Crystal continues to converse with the, [sic] three Pueblo government officials in her backyard. You can then hear me on the speaker again loudly stating the following 'Tell them you need to see the search warrant! Do they have a search warrant?'

Crystal 'Do you have a search warrant?'

Mario Diaz 'No ma'am. You voluntarily took us back here, so we were able to examine your grow. If I needed a search warrant for that, I could have got one. Yes absolutely. And I would've took all your plants, and giving you a citation. We are not doing that.'

I loudly interrupt on speaker. 'you don't have the right to take everyone's plants just because you have a search warrant! Are you with the county or are you with the city?'

Crystal then Ask [sic] Defendant Diaz. OK I just want to know, is there any way I can file an appeal against this?'

Mario Diaz replies. 'What appeal? Ma'am it's city ordinance.'

I once again interject with my big mouth. 'It doesn't matter it's due process. Do you understand due process Sir? Do you understand the 5th and the 14th Amendment Sir? That's what I'm asking. We can go to federal court real quick right here.' The body camera video then shows Mario Diaz hanging up the phone. Crystal 'Can I have my phone back'

Mario Diaz gives the phone back, in a very cocky fashion. 'If you have any more questions let us know. I'm not here to argue with your boyfriend over the phone. OK Tomorrow ma'am about this time. You got the time. Alright tomorrow 3 o clock or Mrs. Casias will be receiving a citation.'

Crystal can be heard being distraught in the background. (*Id.* at 4-8.) Mr. Sgaggio includes a picture of Mr. Diaz and claims there is "a big problem in America today. The Dipshit pictured above, is that problem." (*Id.* at 8.) Mr. Sgaggio goes on to make various allegations, including that "the plants were protected under the Colorado constitution," that there were due process violations against Mr. Aguilera and his wife, and

that the landlord—who was sued by Mr. Aguilera in small claims court—was the one to call the police, therefore "this was a retaliation." (*Id.* at 8-9.) Mr. Sgaggio then alleges what amounts to the crux of his complaint against Defendants:

> My back and forth with defendant Mario Diaz is a matter of public concern. We're dealing with a public servant who is lying out of his ass. He has absolutely zero clue as to what, due process is, yet he holds the rank of detective. This is utterly disgusting. The video shows a ridiculous abuse of power, and no respect for the Colorado Constitution. Defendant Diaz does not agree with my viewpoint, he stopped my speech by hanging up the phone. This is stopping my message, my vibrations, and my sincerely held spiritual beliefs of defending members of my flock. Crystal is also a member of our Indigenous house of worship.

**\*3** (*Id.* at 9.) Mr. Sgaggio alleges that the "broadcasting of [his] speech from Crystal[']s phone was speech regarding: Due Process, the 5th and 14th Amendment and the Colorado Constitution. This is protected speech under the First Amendment." (*Id.* at 11-12.) He claims that "Defendant Diaz responded to my First Amendment activity with retaliation, by hanging up Crystal[']s phone and stopping my constitutionally protected activity.... Defendant Diaz's retaliatory actions and hanging up crystals [sic] phone, was meant to punish me for exercising my First Amendment." (*Id.* at 13-14.)

Mr. Sgaggio brings three claims pursuant to 42 U.S.C. § 1983: one for the alleged violation of the freedom of speech guarantee, one for alleged retaliation in connection with the exercise of first amendment rights, and one for the violation of the free exercise of religion guarantee. (*See id.* at 11-17.) Mr. Sgaggio also brings a claim under C.R.S. § 13-21-131, with authorizes a civil action for the deprivation of constitutional rights. (*Id.*)

Defendants have moved to dismiss the Complaint. (Doc. No. 12.) That motion has been referred to the undersigned for a report and recommendation. (Doc. No. 13.) Although the

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.607 Filed 03/26/26 Page 187 of 194

Sgaggio v. Diaz, Not Reported in Fed. Supp. (2023)

Court does not address the merits of Defendants' motion to dismiss in this Order, it preliminarily considers the dismissal arguments in connection with determining whether a stay pending resolution of the motion to dismiss is warranted.

In their motion to dismiss, Defendants argue that hanging up the phone does not amount to a law that abridges freedom of speech, nor does it amount to the type of conduct that is considered retaliatory, such as arresting, fining, or harassing an individual based on what they say. (Doc. No. 12 at 5-6.) Defendants argue, therefore, that "Plaintiff has failed to plausibly allege a violation of free speech under the First Amendment and, thus, this claim should be dismissed." (*Id.* at 6.) Defendants also argue that Mr. Sgaggio has not set forth a valid claim for retaliation because he does not plausibly allege "that Defendant Diaz's action caused Plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in protected activity, nor [does he allege] that Defendant Diaz's actions were substantially motivated as a response to Plaintiff's right to free speech." (*Id.* at 9.) According to Defendants, the free exercise claim also fails because even if Mr. Sgaggio could prove that defending his father-in-law was part of Mr. Sgaggio's sincerely held religious beliefs, the act of hanging up the phone does not constitute an impermissible burden on Mr. Sgaggio's religious freedoms. (*Id.* at 11-12.) Finally, Defendants argue that because there is no underlying constitutional violation, the C.R.S. § 13-21-131 claim must also be dismissed, the *Monell* claim against the City fails, and Defendant Diaz is entitled to qualified immunity. (*Id.* at 12-15.)

In response to Defendants' motion to dismiss, Mr. Sgaggio cites various cases illustrating the suppression of free speech. (Doc. No. 20 at 3-5.) Mr. Sgaggio also makes several arguments in support of his claims, insisting that his speech was constitutionally protected, that hanging up the phone stopped his speech, and that he suffered injury as a result. He explains that the act of hanging up the phone "stopp[ed] my message, my vibrations, and my sincerely held spiritual beliefs of defending members of my flock." (*Id.* at 9.) He also explains:

> My speech are the vibrations that are sent into the Universe. Just as a Christian or Muslim may choose to pray. All vibrations, I send into the universe our sincerely held spiritual activities protected by the 1 st

amendment. As I am communicating with Spirit in the traditional and historical context related to my spiritual beliefs. This is one reason we never speak bad about ourselves, for everything we say will happen.

**\*4** (*Id.* at 10.)

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure do not expressly provide for a stay of proceedings. Rule 26(c), however, permits a court to "make an order which justice requires to protect a party ... from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c). Further, "[t]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.,* 299 U.S. 248, 254-55 (1936) (citing *Kan. City S. Ry. Co. v. United States,* 282 U.S. 760, 763 (1931)).

In this Court, as in this District, a stay of discovery is generally disfavored. *See, e.g.*, *LS3, Inc. v. Cherokee Fed. Sols., LLC,* No. 1:20-cv-03555-PAB-NYW, 2021 WL 4947284, at *2 (D. Colo. Aug. 26, 2021)*; *Gold, Inc. v. H.I.S. Juveniles, Inc.,* No. 14-cv-02298-RM-KMT, 2015 WL 1650900, at *1 (D. Colo. April 8, 2015)*; *Rocha v. CCF Admin.,* No. 09-cv-01432-CMA-MEH, 2010 WL 291966, at *1 (D. Colo. Jan. 20, 2010).* Nevertheless, the decision of whether to stay discovery rests firmly within the sound discretion of the Court. *United Steelworkers of Am. v. Or. Steel Mills, Inc.,* 322 F.3d 1222, 1227 (10th Cir. 2003) (quoting *Landis,* 299 U.S. at 254).

In ruling on a motion to stay discovery, five factors are generally considered: "(1) [the] plaintiff's interests in proceeding expeditiously with the civil action and the potential prejudice to [the] plaintiff of a delay; (2) the burden on the defendants; (3) the convenience to the court; (4) the interests of persons not parties to the civil litigation; and (5) the public interest." *String Cheese Incident, LLC v. Stylus Shows, Inc.*, No. 02-cv-01934-WYD, 2006 WL 8949955, at *2 (D. Colo. Mar. 30, 2006); *see United Steelworkers,* 322 F.3d at 1227. Further, "a court may decide that in a particular case it would be wise to stay discovery on the merits until [certain challenges] have been resolved." 8A

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.608 Filed 03/26/26 Page 188 of 194

Sgaggio v. Diaz, Not Reported in Fed. Supp. (2023)

CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2040, at 198 (3d ed. 2010); *see, e.g.*, *Burkitt v. Pomeroy*, No. 15-cv-02386-MSK-KLM, 2016 WL 696107, at \*3 (D. Colo. Feb. 22, 2016) (observing that a stay may be appropriate pending the resolution of a motion to dismiss impacting immunity or jurisdictional issues).

## ANALYSIS

### I. Prejudice to Plaintiff

Mr. Sgaggio asks the Court not to stay discovery, but he does not articulate any prejudice he might suffer in the event of a stay.[2] (*See* Doc. No. 21.) *See* *Barrington v. United Airlines, Inc.*, 565 F. Supp. 3d 1213, 1217 (D. Colo. 2021) (finding the first factor to be neutral, where the plaintiff identified no specific prejudice arising from the imposition of a stay). Regardless, plaintiffs always possess a general interest in proceeding to the merits of their case, and because Mr. Sgaggio proceeds *pro se*, the Court will read his response liberally and will not assume that he concedes the prejudice point. Although the Court does not see how a temporary stay would meaningfully prejudice Mr. Sgaggio, given that the incident occurred approximately two years before he filed his Complaint and given that the claim is based on the seconds during which Defendant Diaz hung up the phone, the Court draws several inferences in Mr. Sgaggio's favor and weighs this factor against the imposition of a stay.

### II. Burden to Defendants

**\*5** In support of a stay, Defendants argue that the motion to dismiss is based on "purely legal arguments," and that discovery in this case would not be insubstantial. (Doc. No. 14 at 4-5.) They also argue that "[e]ven if Defendants' Motion to Dismiss is not entirely successful, it is likely that at least *some* Defendants and *some* claims will be resolved through the motion, leaving the parties and the Court in a much better position to tailor discovery to address any remaining claims." (*Id.* at 6.) Moreover, they argue that "Defendant Diaz will unnecessarily suffer without a stay because qualified immunity is intended to protect litigants from the burden of discovery." (*Id.*)

A stay is not warranted merely by virtue of a defendant's filing a motion to dismiss. *See* *PopSockets LLC v. Online King LLC*, No. 19-cv-01277-CMA-NYW, 2019 WL 5101399, at \*3 (D. Colo. Oct. 11, 2019). Moreover, the Court is not

obligated to make a preliminary determination on such a motion. *Church Mut. Ins. Co. v. Coutu*, No. 17-CV-00209-RM-NYW, 2017 WL 3283090, at \*3 (D. Colo. Aug. 2, 2017) ("[N]o element of the *String Cheese* factors requires that this court make a preliminary determination as to the likelihood of success of either the dispositive motion or the ultimate merits of the case."). That said, the Court finds the second factor does support the imposition of a brief stay pending resolution of Defendants' motion to dismiss, because of the apparent strength of the pending motion (which the Court only preliminarily assesses) and the fact that Defendants' motion could be entirely dispositive. *See* *Morrill v. Stefani*, No. 17-cv-00123-WJM-KMT, 2017 WL 1134767, at \*2 (D. Colo. Mar. 13, 2017) (finding plaintiff's interest in proceeding expeditiously with the case was overcome by the potential burden to the defendants "if they were forced to proceed with discovery only to have the case dismissed for lack of jurisdiction"); *see also* *String Cheese Incident, LLC v. Stylus Shows, Inc.*, No. 02-cv-01934-LTB-PAB, 2006 WL 894955, at \*2 (D. Colo. Mar. 30, 2006) ("[S]ubjecting a party to discovery when a motion to dismiss for lack of personal jurisdiction is pending may subject him to undue burden or expense, particularly if the motion to dismiss is later granted."). Under these circumstances, requiring the parties to submit to full discovery at this time would subject Defendants to undue burden and expense if this case is ultimately dismissed. To be sure, the Court is not saying that all dismissal arguments automatically warrant a stay, but in this case, under these circumstances, and in light of the arguments made in the pending motion to dismiss, the Court finds the burden on Defendants could be substantial and undue, in the absence of a stay. Accordingly, the second factor weighs in favor of a stay.

### III. Remaining Factors

**\*6** Looking to the remaining *String Cheese* factors, the third factor (court convenience) and the fifth factor (public interest) also weigh in favor of a stay. Indeed, judicial economy and resources would be wasted if the Court allowed discovery to proceed, only to later determine that this case must be dismissed in its entirety. *See* *Skyline Potato Co. v. Rogers Bros. Farms, Inc.*, No. 10-cv-02353-WJM-KLM, 2011 WL 587962, at \*2 (D. Colo. Feb. 10, 2011) ("[T]he Court notes that neither its nor the parties' time is well-served by being involved in the 'struggle of the substance of suit' when potentially dispositive issues are adjudicated at the outset of a case."). And while the public has an interest in seeing constitutional violations redressed, it also has an interest in the appropriate allocation of judicial resources and the

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.609 Filed 03/26/26 Page 189 of 194

Sgaggio v. Diaz, Not Reported in Fed. Supp. (2023)

prioritization of matters. This is—in part—why courts should have broad discretion in determining whether to grant a motion to stay.

The fourth factor concerns the interests of persons not parties to the litigation. Here, there are several witnesses who will likely have to be deposed. The burden on them is not insubstantial because the preparation and the deposition itself can be time-consuming. *See generally Hay v. Family Tree, Inc.*, No. 16-cv-03143-CMA-KLM, 2017 WL 2459777, at *2 (D. Colo. June 6, 2017) (finding the fourth factor to weigh in favor of a stay, where discovery was likely to "involve significant efforts concerning others who are not parties to th[e] lawsuit"). That said, two of those witnesses, Mr. Aguilera and Ms. Casias, are Mr. Sgaggio's family members and may have an interest in seeing this matter proceed. Because this factor could be weighed in either direction, the Court finds it to be neutral.

On this record, then, having weighed the appropriate factors and found that three weigh in favor of a stay, one weighs against it, and another is neutral, the Court finds a temporary stay of discovery is warranted.

**CONCLUSION**

For the foregoing reasons, **IT IS ORDERED THAT**:

(1) The "Defendants' Motion for Stay of Discovery Pending Ruling on Motion to Dismiss" (Doc. No. 14) is **GRANTED**.

(2) Discovery in this matter is **STAYED** pending a ruling on Defendants' Motion to Dismiss. (Doc. No. 12.)

(3) The parties **SHALL** file a joint status report within ten (10) days of a final ruling on the outstanding motion to dismiss, if any portion of the case remains, to advise whether a scheduling conference should be set.

(4) The Clerk is hereby directed to send a copy of this Order to:

Delbert Elmer Sgaggio, Jr

1850 North Academy Boulevard

Colorado Springs, CO 80909

**All Citations**

Not Reported in Fed. Supp., 2023 WL 22188

---

**Footnotes**

1    Mindful of Plaintiff's *pro se* status, the Court "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted); *see Haines v. Kerner*, 404 U.S. 519, 520–21 (1972) (holding the allegations of a *pro se* complaint "to less stringent standards than formal pleadings drafted by lawyers").

2    Mr. Sgaggio attaches an order issued by the Honorable Nina Y. Wang denying a stay of discovery in a different case. (["Order"] Doc. No. 21-1.) Mr. Sgaggio states that he agrees "with the arguments in this order[.]" (Doc. No. 21 at 2.) The Court has reviewed the Order, which was issued in a putative class action brought against officers from the Aurora Police Department and the Jefferson County Sherriff's Office, alleging violations of plaintiffs' first amendment rights "during a violin vigil [p]laintiffs organized and/or attended in Elijah McClain's memory on June 27, 2020 in Aurora, Colorado." (Doc. No. 21-1 at 3.) In her Order, Judge Wang finds that the invocation of qualified immunity did not in and of itself warrant a stay. (*Id.* at 12.) The Court agrees with Judge Wang on that point. A stay is not automatically warranted every time a defendant raises qualified immunity. Judge Wang then went on to apply the *String Cheese* factors and determined that in that particular case, under those particular circumstances, a stay was appropriate. This Court will also apply the *String Cheese* factors, and although it is guided by Judge Wang's Order and other orders applying the *String Cheese* factors,

it notes that courts are afforded broad discretion on the question of whether to issue a stay. Because every case is different, the outcome in one case will not necessarily determine the outcome in another case, even if the claims are similar or even identical.

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.611 Filed 03/26/26 Page 191 of 194

Tribula v. SPX Corp., Not Reported in Fed. Supp. (2009)

2009 WL 87269
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Christopher TRIBULA, Plaintiff,
v.
SPX CORP., Defendant.

Civil Action No. 08–CV–13300–DT.
|
Jan. 12, 2009.

West KeySummary

1    **Witnesses** 👈 Documents; subpoena duces tecum

Employee showed good cause to quash employer's subpoena, served on university, seeking employee's educational records, in employee's Family and Medical Leave Act (FMLA) cause of action against employer. Employer argued that the records were likely to lead to the discovery of admissible evidence because employee admitted to an evaluating physician that he was under stress trying to work and go to school at the same time. This factor was insufficient to establish that employee's educational records were likely to lead to admissible evidence.

4 Cases that cite this headnote

**Attorneys and Law Firms**

Charles Gottlieb, Gottlieb & Goren, Bingham Farms, MI, for Plaintiff.

Anne-Marie Vercruysse Welch, Daniel J. Bretz, Jennifer M. Buckley, Clark Hill, Detroit, MI, for Defendant.

*OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO QUASH SUBPOENAS*

MONA K. MAJZOUB, United States Magistrate Judge.

**\*1** This matter comes before the Court on Plaintiff's Motion to Quash Subpoenas. (Docket no. 11). Defendant has responded. (Docket no. 15). Plaintiff filed a Reply brief. (Docket no. 16) The parties also filed a Statement of Resolved and Unresolved Issues. (Docket nos. 17, 18). This motion was referred to the undersigned for decision. (Docket no. 12). The Court dispenses with oral argument pursuant to E.D. Mich. LR 7.1(e). Plaintiff's Motion is now ready for ruling.

**1. Facts and Claims**
Plaintiff alleges in his Complaint that he was wrongfully terminated by Defendant in violation of the Family and Medical Leave Act (FMLA) on November 13, 2007. (Docket no. 1). Defendant contends that Plaintiff was terminated for failing to provide the requested medical documentation to support his continued leave request. (Docket no. 15 at 5). By this motion Plaintiff seeks to quash 9 subpoenas served by Defendant on August 21 and 22, 2008. Most of these subpoenas went to former employers of Plaintiff. One subpoena went to the school that Plaintiff was attending when he was employed by Defendant. The final subpoena went to U.S. army TACOM which was possibly a subsequent employer of Plaintiff. The parties disagree on whether Plaintiff worked for this entity. (Docket no. 17 at 2).

There are procedural irregularities on both sides of this motion. First, Plaintiff states in the Facts section of his motion that Defendant served these subpoenas before the parties conferred for a discovery conference pursuant to Fed.R.Civ.P. 26(f). (Docket no. 11 at 4). Defendant does not dispute this allegation. This is a violation of Fed.R.Civ.P. 26(d)(1) because there was no stipulation or court order allowing such premature discovery. However, Plaintiff does not rely on this violation as an argument to quash the subpoenas. (Docket no. 11 at 4–6). Second, Plaintiff is moving to quash these subpoenas under Fed.R.Civ.P. 26(b) because "they are not relevant and not reasonably calculated to lead to the discovery of admissible evidence pursuant to Fed.R.Civ.P. 26(b)(1)."[1] (*Id.* at 3–4). However, Rule 26(b) does not provide any authority for the Court to quash subpoenas. Parties generally object to or seek to quash subpoenas pursuant to either Rule 26(c) (protective orders) or Rule 45(c) (objections to and quashing or modifying subpoenas). Defendant does not raise this irregularity as a reason to deny Plaintiff's motion, however. (Docket no. 15). Because the parties are not seeking

relief based on either of these irregularities, the Court will consider the merits of Plaintiff's motion.

### 2. Governing Law

Although Fed.R.Civ.P. 26(b) does not provide a basis for granting the relief sought by Plaintiff, Rule 26(c) does provide such a basis. Rule 26(c), Fed.R.Civ.P., allows the Court to enter a protective order "for good cause" to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including forbidding the disclosure or discovery and limiting the scope of disclosure to certain matters. A showing that the proposed discovery is irrelevant can satisfy the "good cause" requirement of Rule 26(c). *See Auto–Owners Ins. Co. v. Southeast Floating Docks, Inc.,* 231 F.R.D. 426, 429 (M.D.Fla.2005); *see also In re REMEC, Inc. Sec. Litig.,* 2008 WL 2282647, slip op. at *1 (S.D.Cal. May 30, 2008); *McCurdy v. Wedgewood Capital Mgmt. Co. .,* 1998 WL 964185, slip op. at *8 (E.D.Pa. Nov. 16, 1998); *Smith v. Dowson,* 158 F.R.D. 138, 140 (D.Minn.1994). In addition, a court may deem a motion to quash as a motion for a protective order. *Auto–Owners Ins. Co.,* 231 F.R.D. at 429. Plaintiff's Motion to Quash will therefore be construed to be a motion for a protective order pursuant to Fed.R.Civ.P. 26(c).

### 3. Analysis

#### a. US Army TACOM

**\*2** The parties disagree on whether Plaintiff worked for the Army Tank Command. (Docket no. 17 at 2). If Plaintiff did work for this entity it was subsequent to his employment by Defendant. (Docket no. 15 ex. 7) (Plaintiff reportedly working for the Command in April 2008 after termination by Defendant in November 2007). The parties have agreed that Defendants can subpoena the records of subsequent employers from whom Plaintiff's employment has been terminated. (Docket no. 17 at 2). Because this agreement apparently includes this entity if Plaintiff was indeed employed by it, the Court will not quash this subpoena.

#### b. National Personnel Records Center, ZF Sacks Automotive of America, Valeo, Inc., Continental Teves, and Total Performance

These five entities employed Plaintiff before his employment with Defendant or, with respect to the Personnel Records Center, may have information regarding Plaintiff's military experience prior to his employment with Defendant. Defendant generally seeks all employment records of Plaintiff

from these entities. Defendant argues that information about Plaintiff's past employment history is likely to reveal that Plaintiff was not qualified for his position with Defendant which will form the basis for its after acquired evidence defense. (Docket no. 15 at 10). Defendant would use this defense to reduce an award of damages. (*Id.*). In order to qualify under this defense, the information must be of such severity "that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *McKennon v. Nashville Banner Publ'g Co.,* 513 U.S. 352, 362–63, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995).

The records in this action show that Defendant was aware at the time it hired Plaintiff that these entities were former employers of Plaintiff or, in the case of the Army records, that the entity may possess such records. Plaintiff's employment application (docket no. 15 ex. 6) reveals his past employment with Sacks Automotive, Valeo Inc., and Continental Teves. Plaintiff's resume, which Defendant now admits it possessed at the time Plaintiff was hired (docket no. 18 at 1–2), reveals his past military experience in the Army from 1984 through 1987 and his Army Reserve and National Guard experience from 1987 until 1998. (Docket no. 18 ex. 1). Plaintiff's resume also reveals that Total Performance was a previous employer, along with Sachs Automotive, Valeo Systems, and Continental. (*Id.*).

Defendant fails to allege any specific information which might come from these entities that could rise to the level of severity necessary for the after acquired evidence defense, except possibly for Plaintiff's past military records. Defendant argues that Plaintiff was reprimanded and jailed while working for the Army. (Docket no. 15 at 13). Just as for the other past employers, Defendant knew about Plaintiff's military experience before it hired Plaintiff. [2]

The Supreme Court has cautioned that discovery into past employment for the purpose of obtaining evidence to support an after acquired evidence defense is a "concern" that is "not an insubstantial one," but that the Federal Rules may be invoked to "deter most abuses." *McKennon,* 513 U.S. at 363. Defendant had the ability to obtain and should have evaluated any information which might rise to the level of an after acquired evidence defense from these former employers of Plaintiff before it terminated Plaintiff's employment. *See Miller v. AT & T,* 83 F.Supp.2d 700, 705 (S.D.W.Va. Jan.31, 2000) (before making decision to terminate an employee the employer should evaluate all

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.613 Filed 03/26/26 Page 193 of 194

Tribula v. SPX Corp., Not Reported in Fed. Supp. (2009)

information in its possession pertaining to the employee and should be required to make determination regarding all potentially adverse information). Because Defendant could have earlier obtained the information it now seeks from Plaintiff's former employers, and because Defendant has cited no specific qualifying information for its defense being held by these employers, Plaintiff has shown good cause to quash the subpoenas served on ZF Sacks Automotive, Valeo, Inc., Continental Teves, and Total Performance. Because Defendant has shown that the subpoena served on the National Personnel Records Center for Plaintiff's military records is reasonably calculated to lead to admissible evidence, the Court will not quash that subpoena.

### c. Northwood University

**\*3** Defendant served a subpoena on Northwood University for all records on Plaintiff. (Docket no. 15 ex. 4). Plaintiff revealed that he was currently a student on his application form that he submitted to Defendant. (*Id.* ex. 6). He did not specify that he was attending Northwood University, but Defendant obviously could have obtained this information if it wished to do so. Defendant argues that these records are likely to lead to the discovery of admissible evidence because Plaintiff admitted to an evaluating physician that he was under stress trying to work and go to school at the same time. (Docket no. 17 at 7). Defendant also notes that Plaintiff took 16 weeks of vacation, sick, and FMLA leave in 2007. (*Id.*). These two factors are insufficient to establish that Plaintiff's educational records are likely to lead to admissible evidence. Therefore, Plaintiff has shown good cause to quash this subpoena.

### d. Utica Transit Mix and Supply Co. and Adecco Employment Services

Plaintiff has not shown that he revealed these two former employers to Defendant at the time he was hired. His employment application for Defendant asked him to list his entire employment history, and he failed to do so. (Docket no. 15 ex. 6). Plaintiff's resume also failed to list these two former employers. (Docket no. 18 ex. 1). Defendant therefore cannot be blamed for not obtaining information from these employers when Defendant was considering hiring Plaintiff. Defendant argues that Plaintiff's omission of these previous employers suggests that he had a reason not to reveal them. (Docket no. 15 at 7). Plaintiff has failed to establish good cause to quash these two subpoenas.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Quash Subpoenas is **GRANTED** to the extent that Defendant's subpoenas served on ZF Sacks Automotive of America, Valeo, Inc., Continental Teves, Total Performance, and Northwood University are quashed, and is otherwise **DENIED.**

### NOTICE TO THE PARTIES

Pursuant to Fed.R.Civ.P. 72(a), the parties have a period of ten days from the date of this Order within which to file any written appeal to the District Judge as may be permissible under 28 U.S.C. 636(b)(1).

### All Citations

Not Reported in Fed. Supp., 2009 WL 87269

---

### Footnotes

1    Plaintiff argues that Defendant is on a "fishing expedition." Defendant argues that information from Plaintiff's past employers is relevant to its after-acquired evidence defense and to Plaintiff's claims for damages, the duty to mitigate, and Plaintiff's credibility on the issues of wage loss and ability to obtain and retain employment. (Docket no. 17 at 4).

2    The issues of back pay, front pay, and mitigation of damages are much more dependent on Plaintiff's employment history after Defendant terminated him. Defendant's attempts to discover information from Plaintiff's former employers and schools are not reasonably calculated to lead to the discovery of admissible evidence on these issues.

Case 2:24-cv-10216-TGB-DRG ECF No. 35-1, PageID.614 Filed 03/26/26 Page 194 of 194

Tribula v. SPX Corp., Not Reported in Fed. Supp. (2009)

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.